**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KENNETH FERENCE, | ELECTRONICALLY FILED |
| Plaintiff, | |
| | No. 2:22-cv-00797-MPK |
| vs. | |
| | Magistrate Judge Maureen P. Kelly |
| ROMAN CATHOLIC DIOCESE OF GREENSBURG, | |
| Defendant. | JURY TRIAL DEMANDED |

**BRIEF SUPPORTING RULE 12(b)(6) MOTION TO DISMISS**

I.     **Introduction**

The Roman Catholic Diocese of Greensburg ("Diocese") hired Kenneth Ference ("Plaintiff") in the summer of 2021 to serve as a Catholic school teacher.  Plaintiff signed multiple documents acknowledging that, as a Catholic school teacher, he: was considered church personnel; recognized the religious nature of his employer and position; could be terminated for violating Catholic doctrine, including Catholic beliefs regarding homosexuality and marriage; would serve the purpose of Catholic ministry within classroom and extracurricular instruction; and would have to comport his behavior with canon law and the code of pastoral conduct.

Plaintiff waived his ability to receive medical benefits from Diocese.  In doing so, he disclosed that he was married to a man.  The Diocese then terminated Plaintiff. Plaintiff claims that Diocese wrongfully terminated him under Title VII due to his sexual orientation.  If Diocese was a secular school, Plaintiff's claim would be colorable.  But Diocese's religious status exempts it from Title VII's prohibition of discrimination based on failure to comport with Diocese's religious views.  Two doctrines connected to the First Amendment also preclude Plaintiff's suit: church autonomy and the ministerial

exception.  Finally, the Religious Freedom Restoration Act ("RFRA") forbids Plaintiff from using the federal judiciary as a coercive instrument to overcome Diocese's sincerely held religious beliefs on sexuality and marriage.

The Court should grant Diocese's Rule 12(b)(6) motion and dismiss Plaintiff's Title VII suit with prejudice.

## II.  **Background**

Plaintiff was hired as a teacher in August 2021 at Aquinas Academy ("Aquinas") by Diocese.  (ECF No. 1 ¶ 6.)  He completed "several standard employment forms" as part of the hiring process.  (Id. ¶¶ 7–8.)  Plaintiff did not attach those documents to his complaint.

Plaintiff signed a professional services agreement with Diocese so he could be hired as a teacher.  (Ex. A.)  In that contract, Plaintiff "recognize[d] the religious nature of the Catholic school and agree[d]" that the Diocese had the right to dismiss him "for immorality, scandal, or rejection of the official teaching, doctrine[,] or laws of the Roman Catholic Church[.]"  (Ex. A ¶ 1k.)  He additionally acknowledged that he could be immediately terminated for violating "the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality."  (Id. ¶ 1l.)

An appendix attached to the professional services agreement further described Plaintiff's role as a teacher for the Diocese.  (Ex. A App'x A.)  Teachers at Diocese must "serve[] the school in this Catholic Ministry within instructional and extra-curricular capacities . . . ."  (Id.)  They further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students in a Christ-like manner . . . ."  (Id.)  The requirements of being a teacher for Diocese include having "an understanding and

acceptance of Catholic School Philosophy, goals, and objectives," abiding "by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church." (Id.)  Plaintiff accepted the Diocese's teacher job description and signed the appendix to the professional services agreement. (Id.)

Plaintiff also signed a form acknowledging his receipt of the Diocese's code of pastoral conduct. (Ex. B.)  Plaintiff, via that form, stated

> [i]n accord with my role as Church personnel, and in witness to the Gospel of Jesus Christ, I will conduct myself with integrity, acting in a manner that is consistent with the discipline and teachings of the Catholic Church.  I will guide my behavior by civil and canon law, by the policies of the Diocese of Greensburg and by the Code of Pastoral Conduct by . . .
>
> 1. Respecting the rights of each person and advancing his or her welfare during the course of counseling, advising or spiritual direction.
>
> 2. Holding in the strictest confidence information disclosed during the course of counseling, advising or spiritual direction . . . .

(Id.)    By executing that form, Plaintiff acknowledged that he "carefully read, underst[ood], and hereby commit[ted] to conducting myself in accord with the Diocesan Code of Pastoral Conduct." (Id.)

Plaintiff asserts that he only taught secular subjects at Aquinas and Diocese did not allow him to provide religious education to its students because he is Lutheran. (ECF No. 1 ¶¶ 15–16, 23.)  According to Plaintiff, he attended church services at Aquinas "only to monitor the students' behavior" as another teacher "took the lead at church services with any rituals and religious materials." (Id. ¶¶ 17–19.)  The school day at Aquinas began and concluded with prayers over the public address system.  (Id. ¶¶ 20–21.)  But according to Plaintiff, he "had no role in facilitating th[o]se prayers." (Id. ¶ 22.)

Plaintiff designated a "[f]riend" as his contingent beneficiary for the life insurance plan that Diocese provided to Plaintiff.  (Ex. C.)  About a week later, Plaintiff indicated that this "friend" was actually his husband when Plaintiff elected to waive the Diocese's health care benefits.  (Ex. D; ECF No. 1 ¶ 11.)  Diocese, according to Plaintiff, fired him "because he is in a same-sex relationship."  (ECF No. 1 ¶ 25.)  Plaintiff contends that Diocese learned about his same-sex relationship by disclosing that he had a husband on a form waiving the Diocese's health care benefits.  (Id. ¶ 26; Ex. D.)

### III.  <u>Standard of Review</u>

A Rule 12(b)(6) motion to dismiss assesses the complaint's legal sufficiency.  <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993).  To survive a Rule 12(b)(6) motion, plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief that is plausible on its face.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  Courts must accept all well-pled factual allegations as true and view them in the light most favorable to the plaintiff.  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009); <u>DiCarlo v. St. Marcy Hosp.</u>, 530 F.3d 255, 262–63 (3d Cir. 2008).

Complaints must state plausible claims to withstand a Rule 12(b)(6) motion; the complaint's factual allegations must be enough to raise a right to relief above mere speculation.  <u>Twombly</u>, 550 U.S. at 555.  A claim is facially plausible when the plaintiff pleads factual content allowing the court to reasonably infer the defendants' liability for the alleged misconduct.  <u>Iqbal</u>, 556 U.S. at 678.  A plausible inference, arising from a complaint's well-pled facts, is not enough to entitle the plaintiff to relief.  <u>Id.</u> at 682.  That inference, to be plausibly justified, must be supported with facts in the complaint.  <u>Id.</u>

"[A] motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011). Although a complaint's allegations must be taken as true when a court considers a Rule 12(b)(6) motion, a court is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

District courts, "[i]n deciding a Rule 12(b)(6) motion . . . must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). District courts "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Ben. Guar. Corp. v. White Consol. Industries, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). This rule prevents plaintiffs from shielding legally deficient claims from motions to dismiss "by failing to attach a dispositive document on which" they relied. Id.

## IV.    **Argument**

Diocese is an ecclesiastical entity, charged with the responsibility, *inter alia*, of teaching the Catholic Faith within its territorial boundaries. It is governed by the Roman Catholic Code of Canon Law, and by ecclesiastical statutes and other enactments adopted by the competent ecclesiastical authorities within the Catholic Church.

The Roman Catholic Church believes that its schools are the principal means for transmitting the Catholic Faith to new generations of Catholics. Catholic schools do not

segment their functions into religious and secular components; at all times, the Catholic school is engaged in the process of catechesis and the formation of the Christian personality, a process which is integrated within the curriculum of the Catholic schools.

Civil courts have repeatedly recognized that Catholic schools, unlike public or nonsectarian schools, exist for a religious mission to which everything in the life and operation of the school is subordinate. Moreover, the U.S. Supreme Court has repeatedly defined Catholic schools, not as secular off-shoots of the Church, but as the Church itself. Lemon v. Kurtzman, 403 U.S. 602 (1971); Meek v. Pittenger, 421 U.S. 349 (1975); Tilton v. Richardson, 403 U.S. 672 (1971); Aguilar v. Felton, 473 U.S. 402 (1985). The characteristics of Catholic schools most frequently relied upon by the Supreme Court and other courts in discussing the religious nature of these entities all apply to Aquinas and the Diocese. As an integral part of the religious teaching ministry of the Roman Catholic Church and the Diocese, Aquinas:

a. is a religious enterprise and is conducted as "an integral part of the religious mission" of the Catholic Church. Lemon, 403 U.S. at 618; Meek, 421 U.S. at 366;

b. is an institution whose substantial, if not dominant, purpose is to inculcate Catholic religious values. Tilton, 403 U.S. at 685;

c. is an institution in which religion is so pervasive that a substantial portion of its function is subsumed in the religious mission of its sponsoring parish, which is the only reason for the School's existence. Meek, 421 U.S. at 366;

d. is an institution whose affirmative, if not dominant, policy of instruction for school children is to assure future adherents to the Catholic faith by

having control of their education at an early age.  <u>Tilton</u>, 403 U.S. at 685–86;

e.  carries on religious activities, including instruction and worship, prayer and Catholic Christian witness.  <u>Lemon</u>, 403 U.S. at 618;

f.  conducts and sponsors religiously oriented extracurricular activities for faculty and students.  <u>Lemon</u>, 403 U.S. at 615;

g.  is housed in a building whose exteriors contain identifying religious symbols, and whose interiors, such as classrooms and hallways, contain Catholic religious symbols, as well as inspirational quotations from Scripture and other religious doctrinal sources.  <u>Lemon</u>, 403 U.S. at 615;

h.  is an institution which has an atmosphere in which religious instruction and religious vocations are integrated into the total educational function.  <u>Lemon</u>, 403 U.S. at 615;

i.  is an institution which is a vehicle for transmitting the Catholic faith to the next generation.  <u>Lemon</u>, 403 U.S. at 616;

j.  conducts regular religious services and exercises.  <u>Lemon</u>, 403 U.S. at 615;

k.  employs teachers and other employees who are subject to the direction and discipline of religious authority which necessarily pervades the school and who are required to subscribe to the School's doctrinal statements, and conform themselves, both on and off campus, to high standards of Catholic Christian behavior.  <u>Lemon</u>, 403 U.S. at 617–18; <u>Meek</u>, 421 U.S. at 371; and <u>Little v. Wuerl</u>, 929 F.2d 944, 948 n.6 (3d Cir. 1991);

l.  employs teachers and other employees who work in a school which is operated to inculcate the tenets of the Catholic religion and which is

dedicated to rearing children in that faith.  <u>Lemon</u>, 403 U.S. at 618; <u>Meek</u>, 421 U.S. at 371;

m. employs teachers and other employees who are responsible by their teaching and conduct to impart the Word of God, and the principles of the Catholic faith.  <u>Grand Rapids Sch. Dist. v. Ball</u>, 473 U.S. 373, 379 (1985);

n. employs teachers who are expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They do so by, *inter alia*, praying with their students, attending Mass with the students, and preparing the children for their participation in other religious activities.  <u>Our Lady of Guadalupe Sch. v. Morrissey-Berru</u>, 140 S.Ct. 2049, 2066 (2020);

o. does not divide instruction into "religious" and "secular" components, the entire ongoing life of the church-school community being religious.  <u>Meek</u>, 421 U.S. at 366;

p. operates as a "faith community" with all persons therein being expected to provide Catholic Christian nurture and to encourage, by work and action, reverence for and adherence to Catholic religious principles.  <u>McCormick v. Hirsch</u>, 460 F. Supp. 1337, 1352 (M.D. Pa. 1978).

As summarized by the Supreme Court, the "raison d'etre" of Diocesan Church schools "is the propagation of a religious faith."  <u>NLRB v. Catholic Bishop of Chicago</u>, 440 U.S. 490, 503 (1979).

**A.      Title VII's Exemptions Cover Diocese's Decision to Terminate Plaintiff Because He is Married to a Man**

The Diocese cannot be liable under Title VII for terminating Plaintiff because he is married to a man.  This conclusion follows from Title VII's text and precedential case law interpreting Title VII.

Title VII defines religion as "all aspects of religious observance and practice, as well as belief . . . ."  42 U.S.C. § 2000e(j).  While Title VII usually prohibits religion-based employment discrimination, two exemptions explicitly permit such discrimination.  First, Title VII's prohibition of religion-based discrimination does not apply "to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."  42 U.S.C. § 2000e-1(a); see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 329 (1987) (holding that 42 U.S.C. § 2000e-1(a) "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion."). Second, Title VII does not prohibit a religious educational institution from hiring

> employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

Precedential case law permits religious organizations to discriminate in employment decisions on the basis of religion. The United States Court of Appeals for the Third Circuit ("Third Circuit") construed the above provisions and held that

> Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's "religious activities." Against this background and with sensitivity to the constitutional concerns that would be raised by a contrary interpretation, we read the exemption broadly. We conclude that the permission to employ persons "of a particular religion" includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles.

Wuerl, 929 F.2d at 951 (holding that Title VII's exemptions protected a parish's decision to not rehire a teacher who remarried without the new marriage being validated by the Catholic Church).

This Court is bound by Wuerl and must apply it to Plaintiff's case. According to Plaintiff, Diocese fired him because it found out that he is married to a man. (ECF No. 1 ¶¶ 25–26; Ex. D.) Plaintiff acknowledged the religious nature of his employer by signing employment forms that, among other things, indicated he was "Church" personnel, could be fired for violating Church laws on marriage and espousing views contrary to the Church's on homosexuality. (Exs. A–B.) Thus, assuming Diocese fired Plaintiff from his teaching position because he is married to a man, that is legal under Title VII as Plaintiff's conduct contradicted Diocese's religious principles. (ECF No. 1 ¶¶ 25–26; Exs. A–B, D); Wuerl, 929 F.2d at 951. Title VII's religious exemptions create an

exemption to all forms of discrimination under Title VII, not just religious discrimination claims, so long as the employment decision was rooted in religious belief. Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 141 (3d Cir. 2006); EEOC v. Mississippi College, 626 F.2d 477 (5th Cir. 1980); Maguire v. Marquette Univ., 627 F. Supp. 1499 (E.D. Wis. 1986), aff'd in part on other grounds, vacated in part, 814 F.2d 1213 (7th Cir. 1987); Bear Creek Bible Church & Braidwood Mgmt., Inc., v. EEOC, 2021 WL 5449038, *6 (N.D. Tex. Oct. 31, 2021) ("The plain text of this exemption, therefore, is not limited to religious discrimination claims; rather, it also exempts religious employers from other forms of discrimination under Title VII, so long as the employment decision was rooted in religious belief."); Starkey v. Archdiocese of Indianapolis, 2022 WL 2980350 (7th Cir. 2022) (Easterbrook, J., concurring) ("The Diocese is a religious association, and the high school is a religious educational institution.  Any temptation to limit this exception to authorizing the employment of co-religionists, and not any other form of religious selectivity, is squelched by the definitional clause in § 2000e(j), which tells us that religion includes "all aspects of religious observance and practice, as well as belief").

The Court should grant Diocese's motion to dismiss with prejudice.

### B.     The Church Autonomy Doctrine Precludes Plaintiff's Title VII Claim Because First Amendment Concerns Override Title VII's Prohibition of Sexual Orientation Discrimination

Should the Court refuse to apply Wuerl, it should instead apply the church autonomy doctrine to dismiss Plaintiff's Title VII claim with prejudice.  The church autonomy doctrine springs from the First Amendment.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. CONST.

amend. I.  The Supreme Court of the United States ("Supreme Court") has long warned

against entanglements between government and religion that produce "confrontations

and conflicts" between government and churches.  Walz v. Tax Comm'n, 397 U.S. 664,

674 (1970).  Over 150 years ago, the Supreme Court explained the basis of the church

autonomy doctrine:

> "it is a very different thing where a subject-matter of dispute,
> strictly and purely ecclesiastical in its character, a matter
> over which the civil courts exercise no jurisdiction, in a
> matter which concerns theological controversy, church
> discipline, ecclesiastical government, or the conformity of
> the members of the church to the standard of morals
> required of them, becomes the subject of its action.  It may
> be said here, also, that no jurisdiction has been conferred on
> the tribunal to try the particular case before it, or that, in its
> judgment, it exceeds the powers conferred upon it, or that
> the laws of the church do not authorize the particular form of
> proceeding adopted; and, in a sense often used in the courts,
> all of those may be said to be questions of jurisdiction.  But it
> is easy to see that if the civil courts are to inquire into all
> these matters, the whole subject of the doctrinal theology,
> the usages and customs, the written laws, and fundamental
> organization of every religious denomination may, and must,
> be examined into with minuteness and care, for they would
> become, in almost every case, the criteria by which the
> validity of the ecclesiastical decree would be determined in
> the civil court.  This principle would deprive these bodies of
> the right of construing their own church laws, would open
> the way to all the evils which we have depicted as attendant
> upon the doctrine of Lord Eldon, and would, in effect,
> transfer to the civil courts where property rights were
> concerned the decision of all ecclesiastical questions."

Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713–14 (1976) (quoting

Watson v. Jones, 80 U.S. 679, 733–34 (1872)).

The church autonomy doctrine (also known as the ecclesiastical abstention doctrine or religious autonomy) precludes claims challenging religious organizations' personnel decisions if "the alleged misconduct is 'rooted in religious belief.'" Bryce v. Episcopal Church in Diocese of Colorado, 289 F.3d 648, 657–58 (10th Cir. 2002) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)). The Religion Clauses of the First Amendment "protect[] a religious group's right to shape its own faith and mission through its appointments" and "prohibit[] government involvement in such ecclesiastical decisions." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 188–89 (2012); Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952); Serbian Eastern Orthodox Diocese, 426 U.S. at 709; Watson, 80 U.S. at 733 (Thus, matters that concern church discipline or "the conformity of members of the church to the standard of morals required of them" are matters "strictly and purely ecclesiastical in its character . . . over which the civil courts exercise no jurisdiction.").

The church autonomy doctrine applies when resolution of a case would require a court to decide a religious dispute, answer a religious question, or decide the meaning or application of church rules or processes. Catholic Bishop of Chicago, 440 U.S. at 502 ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); Wuerl, 929 F.2d at 949; Demkovich v. St. Andrew the Apostle Parish, 3 F.4th 968, 975–77 (7th Cir. 2021) (en banc); Garrick v. Moody Bible Inst., 412 F. Supp. 3d 859, 868–69, 871–72 (N.D. Ill. 2019); Curay-Cramer, 450 F.3d 130; Bryce, 289 F.3d at 655–59. If Title VII were construed to apply to Diocese for terminating a teacher at its private Catholic school because that teacher violated

13

Catholic principles, the federal government would be contradicting the church autonomy doctrine by controlling or manipulating the religious-based employment decisions of private Catholic schools.  Kedroff, 344 U.S. at 116; Wuerl, 929 F.2d at 948–49; Catholic Bishop of Chicago, 440 U.S. at 502; Curay-Cramer, 450 F.3d at 138–39; Bryce, 289 F.3d at 657–58; Butler v. St. Stanislaus Kostka Catholic Academy, 2022 WL 2305567 (E.D.N.Y. 2022) ("The ministerial exception is not, however, the only mechanism limiting secular courts' intrusion into the employment decisions of religious institutions.  The ministerial exception derives from, and is but one manifestation of, a broader (and well-settled) principle expressed in Supreme Court and Second Circuit jurisprudence—the principle of "church autonomy."  This principle is process-oriented: it cabins a court's authority to interfere in a religious organization's "independence in matters of faith and doctrine and in closely linked matters of internal government," Our Lady of Guadalupe, 140 S. Ct. at 2061, even outside the discrimination context.").

The Third Circuit recognizes that the First Amendment's Establishment Clause prevents "excessive government entanglement with religion" while the First Amendment's Free Exercise Clause "protects not only the individual's right to believe and profess whatever religious doctrine one desires, but also a religious institution's right to decide matters of faith, doctrine, and church governance." Petruska v. Gannon Univ., 462 F.3d 294, 306, 311 (3d Cir. 2006) (internal citation and quotation marks omitted).  Federal courts may only adjudicate disputes turning "on a question devoid of doctrinal implication" and that "employ neutral principles of law to adjudicate." Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc., 684 F.3d 413, 418–19 (3d Cir. 2012).  Nor should federal courts "pars[e] the precise reasons" for a church employee's termination if doing so "would

intrude on internal church governance [and] require consideration of church doctrine . . . ." <u>Lee v. Sixth Mount Zion Baptist Church of Pittsburgh</u>, 903 F.3d 113, 121–22 (3d Cir. 2018).

Plaintiff seeks to hold Diocese liable for terminating him because he is married to a man. (ECF No. 1 ¶¶ 25–26.) Yet, Plaintiff contradictorily recognized Diocese's anti-homosexuality and anti-same-sex-marriage religious beliefs when he signed his professional services agreement and acknowledgment of receipt of the code of pastoral conduct. (Exs. A–B.) If the Court rules in Plaintiff's favor, it will force Diocese to employ teachers in its Catholic schools whose conduct violates Catholic religious precepts or will penalize Diocese for not employing such teachers. Such a result would eviscerate the First Amendment of the United States Constitution.

The Court should grant Diocese's motion to dismiss via the church autonomy doctrine and dismiss Plaintiff's Title VII suit with prejudice.

## C.   Plaintiff's Title VII Claim Fails as a Matter of Law Under the Ministerial Exception

The Court should dismiss Plaintiff's Title VII claim with prejudice because it is not cognizable per the ministerial exception. The Supreme Court recently discussed the ministerial exception in two cases.

First, in <u>Hosanna-Tabor</u>, the Supreme Court recognized that "it is impermissible for the government to contradict a church's determination of who can act as its ministers." <u>Hosanna-Tabor</u>, 565 U.S. at 185. "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so," violates the Free Exercise and Establishment Clauses. <u>Id.</u> at 188–89, 194–95. The ministerial exception "is not limited to the head of a religious congregation . . . ." <u>Id.</u> at 190. Nor does the ministerial

exception only apply to individuals that exclusively perform religious functions.  Id. at 193.

The Supreme Court has not created "a rigid formula for deciding when an employee qualified as a minister." Id. at 190.  It held in Hosanna-Tabor that the ministerial exception applied to a teacher at a Lutheran school for kindergarteners through eighth graders. Id. at 177–78, 190.  In making that decision, the Supreme Court noted several facts.  The teacher was held out as a minister in a role distinguished from most of the church's members. Id. at 191.  To become a minister, the teacher undertook "a significant degree of religious training followed by a formal process of commissioning." Id.  The teacher accepted the church's "formal call to religious service, *according to its terms*." Id. (emphasis added).  And her job duties reflected her role in "conveying the [c]hurch's message and carrying out its mission." Id. at 192.

The Hosanna-Tabor court concluded its opinion with the following summary:

> The interest of society in the enforcement of employment discrimination statutes is undoubtedly important.  But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission. When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us.  The church must be free to choose those who will guide it on its way.

Id. at 196.

Eight years after the Supreme Court decided Hosanna-Tabor, it revisited the ministerial exception in Our Lady of Guadalupe.  140 S.Ct. 2049.  The Supreme Court in Our Lady of Guadalupe held that the ministerial exception applied to two elementary school teachers in Catholic schools, even though those teachers lacked the title of

"minister" and had less religious training than the plaintiff in Hosanna-Tabor.  140 S.Ct. at 2055.  The Our Lady of Guadalupe court reasoned that

> [t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission.  Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

Id.  "A church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities."  Id. at 2060.  Otherwise, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith."  Id.

It is not necessary for someone to be designated a "minister" for the ministerial exception to apply to them.  Id. at 2063–64.  If titles were dispositive, federal courts "would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail."  Id. at 2064.  This is also why a religious employee does not, in every case, have to meet "rigid academic requirements" to be subject to the ministerial exception.  Id.  The Our Lady of Guadalupe court stated that "[w]hat matters," in determining whether the ministerial exception applies, "is what an employee does."  Id.  "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."  Id.

The Supreme Court recognized "abundant record evidence" that two Catholic school elementary teachers in Our Lady of Guadalupe "performed vital religious duties"

and held that the ministerial exception applied to them.  Id. at 2066.  The Supreme Court also highlighted that those teachers' employment agreements "specified in no uncertain terms that they were expected to help the schools carry out" the mission of "[e]ducating and forming students in the Catholic faith."  Id.  The teachers "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith.  They prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities." The Our Lady of Guadalupe court stated that the teachers' schools

> expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important.  In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition.  A religious institution's explanation of the role of such employees in the life of the religion in question is important.

Id.

Courts, when determining if the ministerial exception applies, should "take all relevant circumstances into account" and "determine whether each particular position implicated the fundamental purpose of the exception."  Id. at 2067.  An employee is not required to be a "'practicing' member of the religion with which the employer is associated" for the ministerial exception to apply.  Id. at 2068–69.  The Our Lady of Guadalupe court concluded that "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow."  Id. at 2069.

Plaintiff contends that Diocese did not allow him to provide religious instruction to the students and that his "job responsibilities were to be entirely secular . . . ." (ECF No. 1 ¶¶ 15–16, 23–24.)  Plaintiff attended church services with Diocese's students but minimizes the significance of his presence at those services.  (Id. ¶¶ 17–19); Our Lady of Guadalupe, 140 S.Ct. at 2066 (ministerial exception applied to teachers at Catholic school that attended mass with students).  He admitted in his complaint that "a standard school day" at Aquinas "started and ended with prayers" but denied having any "role in facilitating th[o]se prayers."  (ECF No. 1 ¶¶ 20–22); Our Lady of Guadalupe, 140 S.Ct. at 2066 (daily prayer occurred in the Catholic schools that the ministerial exception applied to in that case).

The documents that Plaintiff did not attach but were referred to in his complaint or relied upon in drafting the complaint require the Court to apply the ministerial exception to Plaintiff.  In Plaintiff's professional services agreement, he "recognize[d] the religious nature of the Catholic school and agree[d]" that the Diocese had the right to dismiss him "for immorality, scandal, or rejection of the official teaching, doctrine[,] or laws of the Roman Catholic Church[.]"  (Ex. A ¶ 1k.)  He additionally acknowledged that he could be immediately terminated for violating "the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality."  (Id. ¶ 1l.)  This is similar to the employment agreements between the plaintiff teachers and Catholic schools that favored application of the ministerial exception in Our Lady of Guadalupe, in which the teachers were to be an example of living their lives in accordance with the Catholic faith. 140 S.Ct. at 2066.

An appendix attached to the professional services agreement further described Plaintiff's role as a teacher for Diocese.  (Ex. A App'x A.)  Teachers must "serve[] the school in this Catholic Ministry within instructional and extra-curricular capacities . . . ."  (Id.)  They further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students in a Christ-like manner . . . ."  (Id.)  The requirements of being a teacher for Diocese include having "an understanding and acceptance of Catholic School Philosophy, goals, and objectives," abiding "by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church."  (Id.)  This is, again, similar to the plaintiff teachers in Our Lady of Guadalupe that the ministerial exception applied to.  140 S.Ct. at 2066.

Plaintiff also signed a form acknowledging his receipt of the Diocese's code of pastoral conduct.  (Ex. B.)  Plaintiff, via that form, stated

> [i]n accord with my role as Church personnel, and in witness to the Gospel of Jesus Christ, I will conduct myself with integrity, acting in a manner that is consistent with the discipline and teachings of the Catholic Church.  I will guide my behavior by civil and canon law, by the policies of the Diocese of Greensburg and by the Code of Pastoral Conduct by . . .
>
> 1. Respecting the rights of each person and advancing his or her welfare during the course of counseling, advising or spiritual direction.
>
> 2. Holding in the strictest confidence information disclosed during the course of counseling, advising or spiritual direction . . . .

(Id.)

The exhibits supporting Diocese's brief and motion to dismiss are sufficient for this Court to hold that the ministerial exception applies to Plaintiff.  Discovery is unnecessary because that would tempt the Court into probing the sincerity of the

Diocese's doctrinal basis for terminating Plaintiff.  Plaintiff may try to unearth evidence to contend that Diocese enforced its doctrine on sexuality and marriage more strictly than other conduct that contradicts Catholic principles.  Discovery on such matters in the ministerial exception context is improper.  <u>Demkovich</u>, 3 F.4th at 974, 982–83, 985.

Plaintiff apparently believes that he can agree to live by Catholic principles, teach in a Catholic school, and follow the code of pastoral conduct and yet be shielded from the ministerial exception when he sues for wrongful termination on the basis of his same-sex marriage—a form of conduct that violates all of the principles he had promised to faithfully foster.  (Exs. A–B.)  If Plaintiff did not want to be terminated for being married to a man, he should not have become a teacher for Diocese.  (Exs. A–D.)  He knew what he was signing up for.  (Exs. A–B.)  Yet he protests.

Through this lawsuit, Plaintiff seeks to impose his views on same-sex marriage upon Diocese and penalize it for its refusal to acquiesce, like invaders establishing a hostile beachhead upon another's territory.  But there is no Diocesan beach for Plaintiff to land upon.  The First Amendment stands in Plaintiff's way.  His only recourse is to amend the United States Constitution so that the ministerial exception will not apply.  But until that unlikely day comes, the Court must apply the ministerial exception to Plaintiff and dismiss his Title VII claim with prejudice.

### D.   The Religious Freedom Restoration Act Bars Plaintiff's Title VII Claim

If the Court determines that Title VII and doctrines arising under the First Amendment do not defeat Plaintiff's suit, then the Court should hold that RFRA requires the Court to dismiss Plaintiff's suit with prejudice.  RFRA applies to Diocese as its religious practices would be substantially burdened by Title VII by penalizing Diocese

for making a religious-based employment decision.  42 U.S.C. § 2000bb-1(a–b); <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 573 U.S. 682, 690–92 (2014).

RFRA's purposes include guaranteeing the compelling interest test's "application in all cases where free exercise of religion is substantially burdened" and providing "a claim or defense to persons whose religious exercise is substantially burdened by government."  42 U.S.C. § 2000bb(b)(1–2).  Government is only allowed to burden a person's exercise of religion "if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  The term "demonstrates" means "meets the burdens of going forward with the evidence and of persuasion[.]"  42 U.S.C. § 2000bb-2(3).  RFRA defines "government" as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States . . . ."  42 U.S.C. § 2000bb-2(1).  If a person's religious exercise is burdened in violation of RFRA, that person "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000bb-1(c).  All federal law and its implementation is covered by RFRA.  42 U.S.C. § 2000bb-3(a).

RFRA applies to a suit by one private party seeking relief under a federal statute against another private party when that other party claims that the federal statute substantially burdens its free exercise of religion.  The United States Court of Appeals for the Second Circuit held that

> [t]he RFRA's language surely seems broad enough to encompass such a case.  The statutory language states that it "applies to all federal law, and the implementation of that law," 42 U.S.C. § 2000bb-3(a), and that a defendant arguing that such a law substantially burdens the exercise of religion

> "may assert [a violation of the RFRA] as a . . . defense in a judicial proceeding." <u>Id.</u> § 2000bb-1(c). This language easily covers the present action.  The only conceivably narrowing language is the phrase immediately following: "and obtain appropriate relief against a government." <u>Id.</u> However, this language would seem most reasonably read as broadening, rather than narrowing, the rights of a party asserting the RFRA.    The  narrowing  interpretation—permitting  the assertion of the RFRA as a defense only when relief is also sought against a governmental party—involves a convoluted drawing of a hardly inevitable negative implication.  If such a limitation was intended, Congress chose a most awkward way of inserting it.  The legislative history is neither directly helpful nor harmful to that view.

<u>Hankins v. Lyght</u>, 441 F.3d 96, 103 (2d Cir. 2006).  The <u>Hankins</u> court further stated:

> [t]he ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party.  An action brought by an agency such as the EEOC is clearly one in which the RFRA may be asserted as a defense, and no policy of either the RFRA or the ADEA should tempt a court to render a different decision on the merits in a case such as the present one.

<u>Id.</u> (citation omitted).  According to <u>Hankins</u>, because the EEOC could have enforced the ADEA against a church, RFRA's protections should not change based on the federal government's decision to not prosecute an employment discrimination claim and instead allow a private complainant to do so.  <u>Id.</u>

Diocese should not be stripped of RFRA's protections just because the EEOC gave Plaintiff the right to bring a Title VII suit.  Should Plaintiff prevail and obtain a judgment against Diocese, the Court would have the power to enforce that judgment against Diocese.  RFRA's language allows Diocese to assert RFRA as a defense in this suit and "obtain appropriate relief against a government."  42 U.S.C. § 2000bb-1(c).  The

appropriate relief could be an order precluding the Court from entering a judgment against Diocese that could be enforced by federal agents.

RFRA's definition of government also extends to "( . . . other person[s] acting under color of law) of the United States . . . ." 42 U.S.C. § 2000bb-2(1). Even though the EEOC is not litigating this suit on Plaintiff's behalf, Plaintiff is acting under color of law by utilizing the federal judiciary's procedures in an unlawful manner against Diocese. See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 628 (1991) (holding that a private litigant cannot use preemptory challenges to exclude jurors on the basis of race and, when the private litigant so acts, is acting under color of law).

The federal government does not have a compelling interest in forcing Diocese to employ teachers at a religious school that contradict the Diocese's core religious belief that marriage is solely between a man and a woman. 42 U.S.C. § 2000bb-1. Forcing Diocese to comply with Title VII's prohibition of employment discrimination based on sexual orientation is not the least restrictive means of the government fulfilling its objective of eliminating such discrimination. Instead, the least restrictive means of doing so would be exempting Diocese from liability under Title VII for making religious-based employment decisions that discriminate on the basis of sexual orientation. The federal government could otherwise enforce Title VII's purported preclusion of sexual orientation or gender identity discrimination in non-religious, non-closely held organizations.

RFRA shields Diocese from Plaintiff's Title VII suit. The Court should grant Diocese's Rule 12(b)(6) motion and dismiss Plaintiff's suit with prejudice.

## V.    Conclusion

Plaintiff's suit fails as a matter of law for several reasons.  Diocese is exempt from Title VII due to its status as a religious employer seeking to employ people whose conduct is consistent with Diocese's religious beliefs.  The church autonomy doctrine forbids the Court from penalizing Diocese for terminating Plaintiff as a Catholic school teacher because Plaintiff's same-sex marriage contradicts church doctrine.  The ministerial exception applies to Plaintiff because, by accepting a teaching position for Diocese, he agreed to be an exemplar of the faith in word and deed to Diocese's students.  By being in a same-sex marriage, he failed to meet that standard and was fired.  Finally, RFRA applies to this suit and precludes Plaintiff from prevailing in his Title VII suit and enforcing a judgment procured in that suit against Diocese.


Respectfully submitted,

**MEYER, DARRAGH, BUCKLER,**
**BEBENEK & ECK, P.L.L.C.**

/s/ Bernard P. Matthews, Jr., Esq.
**BERNARD P. MATTHEWS, JR., ESQ.**
PA. I.D. #54880
bmatthews@mdbbe.com
**ALEXANDER W. BROWN, ESQ.**
PA. I.D. #322661
abrown@mdbbe.com
40 North Pennsylvania Ave., Suite 410
Greensburg, PA 15601
Telephone No.: (724) 836-4840
Fax No.: (724) 836-0532
*(Attorneys for Defendant)*

**BALL, MURREN & CONNELL, LLC**

/s/ Philip J. Murren, Esq.
**PHILIP J. MURREN, ESQ.**
PA. I.D. #21426
bmc-law2@msn.com
**KATHERINE   M.   FITZ-PATRICK,**
**ESQ.**
PA. I.D. #208863
fitz-patrick@bmc-law.net
**DAVID R. DYE, ESQ.**
PA I.D. 88665
dye@bmc-law.net
2303 Market Street
Camp Hill, PA 17011
Telephone No.: (717) 232-8731
Fax No.: (717) 232-2142
*(Attorneys for Defendant)*