**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KENNETH FERENCE, | **ELECTRONICALLY FILED** |
| Plaintiff, | No. 2:22-cv-797 |
| v. | JURY TRIAL DEMANDED |
| ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY, | |
| Defendants. | |

## ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

AND NOW comes Defendant Roman Catholic Diocese of Greensburg and Defendant Aquinas Academy by and through their attorneys, Bernard P. Matthews, Jr., Esquire, and Alexander W. Brown, Esquire, of Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., and Philip J. Murren, Esquire, David R. Dye, Esquire, and Katherine M. Fitz-Patrick, Esquire of Ball, Murren & Connell, LLC, and files the following Answer and Affirmative Defenses to Plaintiff's First Amended Complaint:

### I.    PRELIMINARY STATEMENT

This unnumbered paragraph is Plaintiff's description of the claims asserted and requires no response.  To the extent a response is required, it is denied that Plaintiff, Kenneth Ference, is entitled to lost wages and benefits, compensatory and punitive damages, costs, and attorney fees because Defendants, Roman Catholic Diocese of Greensburg and Aquinas Academy, terminated his employment due to his sexual orientation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

## II.     JURISDICTION

1.     The Court's jurisdiction of this matter by virtue of 28 U.S.C. § 1331 is admitted.

2.     Venue in the U.S. District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) is admitted.

3.     The Court's jurisdiction of this matter by virtue of 28 U.S.C. § 1367 is admitted.

4.     Admitted.

## III.     PARTIES

5.     Admitted.

6.     It is admitted that the Roman Catholic Diocese of Greensburg ("Diocese") is a Catholic diocese with parishes located in Armstrong, Fayette, Indiana, and Westmoreland Counties and with the Chancery Office located at 723 East Pittsburgh Street, Greensburg, Pennsylvania 15601.  It is denied that Diocese is properly identified as a party defendant to this action.

7.     It is admitted that Aquinas Academy ("Aquinas") is an elementary school located in Diocese's geographic area, with its school building located at 340 N. Main Street, Greensburg, PA 15601.  It is denied that Aquinas is "in the Roman Catholic Diocese of Greensburg."   To the contrary, Aquinas is a separate Pennsylvania Charitable Trust.

## IV.     STATEMENT OF CLAIM

8.     It is admitted that Mr. Ference began working at Aquinas as a sixth-grade teacher on or about August 23, 2021, when he executed a "Professional Services Agreement for Elementary Lay Teachers."

2

9.     Denied in part and admitted in part.  It is admitted that as part of the new-hire process, Mr. Ference completed several employment forms.  It is denied that these forms were "standard employment forms" and, to the contrary, Mr. Ference initially executed a "Professional Services Agreement for Elementary Lay Teachers" dated August 26, 2021, with specific terms and conditions for his employment by Aquinas, and an "Acknowledgment of Receipt of the Code of Pastoral Conduct" dated August 24, 2021.

10.     Denied in part and admitted in part.  It is denied that Mr. Ference completed most of the documents on August 25, 2021, during a meeting with Maria Cochenour, Aquinas's Business Manager.  It is admitted that Mr. Ference completed various onboarding forms between August 24, 2021 and September 2, 2021.

11.     It is admitted that Mr. Ference was informed at the time he executed his employment agreement that he would separately receive a medical insurance election form.

12.     Admitted in part and denied in part.  It is admitted that Mr. Ference was emailed a link to complete the medical insurance election form.  It is denied he did not have access to his Aquinas email address until September 2, 2021.

13.     It is admitted that Mr. Ference completed an election to waive group medical insurance form dated September 2, 2021, indicating that he is covered under his husband's medical insurance.

14.     Admitted.

15.     It is denied that the Virtus trainings concerned only the prevention of child sexual abuse and, to the contrary, it is averred that one of the many subjects of Virtus training involved prevention of child sexual abuse.

16.     Admitted but further averred that Mr. Ference was also subject to supervision and oversight by the superintendent and assistant superintendent.

17.     Denied. To the contrary, Ms. Watkins stated that Mr. Ference could not teach one class on the Catholic religion, however, she instructed that he was required to lead his students in prayer in the classroom during morning and afternoon prayers each day, uphold and reinforce Catholic values during all classes that he taught, and comply with the terms and conditions of his employment agreement and the Code of Pastoral Conduct.

18.     Denied.  To the contrary, Ms. Watkins stated that Mr. Ference could not teach one class on the Catholic religion, however, she instructed that he was required to lead his students in prayer during morning and afternoon prayers each day, uphold and reinforce Catholic values during all classes that he taught, and comply with the terms and conditions of his employment agreement and the Code of Pastoral Conduct.

19.     Denied.  To the contrary, Ms. Watkins told Mr. Ference that his assigned duties included participating in Mass with his students, except for Holy Communion, and Mr. Ference stated he was comfortable with these duties because he "grew up Catholic."

20.     Denied.  To the contrary, Ms. Watkins told Mr. Ference that his assigned duties included participating in Mass with his students, except for Holy Communion, and Mr. Ference stated he was comfortable with these duties because he "grew up Catholic."

21.     Denied.  To the contrary, Ms. Watkins told Mr. Ference that his assigned duties included participating in Mass with his students, except for Holy Communion, and Mr. Ference stated he was comfortable with these duties because he "grew up Catholic."

22.     Admitted.

23.     Admitted, in part.  It is admitted that Ms. Cochenour often recited prayers over Aquinas's PA system, however, it is averred that students and other administrators and teachers also recited prayers over the PA system and it is averred that Mr. Ference was required to lead his students in prayer in the classroom during morning and afternoon prayers each day.  Otherwise, denied.

24.     Denied.  Mr. Ference was required to facilitate and lead his students in prayer during morning and afternoon prayers each day.

25.     Admitted in part, and denied in part. It is admitted that Ms. Watkins stated that Mr. Ference could not teach one class on the Catholic religion, however, it is denied that he taught secular subjects and, to the contrary, Ms. Watkins instructed that he was required to lead his students in prayer during morning and afternoon prayers each day, uphold and reinforce Catholic values during all classes that he taught, and comply with the terms and conditions of his employment agreement and the Code of Pastoral Conduct.

26.     Denied. Mr. Ference could not teach one class on the Catholic religion, however, he was required to lead his students in prayer during morning and afternoon prayers each day, uphold and reinforce Catholic values during all classes that he taught, and comply with the terms and conditions of his employment agreement and the Code of Pastoral Conduct.

27.     Denied.  Dr. Marstellar informed Mr. Ference he was terminated because his same sex civil union violated the teachings of the Catholic Church, his employment contract, and the Code of Pastoral Conduct he agreed to follow.

28.     To the extent that Diocese is a proper party defendant, it is admitted that it learned of Mr. Ference's marriage to another man only when Mr. Ference disclosed that fact on his election to waive group medical insurance.

29.     Denied.

## V.     CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF TITLE VII – TERMINATION

30.     In response to paragraph 30, Defendants incorporates by reference their answers and responses contained in all preceding paragraphs as if fully set forth herein at length.

31.     Denied.

32.     Denied.  The decision to terminate Mr. Ference's employment was due solely to legitimate and longstanding religious considerations of which Mr. Ference was most certainly aware, and his breach of his employment agreement and the Code of Pastoral Conduct that he agreed to follow.

33.     Denied.

### COUNT II – VIOLATION OF PHRA – TERMINATION

34.     In response to paragraph 34, Defendants incorporate by reference their answers and responses contained in all preceding paragraphs as if fully set forth herein and at length.

35.     Denied.

36.     Denied.

37.     Denied.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendants, Roman Catholic Diocese of Greensburg and Aquinas Academy, demand entry of judgment in their favor and against the Plaintiff, Kenneth Ference, with costs of this action, and further prays that this Court deny all relief, damages, attorneys' fees and costs demanded by Mr. Ference.

## AFFIRMATIVE DEFENSES

38**.**   On August 26, 2021, Mr. Ference signed a professional services agreement with "Aquinas Academy, a Charitable Trust established under the laws of the Commonwealth of Pennsylvania," so he could be hired as a teacher.  (Ex. A.)

39.   In that contract, Mr. Ference "recognize[d] the religious nature of the Catholic school and agree[d]" that Aquinas had the right to dismiss him "for immorality, scandal, or rejection of the official teaching, doctrine[,] or laws of the Roman Catholic Church[.]"  (Ex. A ¶ 1k.)

40.   Mr. Ference additionally acknowledged that he could be immediately terminated for violating "the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality."  (Id. ¶ 1l.)

41.   An appendix attached to the professional services agreement further described Mr. Ference's role as a teacher for Aquinas.  (Ex. A App'x A.)

42.   Teachers at Aquinas must "serve[] the school in this Catholic Ministry within instructional and extra-curricular capacities . . . ."  (Id.)

43.   They further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students in a Christ-like manner . . . ."  (Id.)

44.   The requirements of being a teacher for Aquinas include having "an understanding and acceptance of Catholic School Philosophy, goals, and objectives,"

abiding "by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church." (Id.)

45.     Mr. Ference accepted Aquinas's teacher job description and signed the appendix to the professional services agreement. (Id.)

46.     At the time he was hired, Mr. Ference also signed a form acknowledging his receipt of the Diocese's Code of Pastoral Conduct. (Ex. B.) Mr. Ference, via that form, stated

> [i]n accord with my role as Church personnel, and in witness to the Gospel of Jesus Christ, I will conduct myself with integrity, acting in a manner that is consistent with the discipline and teachings of the Catholic Church. I will guide my behavior by civil and canon law, by the policies of the Diocese of Greensburg and by the Code of Pastoral Conduct by . . .
>
> 1. Respecting the rights of each person and advancing his or her welfare during the course of counseling, advising or spiritual direction.
>
> 2. Holding in the strictest confidence information disclosed during the course of counseling, advising or spiritual direction . . . .

(Id.)

47.     By executing that form, Mr. Ference acknowledged that he "carefully read, underst[ood], and hereby commit[ted] to conducting myself in accord with the Diocesan Code of Pastoral Conduct." (Id.)

48.     Mr. Ference designated a "[f]riend" as his contingent beneficiary on an onboarding form for the life insurance plan that Aquinas provided to Mr. Ference. (Ex. C.)

49.     About a week later, Mr. Ference indicated that this "friend" was actually his civil law husband when Mr. Ference elected to waive health care benefits. (Ex. D.)

50.     Diocese is an ecclesiastical entity, charged with the responsibility, *inter alia*, of teaching the Catholic Faith within its territorial boundaries.  It is governed by the Roman Catholic Code of Canon Law, and by ecclesiastical statutes and other enactments adopted by the competent ecclesiastical authorities within the Catholic Church.

51.     The Roman Catholic Church believes that its schools are the principal means for transmitting the Catholic Faith to new generations of Catholics.  Catholic schools do not segment their functions into religious and secular components; at all times, the Catholic school is engaged in the process of catechesis and the formation of the Christian personality, a process which is integrated within the curriculum of the Catholic schools.

52.     Civil courts have repeatedly recognized that Catholic schools, unlike public or nonsectarian schools, exist for a religious mission to which everything in the life and operation of the school is subordinate.

53.     Moreover, the U.S. Supreme Court has repeatedly defined Catholic schools, not as secular off-shoots of the Church, but as the Church itself.  Lemon v. Kurtzman, 403 U.S. 602 (1971); Meek v. Pittenger, 421 U.S. 349 (1975); Tilton v. Richardson, 403 U.S. 672 (1971); Aguilar v. Felton, 473 U.S. 402 (1985).

54.     The characteristics of Catholic schools most frequently relied upon by the Supreme Court and other courts in discussing the religious nature of these entities all apply to Aquinas and the Diocese.  As an integral part of the religious teaching ministry of the Roman Catholic Church and the Diocese, Aquinas:

        a.  is a religious enterprise and is conducted as "an integral part of the religious mission" of the Catholic Church.  Lemon, 403 U.S. at 618; Meek, 421 U.S. at 366;

9

b.  is an institution whose substantial, if not dominant, purpose is to inculcate Catholic religious values.  <u>Tilton</u>, 403 U.S. at 685;

c.  is an institution in which religion is so pervasive that a substantial portion of its function is subsumed in the religious mission of its sponsoring parish, which is the only reason for the School's existence.   <u>Meek</u>, 421 U.S. at 366;

d.  is an institution whose affirmative, if not dominant, policy of instruction for school children is to assure future adherents to the Catholic faith by having control of their education at an early age.  <u>Tilton</u>, 403 U.S. at 685–86;

e.  carries on religious activities, including instruction and worship, prayer and Catholic Christian witness.  <u>Lemon</u>, 403 U.S. at 618;

f.  conducts and sponsors religiously oriented extracurricular activities for faculty and students.  <u>Lemon</u>, 403 U.S. at 615;

g.  is housed in a building whose exteriors contain identifying religious symbols, and whose interiors, such as classrooms and hallways, contain Catholic religious symbols, as well as inspirational quotations from Scripture and other religious doctrinal sources.  <u>Lemon</u>, 403 U.S. at 615;

h.  is an institution which has an atmosphere in which religious instruction and religious vocations are integrated into the total educational function.  <u>Lemon</u>, 403 U.S. at 615;

i.  is an institution which is a vehicle for transmitting the Catholic faith to the next generation.  <u>Lemon</u>, 403 U.S. at 616;

j.  conducts regular religious services and exercises.   <u>Lemon</u>, 403 U.S. at 615;

k.  employs teachers and other employees who are subject to the direction and discipline of religious authority which necessarily pervades the school and who are required to subscribe to the School's doctrinal statements, and conform themselves, both on and off campus, to high standards of Catholic Christian behavior.  Lemon, 403 U.S. at 617–18; Meek, 421 U.S. at 371; and Little v. Wuerl, 929 F.2d 944, 948 n.6 (3d Cir. 1991);

l.  employs teachers and other employees who work in a school which is operated to inculcate the tenets of the Catholic religion and which is dedicated to rearing children in that faith.  Lemon, 403 U.S. at 618; Meek, 421 U.S. at 371;

m.  employs teachers and other employees who are responsible by their teaching and conduct to impart the Word of God, and the principles of the Catholic faith.  Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 379 (1985);

n.  employs teachers who are expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They do so by, inter alia, praying with their students, attending Mass with the students, and preparing the children for their participation in other religious activities.  Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S.Ct. 2049, 2066 (2020);

o.  does not divide instruction into "religious" and "secular" components, the entire ongoing life of the church-school community being religious.  Meek, 421 U.S. at 366;

p.  operates as a "faith community" with all persons therein being expected to provide Catholic Christian nurture and to encourage, by work and action,

reverence for and adherence to Catholic religious principles.  McCormick v. Hirsch, 460 F. Supp. 1337, 1352 (M.D. Pa. 1978).

55.     The "raison d'etre" of Catholic Church schools "is the propagation of a religious faith."  NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 503 (1979).

56.     Aquinas Academy's purpose and character is primarily religious when weighing all significant religious and secular characteristics. Garcia v. Salvation Army, 918 F.3d 997, 1003 (9th Cir. 2019); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 226 (3d Cir. 2007).

57.     The Diocese and Aquinas cannot be liable under Title VII for terminating Mr. Ference because he is married to a man under the civil law.  This conclusion follows from Title VII's text and precedential case law interpreting Title VII.

58.     Title VII's prohibition of religion-based discrimination does not apply "to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."   42 U.S.C. § 2000e-1(a); see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 329 (1987) (holding that 42 U.S.C. § 2000e-1(a) "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion.").

59.     Title VII does not prohibit a religious educational institution from hiring

> employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

60.     The United States Court of Appeals for the Third Circuit ("Third Circuit")

construed the above provisions and held that

> Congress intended the explicit exemptions to Title VII to
> enable religious organizations to create and maintain
> communities composed solely of individuals faithful to their
> doctrinal practices, whether or not every individual plays a
> direct role in the organization's "religious activities."  Against
> this background and with sensitivity to the constitutional
> concerns that would be raised by a contrary interpretation,
> we read the exemption broadly.   We conclude that the
> permission to employ persons "of a particular religion"
> includes permission to employ only persons whose beliefs
> and conduct are consistent with the employer's religious
> precepts.  Thus, it does not violate Title VII's prohibition of
> religious discrimination for a parochial school to discharge a
> Catholic or a non-Catholic teacher who has publicly engaged
> in conduct regarded by the school as inconsistent with its
> religious principles.

Wuerl, 929 F.2d at 951 (holding that Title VII's exemptions protected a parish's decision

to not rehire a teacher who remarried without the new marriage being validated by the

Catholic Church).

61.     Mr. Ference acknowledged the religious nature of his employer by signing

employment forms that, among other things, indicated he was "Church" personnel, and

therefore could be fired for violating Church laws on marriage and espousing views

contrary to the Church's on homosexuality.  (Exs. A–B.)

62.     Title VII's religious exemptions create an exemption to all types of

discrimination claims under Title VII, not just religious discrimination claims, so long as

the employment decision was based on the employee's religious belief, observance, or

practice.  Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 141

(3d Cir. 2006); EEOC v. Mississippi College, 626 F.2d 477 (5th Cir. 1980); Maguire v.

Marquette Univ., 627 F. Supp. 1499 (E.D. Wis. 1986), aff'd in part on other grounds,

vacated in part, 814 F.2d 1213 (7th Cir. 1987); Bear Creek Bible Church & Braidwood Mgmt., Inc., v. EEOC, 2021 WL 5449038, *6 (N.D. Tex. Oct. 31, 2021) ("The plain text of this exemption, therefore, is not limited to religious discrimination claims; rather, it also exempts religious employers from other forms of discrimination under Title VII, so long as the employment decision was rooted in religious belief."); Starkey v. Archdiocese of Indianapolis, 2022 WL 2980350 (7th Cir. 2022) (Easterbrook, J., concurring) ("The Diocese is a religious association, and the high school is a religious educational institution.   Any temptation to limit this exception to authorizing the employment of co-religionists, and not any other form of religious selectivity, is squelched by the definitional clause in § 2000e(j), which tells us that religion includes "all aspects of religious observance and practice, as well as belief").

63.     Mr. Ference's claims are barred by the church autonomy doctrine, which springs from the First Amendment.  U.S. CONST. amend. I.

64.     The church autonomy doctrine (also known as the ecclesiastical abstention doctrine or solicitude for religious autonomy) precludes claims challenging religious organizations' personnel decisions if "the alleged misconduct is 'rooted in religious belief.'"  Bryce v. Episcopal Church in Diocese of Colorado, 289 F.3d 648, 657–58 (10th Cir. 2002) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)).

65.     The Religion Clauses of the First Amendment "protect[] a religious group's right to shape its own faith and mission through its appointments" and "prohibit[] government involvement in such ecclesiastical decisions."  Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 188–89 (2012); Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952); Serbian Eastern Orthodox Diocese, 426 U.S. at 709; Watson, 80 U.S. at 733 (Thus, matters that concern church discipline or "the conformity of members of the church to

14

the standard of morals required of them" are matters "strictly and purely ecclesiastical in its character . . . over which the civil courts exercise no jurisdiction.").

66.     The church autonomy doctrine applies when resolution of a case would interfere in the internal governance of a religious organization or require a court to decide a religious dispute, answer a religious question, or decide the meaning or application of church rules or processes.  Catholic Bishop of Chicago, 440 U.S. at 502 ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); Wuerl, 929 F.2d at 949; Demkovich v. St. Andrew the Apostle Parish, 3 F.4th 968, 975–77 (7th Cir. 2021) (en banc); Garrick v. Moody Bible Inst., 412 F. Supp. 3d 859, 868–69, 871–72 (N.D. Ill. 2019); Curay-Cramer, 450 F.3d 130; Bryce, 289 F.3d at 655–59.

67.     If Title VII were construed to apply to Diocese and Aquinas for terminating a teacher at its private Catholic school because that teacher violated Catholic principles regarding marriage and sexuality, the federal government would be contradicting the church autonomy doctrine by controlling or manipulating the religious-based employment decisions of private Catholic schools.  Kedroff, 344 U.S. at 116; Wuerl, 929 F.2d at 948–49; Catholic Bishop of Chicago, 440 U.S. at 502; Curay-Cramer, 450 F.3d at 138–39; Bryce, 289 F.3d at 657–58; Butler v. St. Stanislaus Kostka Catholic Academy, 2022 WL 2305567 (E.D.N.Y. 2022) ("The ministerial exception is not, however, the only mechanism limiting secular courts' intrusion into the employment decisions of religious institutions.  The ministerial exception derives from, and is but one manifestation of, a broader (and well-settled) principle expressed in Supreme Court and Second Circuit jurisprudence—the principle of "church autonomy."  This principle is process-oriented: it cabins a court's authority to interfere in a religious organization's

"independence in matters of faith and doctrine and in closely linked matters of internal government," Our Lady of Guadalupe, 140 S. Ct. at 2061, even outside the discrimination context.").

68.     The Third Circuit recognizes that the First Amendment's Establishment Clause prevents "excessive government entanglement with religion" while the First Amendment's Free Exercise Clause "protects not only the individual's right to believe and profess whatever religious doctrine one desires, but also a religious institution's right to decide matters of faith, doctrine, and church governance." Petruska v. Gannon Univ., 462 F.3d 294, 306, 311 (3d Cir. 2006) (internal citation and quotation marks omitted).

69.     Federal courts should not "pars[e] the precise reasons" for a church employee's termination if doing so "would intrude on internal church governance [and] require consideration of church doctrine . . . ." Lee v. Sixth Mount Zion Baptist Church of Pittsburgh, 903 F.3d 113, 121–22 (3d Cir. 2018).

70.     Granting relief to Mr. Ference will force Diocese and Aquinas to employ teachers in its Catholic schools whose conduct violates Catholic religious precepts or will penalize Diocese and Aquinas for not employing such teachers.  Such a result would eviscerate the First Amendment of the United States Constitution.

71.     The Court should dismiss Plaintiff's Title VII claim with prejudice because it is not cognizable per the ministerial exception. Hosanna-Tabor, 565 U.S. at 188-89. ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so," violates the Free Exercise and Establishment Clauses."); Our Lady of Guadalupe, 140 S. Ct. 2049, 2055 (the ministerial exception applied to two elementary school teachers in Catholic schools, even though those teachers lacked the title of "minister" and had less religious training than the plaintiff in Hosanna-Tabor........

Otherwise, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith.").

72.     If the Court determines that Title VII and doctrines arising under the First Amendment do not defeat Mr. Ference's suit, then the Court should hold that the Religious Freedom Restoration Act ("RFRA") bars Plaintiff's Title VII Claim.  Hankins v. Lyght, 441 F.3d 96, 103 (2d Cir. 2006).

73.     RFRA applies to Diocese and Aquinas as their religious practices would be substantially burdened by Title VII—an Act of Congress—by penalizing them for making a religious-based employment decision.  42 U.S.C. § 2000bb-1(a–b); Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 690–92 (2014).

74.     The federal government does not have a compelling interest in forcing Diocese and Aquinas to employ teachers at a religious school that contradict the Diocese's and Aquinas's core religious belief that marriage is solely between a man and a woman.  42 U.S.C. § 2000bb-1.

75.     Forcing Diocese and Aquinas to comply with Title VII's prohibition of employment discrimination based on sexual orientation is not the least restrictive means of the government fulfilling its objective of eliminating such discrimination.

76.     Mr. Ference's claims violate the First Amendment's Right of Association.

77.     The Complaint fails to state a cause of action upon which relief can be granted.

78.     Aquinas is a separate Pennsylvania Charitable Trust.

79.     Diocese is a separate charitable trust.

80.     Diocese is not a proper party to this action.

81.     Mr. Ference's claims are barred under the bona fide occupational qualification exception provided in 42 U.S.C. § 2000e-2(e).

82.     Mr. Ference's claims are barred under the First Amendment prohibition on government entanglement in religion or religious questions.  Presbyterian Church v. Mary Elizabeth Blue Presbyterian Church, 393 U.S. 440, 441, 452 (1969).

83.     Mr. Ference's claims are barred by the doctrine of constitutional avoidance, which requires courts to avoid applying a statute in a way that raises serious constitutional questions unless there is a clear expression of an affirmative intention by Congress to do so.  NLRB v. Catholic Bishop of Chi., 440 U.S. 490 (1979).

84.     Mr. Ference's claims are barred by the Assembly Clause of the First Amendment to the United States Constitution, which protects Defendants' right to engage in otherwise lawful exercise of religion and speech activities with persons of their choosing.

85.     Defendants' employment action was for a legitimate, nondiscriminatory reason, which was Mr. Ference's rejection of the Church's teaching and refusal to support school policy that was binding on his position.

86.     Mr. Ference's violation of Catholic teaching was a legitimate, nondiscriminatory reason for Defendants' actions.

87.     Defendants' actions with respect to Mr. Ference were taken in good faith and/or in a justified and consistent manner.

88.     Defendants' actions were not motivated by sex, sexual orientation, or protected activities.

89.     Mr. Ference's First Amended Complaint and each of its causes of action and requests for relief are barred by the doctrine of unclean hands.

90.     Mr. Ference unreasonably failed to take advantage of any preventative or corrective opportunities provided by the Defendants or to otherwise avoid harm.

91.   Mr. Ference's allegations of physical or emotional injury or distress are governed exclusively by applicable Worker's Compensation Acts and are therefore barred.

92.   Mr. Ference's claims for certain damages, including punitive damages, are barred or limited by the United States Constitution, Title VII, and other federal and state laws

93.   Mr. Ference's claims for damages are barred by failure to mitigate or by successful mitigation.

94.   Mr. Ference's claims are barred by the United States Supreme Court's Decision in <u>303 Creative LLC v. Elenis</u>, 143 S. Ct. 2298 (2023).

**MEYER, DARRAGH, BUCKLER,**
**BEBENEK & ECK, P.L.L.C.**

/s/ Bernard P. Matthews, Jr., Esq.
**BERNARD P. MATTHEWS, JR., ESQ.**
PA. I.D. #54880
bmatthews@mdbbe.com
**ALEXANDER W. BROWN, ESQ.**
PA. I.D. #322661
abrown@mdbbe.com
40 North Pennsylvania Ave., Suite 410
Greensburg, PA 15601
Telephone No.: (724) 836-4840
Fax No.: (724) 836-0532
*(Attorneys for Defendants)*

**BALL, MURREN & CONNELL, LLC**

/s/ Philip J. Murren, Esq.
**PHILIP J. MURREN, ESQ.**
PA. I.D. #21426
bmc-law2@msn.com
**KATHERINE M. FITZ-PATRICK,**
**ESQ.**
PA. I.D. #208863
fitz-patrick@bmc-law.net
**DAVID R. DYE, ESQ.**
PA I.D. #88665
dye@bmc-law.net
2303 Market Street
Camp Hill, PA 17011
Telephone No.: (717) 232-8731
Fax No.: (717) 232-2142
*(Attorneys for Defendants)*