# EXHIBIT B

Deposition of Kenneth Ference
November 20, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH FERENCE, )
 )
Plaintiff, ) No. 2:22-cv-797
 )
vs. )
 )
ROMAN CATHOLIC DIOCESE OF )
GREENSBURG and AQUINAS ACADEMY, )
 )
Defendants. )

* * *

DEPOSITION OF KENNETH FERENCE, a PLAINTIFF herein, taken pursuant to the Federal Rules of Civil Procedure No. 4007.1, by and before Diana C. Clark, a Professional Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the Law Offices of Meyer, Darragh, Buckler, Bebenek & Eck, PLLC, 40 North Pennsylvania Avenue, Suite 410, Greensburg, Pennsylvania, on Monday, November 20, 2023, at 1:30 p.m.

* * *

DIANA C. CLARK
CLARK COURT REPORTING SERVICES
175 HILLVIEW DRIVE
NEW ALEXANDRIA, PA 15670
(724) 668-7792
dianacclark@windstream.net

APPEARANCES:

On behalf of the Plaintiff:

Nicholas W. Kennedy, Esq.
Quatrini Law Group
550 East Pittsburgh Street
Greensburg, PA 15601
(724) 837-0080
nwk@qrlegal.com

On behalf of the Defendants:

Bernard P. Matthews, Jr., Esq.
Meyer Darragh Buckler Bebenek
& Eck, PLLC
40 N. Pennsylvania Avenue, Suite 410
Greensburg, PA 15601
(724) 836-4840
bmatthews@mdbbe.com

Philip J. Murren, Esq.
Katherine M. Fitz-Patrick, Esq.
Ball Murren & Connell, LLC
2303 Market Street
Camp Hill, PA 17011
(717) 232-8731
bmc-law2@msn.com

I-N-D-E-X

WITNESS: 4

KENNETH FERENCE

EXAMINATION 4

BY MR. MATTHEWS

* * *

E-X-H-I-B-I-T

Exhibit A - Plaintiff's Responses to Defendant's First Requests for Admissions 15

Exhibit B - Schedules 16

Exhibit C - August/September 2021 Calendars 42

Exhibit D - Aquinas Academy Teachers Agreement/Contract 44

* * *

PROCEEDINGS CONVENED - 1:25 P.M.

* * *

It is stipulated that the reading and signing of said deposition is hereby NOT waived.

* * *

KENNETH FERENCE, having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

BY MR. MATTHEWS:

Q. Would you please state your name, sir?

A. Kenneth Ference.

Q. Mr. Ference, my name is Bernie Matthews. I represent the Defendants that you sued in a lawsuit in the United States District Court for the Western District of Pennsylvania, those being the Diocese of Greensburg and Aquinas Academy.

Are you familiar with that lawsuit?

A. Yes.

Q. Okay. Have you ever gone by any other name other than Kenneth Ference?

A. No.

Q. Okay. So today we're here to take your deposition. Next to me is my Co-Counsel, Phil Murren

A. No.
Q. Have you received any of the following Sacraments of the Catholic Church; Baptism?
A. Yes.
Q. Holy Communion?
A. Yes.
Q. And Confirmation?
A. Yes.
Q. So I want to ask you a few questions about that if I may. Where were you baptized in a Catholic Church and when?
A. I don't know which Catholic Church it was. It would have been in Sharon, but I'm not sure which one my parents were attending at the time.
Q. Okay. What are your parents' names?
A. Joseph Ference and Anita Ference.
Q. So is there more than one Catholic Church in Sharon?
A. Yes.
Q. Do you remember the name of the priest who baptized you?
A. No, I do not know.
Q. Okay. Are your parents still alive?
A. My father is.
Q. Okay. At that same church, did you

receive the Sacrament of Holy Communion?

A. I don't know if it was the same church, but First Communion was at St. Stanislaus.

Q. Any chance you could spell that?

A. We just always called it St. Stans. I don't know if I actually ever spelled it.

Q. And you said you also received the Sacrament of Confirmation?

A. Yes.

Q. And was that at St. Stanislaus as well?

A. Yes.

Q. Okay. And do you happen to know either of the priests that gave you the Sacraments of either First Communion or Confirmation?

A. I don't recall.

Q. Did your parents take you to church in the Catholic Church on Sundays?

A. They did.

Q. Okay. And for what period of time did you attend church with your parents as a Catholic?

A. From the time I was five or six up through middle school and then I would go on my own to a later service on Sundays up through Confirmation.

Q. And what age or what grade were you confirmed in?

A. I would have been a junior in high school, so 17.
Q. Okay. So your confirmation was around age 17 when you were a junior?
A. Uh-huh (yes), yes.
Q. Was that delayed or was that in the normal course that they did confirmations at St. Stanislaus?
A. That was the normal course.
Q. Okay. And would you say that you regularly attended mass during the period of time you just described from around age of five until your junior year when you were confirmed?
A. Yes.
Q. Was there a period of time when you stopped attending mass on a regular basis?
A. The first time would have been when I went away to college in '96.
Q. So that would have been when you went to Penn State Shenango?
A. That would have been Thiel.
Q. Thiel. Was Thiel a religious affiliated school?
A. Yes.
Q. What affiliation?
A. Lutheran.

Q. Was there any particular reason that you stopped going to mass when you started to attend Thiel?

A. Just being away at college and away from my parents, I just stopped going.

Q. Okay. Would you say during that period of time you were a practicing Catholic?

A. No.

Q. And why would you say you were not a practicing Catholic?

A. I did not attend church unless I was at home with my parents for holidays.

Q. I'm sorry, I misled you. That was a bad question. Let me back up.

From the time that you were baptized up until the point you went to Thiel College, I'm talking about that intervening period, would you say that you were a practicing Catholic?

A. Yes.

Q. Okay. And what do you mean when you say you're a practicing Catholic?

A. I attended church regularly usually with my family.

Q. Okay. Did you have an understanding of the tenets and beliefs of the Catholic Church during

that time?
A. At the age that I was, I believe I knew as much as anyone at that age would know.
Q. Okay. After you started to attend Thiel, were there ever any times that you did go to mass?
A. When I was home with my parents, Christmas, Easter.
Q. When was the last time you think you attended a Catholic Mass?
A. My cousin's funeral in 2015.
Q. So you would agree then when you applied at Aquinas, you were familiar with the tenets and beliefs of the Catholic Church?
A. No.
Q. No. Okay. Who was the principal at Aquinas when you were hired as a teacher in August of '21?
A. Kelly Watkins.
Q. Did you know Ms. Watkins prior to that date?
A. No.
Q. At any point during the hiring process, did you tell Ms. Watkins that you "grew up Catholic"?
A. I did.
Q. Did you describe to Ms. Watkins what you

meant when you said you grew up Catholic?
A. No.
Q. Well, what did you mean?
A. I attended church with my family, went through First Communion and Confirmation.
Q. Was there a point in time when you formally became a member of the Lutheran faith?
A. It happened gradually overtime. An exact date, I can't give you.
Q. Is there some sort of a religious ceremony that you went through to become a member of the Lutheran faith?
A. No.
Q. Was there any sort of an official recognition given to you by the Lutheran faith that you are now Lutheran as opposed to Catholic?
A. There was nothing that was official, no.
Q. Okay. Here's what I -- maybe I can hopefully better explain that on the Catholic side of that.
Are you familiar with the Rite of Initiation in the Catholic Church?
A. No.
Q. Okay. So those who are not Catholic can go through a process to become a member of the

Catholic faith and there's a process that you go through called a Rite of Initiation.

Was there anything similar to that in the Lutheran faith?

A. Not that I went through, no.

Q. Okay. Now, before you were hired as a teacher at Aquinas in August of '21, you were aware that it is a genuinely held tenet and a belief of the Catholic Church that marriage is a conjugal union only between a man and a woman; correct?

A. No.

Q. You were not aware of that?

A. Uh-uh (no).

Q. Okay. Had you ever attended a Catholic ceremony where there was a same-sex marriage that was celebrated?

A. No.

Q. Did you know of any other Catholics prior to your application at Aquinas who had been married in a same-sex marriage that was recognized or celebrated by the Catholic Church?

A. None that I know of.

Q. So before you applied for a job at Aquinas in August of '21, did you have any understanding as to what the tenets and beliefs of the Catholic faith was

started to attend Holy Angels in Wilmerding around 2006, 2007?

A. Yes.

Q. Okay. Have you ever researched or looked into whether there are denominations of the Lutheran Church that do not recognize or celebrate same-sex marriages?

A. I have not.

Q. Now, in August of '21, is that when you applied for the position of a teacher at Aquinas Academy?

A. Correct.

Q. So what did you know about Aquinas Academy before you applied there?

A. I knew that it was a Catholic school. That's all that I knew.

Q. Okay. And by Catholic school, do you agree that you knew that it was a private Catholic religious institution?

A. Yes.

Q. How did you learn about that teacher position?

A. A friend of mine texted the information to me that I believe she found it on a Facebook posting.

Q. And what was your friend's name?

Q. So once you learned about the position, what did you do to inquire about it?
A. I believe I called the school to find out what information that they needed. I got everything together that day and sent it over.
Q. Do you remember who you spoke with?
A. I believe it was Mrs. Cochenour.
Q. And do you remember what you and Mrs. Cochenour discussed during that initial conversation?
A. I believe she told me the paperwork that I needed to send over to the school to be considered for the job.
Q. Nothing more than that?
A. No.
Q. Okay. And when you received that paperwork, can you tell me in general what it consisted of?
A. I didn't receive any paperwork from them. They told me the things that I needed to send to them.
Q. I see. And so what did you send to them?
A. I don't remember everything that was in the packet. I don't remember if they required a PA State teaching application, but I know I sent over my resume, clearances and letters of recommendation.

Q. And did you do that through an e-mail?
A. Yes.
Q. Who did you send it to?
A. I do not recall who I sent it to.
Q. And would that have been the Friday before school started?
A. Correct.
Q. Then what happened next in the process?
A. Within 30 minutes of sending the e-mail with all of the information, I was contacted by the school. I don't remember if it was the secretary or Ms. Watkins herself, but they asked if I could come in for an interview that day.
Q. And was there anything else discussed?
A. No. I made an appointment to go in that day for an interview.
Q. Was that interview in person?
A. Yes.
Q. Who participated in that interview?
A. Myself and Ms. Watkins.
Q. Just the two of you?
A. Yes.
Q. And would that interview have occurred on the Friday?
A. Correct.

(Whereupon, Exhibit C was marked for identification.)

BY MR. MATTHEWS:

Q. So let me see if we can do it this way.

So we have marked as Exhibit C calendars for August and September of '21, which I printed from the website noolyo.com. I think these are accurate.

If you're looking at the calendar, Mr. Ference, that we marked as Exhibit C, are you able to tell me which Friday it was in August that you sent over your papers through an e-mail and then had your interview?

A. It would have been Friday, August 20, 2021.

Q. Okay. Would you mind taking a pen and just write interview date on August 20th on Exhibit C, sir?

A. (Witness complied.)

Q. Thank you. And that interview occurred at what location?

A. It would have been at Aquinas.

Q. Was that in Ms. Watkins' office?

A. Yes.

Q. All right. And did you interview with Ms. Watkins more than once?

math and science. Those were my favor subjects to teach. We did discuss religious education and I told her I would not be comfortable teaching that. She told me that Ms. Davis would be taking care of all religious content if I were hired.

Q. Okay. And do you remember anything else you discussed with Ms. Watkins in the interview?

A. None that I can think of.

Q. Now, during the interview, did you disclose to Ms. Watkins that you were in a same-sex marriage with Mr. Fry?

A. No.

Q. Did you tell Ms. Watkins during the interview that you -- when you say grew up Catholic, but that you had been baptized Catholic?

A. I did not get into specifics.

Q. Okay. You just used the phrase grew up Catholic?

A. Yes.

(Whereupon, Exhibit D was marked for identification.)

BY MR. MATTHEWS:

Q. Mr. Ference, you can take your time looking through the document that I gave you, Exhibit D. I'll just tell you what it is and then you tell me

Q. So if you would just take a minute, Mr. Ference, Pages 1, 2, 3, 4, 5 and 6, would you agree that that was your teacher's contract that you signed with Aquinas Academy?

A. I did sign the document, yes.

Q. But those pages consisted of your contract; is that correct?

A. Yes.

Q. Okay. Also the signature on Page 6 of Exhibit D, there's a signature for Ms. Kelly Watkins of the same date August 26, '21. Did she sign that in your presence?

A. I don't recall.

Q. Now, by executing your signature on Page 6 of Exhibit D, you agreed to abide by the terms and conditions of your teacher contract; correct?

A. I signed the document, but I did not agree to everything in the contract, no.

Q. Okay. So if we look at the position specifications and requirements right above your signature, there are nine bullet points. Do you see that?

A. Yes.

Q. Did you read those bullet points when you signed the document?

A. Yes.
Q. Okay. Now, when you executed this document, it says you dated it on August 25th. Do you have any reason to disagree with that?
A. No, I do not.
Q. So that would have been a Wednesday, August 25th; correct?
A. Yes.
Q. Did you understand why you were preparing this form?
A. I did.
Q. And what was your understanding?
A. It was for a life insurance benefit through Aquinas.
Q. And you had to name who you wanted your beneficiaries to be in the event of your death, and those beneficiaries would receive the benefits of a life insurance policy paid for by Aquinas; correct?
A. Yes.
Q. And the first primary beneficiary was your son; correct?
A. Yes.
Q. And your contingent beneficiary you identified a William David Fry. Is that your husband?
A. It is.

Q. And you described his relationship to you as a friend; is that correct?
A. I did.
Q. And you did not represent to Aquinas at that time that Mr. Fry was your husband; correct?
A. Correct.
Q. Am I correct that the reason you referred to Mr. Fry as your friend in this form is because you knew that you would not be offered a teaching contract at Aquinas if you had referred to Mr. Fry as your husband?
A. No.
Q. Well, why did you refer to him as your friend?
A. Because my personal life is my personal life. It's not my employer's business.
Q. And you believe that's true even if your employer is a religious private institution?
A. Yes.
Q. And you later referred to Mr. Fry as your husband in another document?
A. Yes.
Q. Okay. We'll get to that in a minute. So when you say referring to Mr. Fry as your friend was important because you didn't want to reveal your

personal business to Aquinas. At that time on August 25th, you had not yet signed a contract to be a teacher; correct?

A. Correct.

Q. Okay. And had you disclosed Mr. Fry as your husband, you would not have been able to receive a contract; correct?

MR. KENNEDY: Objection, asked and answered.

BY MR. MATTHEWS:

Q. Is that correct?

A. I don't know.

Q. Well, what did you believe?

A. I didn't think about it.

Q. Now, when you signed your teacher contract on August 26th of 2021 -- I'm sorry. Strike that.

After you signed your teacher contract the next day on August 26th of 2021, you were asked at some point during the on-boarding process to fill out a health insurance form; correct?

A. I was told that that form would be sent to me eventually, yes.

Q. Okay. Who told you that?

A. Mrs. Cochenour.

Q. And what was Mrs. Cochenour's position as

you understood it?
A. She was the business manager I believe.
Q. At Aquinas?
A. Yes.
Q. Okay. And my understanding from your complaint is that you were told that you were going to receive some documents through your e-mail system; correct?
A. Correct.
Q. And that you did not have access to the e-mail system until September 2nd; is that correct?
A. It is.
Q. All right. So if we look at September 2nd on the calendar marked as Exhibit C, that would be the following Thursday; correct?
A. Yes.
Q. Okay. So by September 2nd, you had been going to the Aquinas School essentially either to prepare for the school year or teaching children for almost two weeks; correct?
A. Yes.
Q. All right. And then if you turn to Page 15, Mr. Ference, of Exhibit D, are you familiar with Page 15 of Exhibit D?
A. Yes.

Q. What is that document?

A. This is the waiver of group medical insurance through Aquinas.

Q. And you completed the form on the computer; is that correct?

A. I did.

Q. And that was at Ms. Cochenour's direction that you go into the platform and type in the information needed to waive health insurance; correct?

A. It was not Mrs. Cochenour, no.

Q. Okay. Who was it that told you to do that?

A. I don't remember the name. Mrs. Cochenour told me that it would be coming to me, but she didn't tell me how.

Q. Okay. If I refer to the name Missy DiRado, that is the Benefits Coordinator. If you look on Page 12 of Exhibit D, see if that refreshes your recollection. If you look at the e-mails on Pages 12 through 14 of Exhibit D.

A. Yes.

Q. So Ms. DiRado, who is the Payroll and Pension Benefits Coordinator, sent you e-mails reminding you that you needed to go onto the computer and fill out this form; correct?

A. She did.

Q. Okay. And so when you had access on September 2nd, you went into the computer and completed the waiver form; correct?

A. Yes.

Q. So then turning back to Page 15, the information that is typed in there was included by you; correct?

A. Yes.

Q. Okay. And in that form, you made reference to the fact that you were waiving insurance because you were covered under your spouse William Fry's plan; correct?

A. Yes.

Q. And you referred to him as your husband?

A. Yes.

Q. Is there any reason why you referred to him as your husband in this form now?

A. Because that was more of what was required, they needed to know how I was covered and you can only be covered by a spouse's benefit.

Q. There is a section in the form that says other. Do you see that?

A. Uh-huh (yes).

Q. Did you choose not to refer to him as a

friend in the other category?

A. I did not know that that was an option.

Q. Okay. But at this point, you disclosed to the Diocese and to Aquinas for purposes of waiving health insurance that Mr. Fry was your husband; correct?

A. Yes.

Q. And this is the first time that you had disclosed to the Diocese or Aquinas that Mr. Fry was your husband; correct?

A. Yes.

MR. MATTHEWS: Can we take five minutes?

MR. KENNEDY: Sure.

(Whereupon, a short recess was taken.)

(Whereupon, Alex Brown entered proceedings.)

BY MR. MATTHEWS:

Q. One other question. I was looking back in my notes, Mr. Ference, I had forgot to ask you.

The position at Latrobe that you held when you were a reading intervention teacher, was that position available to you after you were terminated at Aquinas?

A. It was not.
Q. And did you inquire?
A. I had applied at Latrobe for a different position, but there was never a posting for my position.
Q. Okay. Did you serve as a substitute teacher at Latrobe after you were terminated at Aquinas?
A. I did not.
MR. MATTHEWS: What was the last question I asked before we took the break?
(Whereupon, Reporter read from the record as requested.)
BY MR. MATTHEWS:
Q. I want to turn back to your complaint, Mr. Ference, and refer you to Paragraph 17. We talked about this a little earlier with regard to any documents you had to support that and I don't want to go back over things you already told me, but I just want to confirm again that the allegation in Paragraph 17 that the Diocese prohibited you from providing religious education to its students is a little different than what you said.
Was there a conversation you had with Ms. Watkins where she used the words you're prohibited

from providing religious education?

A. Not that exact word, no.

Q. Okay. What words did she use if you remember?

A. It was something to the effect that because I was Lutheran, I would not be able to teach any religious content.

Q. Okay. Now, your students at Aquinas were sixth-grade students that you taught; correct?

A. Yes.

Q. And those students throughout the weeks you served as a teacher would go to a specific religion class; correct?

A. Yes.

Q. And Ms. Davis taught that class --

A. Yes.

Q. -- to your sixth-grade students; correct?

A. She did.

Q. And that was consistent with what Ms. Watkins told you, that you would not be permitted to teach religion class; correct?

A. Yes.

Q. Was there any other class other than the religion class that Ms. Watkins told you you would not be permitted to teach?

A. I was just told nothing to do with religion.

Q. I understand. But did she specifically say that the religion class you could not teach?

A. Yes.

Q. What I'm asking is if there's any other classes or subjects that you taught that Ms. Watkins said you would not be permitted to teach?

A. No, I did not teach anything she said I was not permitted to teach.

Q. Okay. Now, you said in Paragraph 16 of the complaint that you reported to Kelly Watkins as principal; is that correct?

A. Yes.

Q. Was there anyone else that you reported to?

A. In what capacity?

Q. As a teacher? It just says as a sixth-grade teacher, Mr. Ference reported to Kelly Watkins. So I presume that means with regard to your teaching responsibilities, you had a supervisor and you reported to Ms. Watkins; is that correct?

A. Ms. Watkins was my supervisor.

Q. Uh-huh (yes).

A. Yes.

Q. Okay. And what I'm asking is was there anybody else that you also reported to in a supervisory capacity?

A. No.

Q. Okay. I was just verifying that she was your only supervisor. Is that a fair statement?

A. Yes.

Q. Okay. And I'm not sure how the reporting went, so what type of reporting did you do and how often did you report to Ms. Watkins?

A. In the amount of time that I was there, I can't say that it was anything in an official capacity. If I had a question, I could stop by to speak with her.

Q. Okay. So let's sort of back up on that for a second. When you say the amount of time I was there, your complaint alleges at Paragraph 27 that you were terminated on September 28, 2021; correct?

A. Yes.

Q. Okay. So we can agree then that you were a teacher at Aquinas for approximately one month; correct?

A. Yes.

Q. Okay. And during that one month, your students when they attended religion classes, it was

taught by Ms. Davis in her classroom?

A. Yes.

Q. How often did they attend religion class?

A. I believe it was once a day, but I can't say for sure.

Q. Well, what did you do when your students attended religion class?

A. Ms. Davis and I would switch students and I would teach her students math, science and social studies.

Q. Okay. So Paragraph 17, go back to that. The reference to you not teaching religion class or religion education to the students, that occurred only in the interview you had with Ms. Watkins; correct?

A. Yes.

Q. Okay. There was no other time she said that; correct?

A. I don't believe so, no.

Q. Okay. So then turning your attention to Paragraph 18, you said "according to Ms. Watkins, Mr. Ference's job responsibilities were to be entirely secular, with all matters of religious education and rituals for the sixth-grade students to be handled by Jennifer Davis, Aquinas' other sixth-grade teacher". I want to focus on a few of those words.

Am I correct that Ms. Watkins never used the word secular to describe your teaching duties; is that correct?

A. I don't recall.

Q. Okay. Well, you alleged in your complaint that she said you would only have secular duties.

As you sit here today, do you have a recollection of her using the word secular?

A. Not that I can say for certainty, no.

Q. Okay. And I understand if you're using the word secular to describe what you believe she was saying, but she never used the word secular as far as you remember; did she?

A. Not that I recall, no.

Q. Okay. And am I correct that you used the word secular in your complaint to describe Ms. Watkins' statement that you would not teach religion class; correct?

A. Correct.

Q. Okay. And can we agree, unless you need to look at it, can we agree that your teacher contract that's part of Exhibit D doesn't state that you would be teaching only secular duties; correct?

A. The contract does not state that, no.

Q. Now, you also made use of the words in

Ms. Davis, did she have her own homeroom?
A. She did.
Q. And you had your own homeroom?
A. I did.
Q. And in the mornings when students reported for the school day, some students reported to your homeroom classroom and some reported to hers?
A. Correct.
Q. All right. And when you took the kids to church, did you take the kids from your homeroom to church?
A. No. Well, I accompanied them, the entire sixth-grade as a grade level.
Q. Okay. But you accompanied your students over to the Blessed Sacrament Cathedral for mass?
A. We went over as an entire sixth-grade.
Q. I understand.
A. So yes, I was with --
Q. But you were responsible for your students when they went to mass?
A. For their behavior, yes.
Q. And Ms. Davis, she would have accompanied her classroom students to mass along with -- to participate in the mass along with the other sixth-grade students; correct?

A. Yes.

Q. How many sixth-grade classrooms were there?

A. Two.

Q. How many students were in your classroom?

A. I believe there were 12.

Q. How many students were in Ms. Davis' classroom?

A. 12.

Q. And when the sixth-grade students attended mass, were there other grade levels that attended mass with them?

A. Occasionally.

Q. And, again, they would have gone -- when they went to mass while you were there for the month you were there, they just walked from the school building up to the Blessed Sacrament Cathedral to go to mass?

A. Correct.

Q. Okay. So if I could turn your attention back to Exhibit C for a moment. I want to ask you are you able to tell me as you look at Exhibit C -- I think we covered this before, but I just want to make sure I understood exactly what you remember today.

You believed that August 26th, which was a

Thursday, was the first day that your students attended class; correct?
A. It would be the 26th of August, yes.
Q. Okay. And did they come for a full day or a half day that day; do you remember?
A. I believe it was a full day.
Q. Okay. And then the last day that you would have had students in your classroom before you were terminated was on the termination date?
A. Correct.
Q. Okay. And then in your complaint, you said the termination date was September 28th. So that would have been a Tuesday; correct?
A. Yes.
Q. And am I correct that you worked all of the scheduled schooldays in between August 26th and September 28th?
A. Correct.
Q. You didn't take any days off?
A. I don't think so, no.
Q. Okay. Now, when you went over to attend mass or accompanied your students to mass, you stayed with your students during the entire mass; correct?
A. Yes.
Q. And a Catholic Mass lasts approximately

one hour; correct?

A. Yes.

Q. And when your students attended the mass, they sat in a church pew; correct?

A. They did.

Q. And you sat in the church pew with them; correct?

A. Behind them.

Q. Okay. But in a pew behind them?

A. Correct.

Q. Okay. And during the mass with your students, your students prayed either publicly or privately during the mass?

A. Yes.

Q. And during the mass with your students, you prayed with your students; did you not?

A. I did not.

Q. Okay. So during a Catholic Mass, there are at various times psalms or hymns that are sung; correct?

A. Yes.

Q. All right. And during the times that you attended mass with your students, there were times when you sung hymns and psalms with your students; were there not?

A. I don't believe so, no.
Q. Never?
A. Again, I don't recall.
Q. All right. Well, the Catholic Mass has a very structured format; correct?
A. It does.
Q. Okay. And you understood from your days as a practicing Catholic that that structured format was for the mass; correct?
A. Understood or remembered what it was?
Q. How about remembered what it was?
A. Not exactly, no. It had been, I don't know, almost 30 years.
Q. Okay. So do you recall that the mass was conducted where the priest started the mass with an introduction and then there were readings and then there's a homily and then he prepared the altar --
A. Yes.
Q. -- for the Sacrament of Communion, and then there was communion and then there was a concluding rite with the end of the mass; correct?
A. Yes.
Q. That generally describes in summary fashion a Catholic Mass; correct?
A. I believe so, yes.

Q. And that is liturgical, meaning that they do that every mass; correct?

A. If that's your definition of liturgical, yes.

Q. Okay. Now, during a Catholic Mass, there are times when the congregation alternates between sitting, standing and kneeling; correct?

A. Yes.

Q. At any time during the mass you attended with your students when your students sat down in the pew, you sat down in the pew; correct?

A. Yes.

Q. And any time during the mass when your students stood up while they were in the pew, you stood up with them; correct?

A. I did.

Q. Okay. And any time during the mass when your students were kneeling on the kneelers, you also kneeled on the kneelers; correct?

A. I did.

Q. Okay. Did your students receive Holy Communion during the mass?

A. They did.

Q. And did you ever receive Holy Communion during any mass that you attended with your students?

A. I did not.

Q. You understand as a Catholic who was baptized Catholic and who went through Holy Communion that you're still eligible to receive Holy Communion?

A. I did not.

Q. Okay. Was there any reason why you decided not to receive Holy Communion during the mass?

A. Because I was not Catholic.

Q. In Paragraph 22 through 23 of your complaint -- I'll just again lump those together for expedience -- you alleged "as part of a standard school day, Aquinas started and ended with prayers". Paragraph 23, Ms. Cochenour led the students in prayer over Aquinas' PA system. 24, Mr. Ference had no role in facilitating these prayers. Okay. So let me follow up with some questions on those three paragraphs.

When your students said prayers at the beginning and end of each day, you were present with them in the classroom; correct?

A. I was.

Q. And you would have been positioned at the front of the classroom as they were seated in their seats; correct?

A. Most of the time, yes.

MR. MATTHEWS: All right. Can we take another five-minute break?

MR. KENNEDY: Sure.

(Whereupon, a short recess was taken.)

MR. MATTHEWS: Just a couple more, Nick, and then we'll be done.

MR. KENNEDY: Sure.

BY MR. MATTHEWS:

Q. Mr. Ference, I neglected to ask you during the termination meeting -- I asked whether Ms. Watkins or Dr. Marsteller said anything and you told me what they said, but I think I neglected to ask you whether you said anything.

Do you recall whether you said anything during the meeting that you had with Dr. Marsteller and Ms. Watkins where they told you that your employment was terminated?

A. Mostly just that I would do my best to get everything out that day and, if not, I would make arrangements to come back after.

Q. Okay. Did you say anything about why you were terminated, anything on that topic?

A. Well, they told me --

Q. No. I understand they told you, but did

you express any opinion about it?
A. I believe I told them that it was an antiquated view and it was very disappointing that they felt that way.
Q. Okay. Anything other than that?
A. Not that I recall.
Q. And then I apologize if I asked you this before. Mr. Kennedy may yell at me, but I can't remember if I asked you how often your kids attended mass during the month you were there. I thought you may have said once a week, but I can't remember.
A. I know we attended an all-school service and I think we may have gone as a grade level twice.
Q. Okay. The all-school service, was that at the beginning of the school semester?
A. Yes, it was very close to the beginning of the year.
Q. Okay. And then you think you attended with them two times after that before you were terminated?
A. Yes.
Q. Okay. Fair enough.
MR. MATTHEWS: Do you want to instruct on reading?
MR. KENNEDY: Ken, we can either read