**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KENNETH FERENCE,

Plaintiff,

vs.

ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY,

Defendants.

**ELECTRONICALLY FILED**

No. 2:22-cv-00797-NR-MPK

District Judge J. Nicholas Ranjan
Magistrate Judge Maureen P. Kelly

**JURY TRIAL DEMANDED**

**BRIEF SUPPORTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. Introduction

The Roman Catholic Diocese of Greensburg ("Diocese") operates a private, Catholic religious school called Aquinas Academy ("Aquinas" and when referred collectively with Diocese, "Defendants"). Defendants hired Plaintiff Kenneth Ference ("Mr. Ference") to teach at Aquinas. Mr. Ference explicitly agreed, in becoming an Aquinas teacher, to live his life in word and deed in accordance with the undisputed Catholic view of marriage: that it is a union of man and woman. But Mr. Ference told neither Diocese nor Aquinas that he was married to a man.

Defendants soon learned of Mr. Ference's same-sex marriage and terminated him because same-sex marriage contradicts the Catholic view of marriage. Mr. Ference then brought sex-discrimination claims under Title VII and the Pennsylvania Human Relations Act ("PHRA"). The Court twice denied Defendants' Rule 12(b)(6) motions to dismiss because "it would be premature . . . to consider the merits of the Diocese's arguments on the Title VII religious exemption, church autonomy doctrine, and ministerial exception," (ECF No. 24 pp. 5–6) and "premature to consider Defendants' arguments related to 303 Creative" on First Amendment expressive association rights. (ECF No. 51 pp. 3–4.) Those arguments could be raised "on a more

developed record at summary judgment." (ECF No. 24, pp. 5–6). The common denominator between Defendants' arguments is that they all involve assessing whether Defendants are religious employers and whether, as a teacher at a Catholic school, Mr. Ference's role was religious.

The undisputed material facts establish that Aquinas is a Catholic religious institution. (ECF No. 67 ¶¶ 2–3.) Further, even Mr. Ference concedes that his use of the word "secular" in his Complaint and Amended Complaint to describe his job duties meant only that, as a non-practicing Catholic[1], he was told by Aquinas's Principal, Kelly Watkins, that he would not teach the daily religion class to his sixth grade students. (Id. ¶¶ 9–12, 16–18, 26–29.) Otherwise, he was expected to adhere to the obligations of his teaching contract documents during his four-week employment by Aquinas, which required him to "support and participate in all religious functions of the school including school liturgy." (Id. ¶ 14; ECF No. 68-4 pp. 3–4, 7–8.)

Defendants are an exempt religious organization under Title VII. Under 303 Creative, Defendants can lawfully terminate Mr. Ference so that his views and actions on marriage do not dilute Defendants' First Amendment-protected view of marriage that Defendants communicate to their religious school students. The church autonomy doctrine is also a complete bar to this action. Finally, the undisputed facts mandate application of the ministerial exception. The Court should grant summary judgment in favor of defendants and dismiss this action with prejudice.

## II. Undisputed Material Facts

The Diocese contains parishes in Armstrong, Fayette, Indiana, and Westmoreland Counties and its Chancery Office is in Greensburg. (ECF No. 67 ¶ 1). Aquinas is a Catholic elementary school located in Diocese's geographic area, specifically in Greensburg. (Id. ¶ 2.) The Most

[1] Mr. Ference was raised in the Catholic faith. He received the Roman Catholic sacraments of Baptism, Holy Communion, and Confirmation. (ECF No. 67 ¶¶ 16–18.)

Reverend Bishop Larry J. Kulick, JCL ("Bishop Kulick"), is the Bishop of the Diocese. (Id. ¶ 4.) Monsignor Raymond Riffle ("Monsignor Riffle") is the Vicar General of the Diocese. (Id. ¶ 5.)

The Diocese operates and oversees ten Catholic elementary schools, including Aquinas, and two Catholic high schools. (Id. ¶ 6.) The Diocese has operational control over the schools and also provides administrative support to them through a superintendent, assistant superintendent, and other administrative employees. (Id. ¶ 7.) The Roman Catholic Church believes that its schools are the principal means for transmitting the Catholic Faith to new generations of Catholics. (ECF No. 75 ¶ 1.) Catholic schools do not segment their functions into religious and secular components; at all times, the Catholic school is engaged in the process of catechesis and the formation of the Christian personality, a process which is integrated within the curriculum of all subjects taught in Catholic schools, including Aquinas. (Id. ¶ 2.)

Aquinas is a Pennsylvania charitable trust and a nonprofit entity. (Id. ¶ 3.) The Diocese is a Pennsylvania charitable trust and a nonprofit entity. (Id. ¶ 4.) Bishop Kulick is the trustee of Aquinas and the Diocese. (Id. ¶ 5.) A Board of Trust Administrators likewise has responsibility for overseeing the operation of Aquinas. (Id. ¶ 6.) Aquinas's trust administrators are Monsignor Riffle (Chairman of the Board, Vicar General of the Diocese, and Moderator of the Curia), Father Daniel Blout (Pastor of Our Lady of Grace Parish), Father Lawrence Manchas (Pastor of St. Paul and St. Bruno parishes), Father Rod Rodriguez (Pastor of Holy Cross Parish), and Deacon William Newhouse (Administrator of Scared Heart and Ascension parishes). (Id. ¶ 7.) Aquinas's trust administrators oversee their respective parishes, which serve as "feeder parishes" to Diocesan Catholic schools. (Id. ¶ 8.) Feeder parishes send children in their parishes to be educated in Catholic schools operated by the Diocese. (Id. ¶ 9.)

The Diocese provides approximately six million dollars in an annual financial subsidy to the schools in the Diocese, including Aquinas. (Id. ¶ 10.) Aquinas's mission is an extension of the Catholic Church's faith formation. (Id. ¶ 11.) Aquinas is a Catholic school where parents send their children to learn about the faith, not only in a designated religion class that is part of the curriculum, but in every subject that is taught and every activity that is conducted. (Id. ¶¶ 12–13.) The presence of God is infused into all school subjects. (Id. ¶ 14.) As an example, there are many scientific theories about the origin and creation of the universe, however, in a Catholic school, it is taught that God is the prime mover of all creation. (Id. ¶ 15.) In a Catholic school art class, it is taught that the beauty of art is attributed to God. (Id. ¶ 16.) In a Catholic school, children are taught to give primacy to God and develop ways of behavior that give witness to those beliefs. (Id. ¶ 17.) All Catholic and non-Catholic students who attend Diocesan Catholic schools are required to participate in organized prayer and attend mass together. (Id. ¶ 18.)

Mr. Ference was hired by the Diocese in August 2021 to serve as a sixth grade teacher at Aquinas. (ECF No. 67 ¶ 12.) He completed employment onboarding forms as part of the hiring process, including a professional services agreement. (Id. ¶¶ 13–14.) In his contract, Mr. Ference "recognize[d] the religious nature of the Catholic school and agree[d]" that the Diocese had the right to dismiss him "for immorality, scandal, or rejection of the official teaching, doctrine[,] or laws of the Roman Catholic Church[.]" (ECF No. 75 ¶¶ 19–22.) He additionally acknowledged that he could be immediately terminated for violating "the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality." (Id. ¶¶ 21–23.)

An appendix attached to the professional services agreement further described Mr. Ference's role as an Aquinas teacher for the Diocese. (ECF No. 68-4 pp. 6–7.) Diocesan

teachers at Aquinas must "serve[] the school in this Catholic Ministry within instructional and extra-curricular capacities . . . ." (Id. p. 6.) They further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students in a Christ-like manner.. . ." (Id.) The requirements of being an Aquinas teacher include having "an understanding and acceptance of Catholic School Philosophy, goals, and objectives," abiding "by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church." (Id. p. 7.) Mr. Ference was also required to "support and participate in all religious functions of the school including school liturgy." (Id.) Mr. Ference accepted the Diocese's teacher job description and requirements and signed the appendix to the professional services agreement. (Id.)

Mr. Ference also signed a form acknowledging his receipt of the Diocese's code of pastoral conduct. (Id. p. 8.) He, via that form, stated

> [i]n accord with my role as Church personnel, and in witness to the Gospel of Jesus Christ, I will conduct myself with integrity, acting in a manner that is consistent with the discipline and teachings of the Catholic Church. I will guide my behavior by civil and canon law, by the policies of the Diocese of Greensburg and by the Code of Pastoral Conduct by . . .
>
> 1. Respecting the rights of each person and advancing his or her welfare during the course of counseling, advising or spiritual direction.
>
> 2. Holding in the strictest confidence information disclosed during the course of counseling, advising or spiritual direction . . . .

(Id.) By executing that form, Mr. Ference acknowledged that he "carefully read, underst[ood], and hereby commit[ted] to conducting myself in accord with the Diocesan Code of Pastoral Conduct." (Id.)

During his job interview, Mr. Ference did not tell Aquinas's principal, Kelly Watkins, that he was in a same-sex marriage with William Fry. (ECF No. 67 ¶ 22.) In fact, when listing his husband, William Fry, as a contingent beneficiary on a life insurance onboarding form on

August 25, 2021, Mr. Ference referred to Mr. Fry as a "friend." (Id. ¶ 23.) About a week later, Mr. Ference indicated in a health insurance waiver form that this "friend," Mr. Fry, was actually his husband. (Id. ¶¶ 24–25.)

Mr. Ference was a practicing Catholic and regularly attended Mass from the age of five until approximately 1996 when he went to college. (Id. ¶ 17.) Mr. Ference received the Catholic sacraments of Baptism, Holy Communion, and Confirmation. (Id. ¶ 16.) He was further informed and instructed regarding the tenets of the Catholic faith when he acknowledged reviewing, understanding, and agreeing with the following additional onboarding documents he executed when he was hired: Teacher's Contract documents, Code of Pastoral Conduct, and Aquinas Handbook. (ECF No. 75 ¶¶ 19–28.) Had Mr. Ference remained a teacher at Aquinas, he would have received additional catechetical training on the tenets of the Catholic faith. (Id. ¶ 31.)

Mr. Ference taught the subjects of math, science, and social studies to Aquinas's sixth grade students. (ECF No. 67 ¶ 26.) The Aquinas curriculum for science, language arts, and social studies infuses the presence of God in those subjects. (ECF No. 75 ¶¶ 13–17, 33–36.) Jennifer Davis was Aquinas's other sixth-grade teacher; she taught English, writing, and a daily religion class. (ECF No. 67 ¶ 27.) As a hiring restriction, Aquinas principal Kelly Watkins told Mr. Ference that he was not permitted to teach the sixth grade religion class because he is a practicing Lutheran. (Id. ¶ 28.) Mr. Ference does not recall Watkins ever using the word "secular" to describe his teaching duties at Aquinas. (Id. ¶ 29.) Mr. Ference conceded that his use of the word "secular" in his Complaint to describe his teaching duties at Aquinas meant only that he did not teach the religion class that his students attended once daily. (Id.; ECF No. 75 ¶ 37.)

Watkins never told Mr. Ference that "religious rituals" were not part of his teaching duties at Aquinas. (ECF No. 75 ¶ 38.) And Mr. Ference never told Watkins that he objected to

performing the teaching duties described in his Professional Services Agreement, which included support of and participation in Mass, daily prayers, and other religious rituals of a Catholic school. (Id. ¶¶ 19–29, 39.) As part of his teaching duties at Aquinas, Mr. Ference was required to attend and did attend Mass with his students during the school day, wherein he sat in the church pew behind his students. (ECF No. 67 ¶ 30.) During a Catholic Mass, there are times when the congregation alternates between sitting, standing, and kneeling. (Id. ¶ 31.) When Mr. Ference attended Catholic Mass with his Aquinas students, he sat when they sat, he stood when they stood, and he kneeled when they kneeled. (Id. ¶ 32.)

Aquinas students began and ended each school day by saying prayers together, which were recited over the school intercom. (Id. ¶ 33.) Mr. Ference was present, positioned in the front of the classroom, and supervised his students when they said prayers to begin and end each school day. (ECF No. 75 ¶ 40.) Mr. Ference's students said the Our Father and Hail Mary prayers, with which he was familiar, when beginning and ending each school day. (Id. ¶ 41.) Supervising his students in the classroom when they said prayers to begin and end each day did not make Mr. Ference uncomfortable. (Id. ¶ 42.) As a teacher at Aquinas, Mr. Ference understood that he could not question the validity of the tenets of the Catholic faith when teaching his students. (Id. ¶ 43.) In addition, Mr. Ference's performance evaluation, and the form used by Aquinas's principal to complete the evaluation, included an assessment of whether he infused the Catholic faith into his lessons. (Id. ¶¶ 46–47.)

It is a genuinely held tenet and belief of the Roman Catholic faith that marriage is a conjugal union between a man and a woman, both in legal status, in which they establish a perpetual and indissoluble union of lives and that the two goals of this union are procreation and education of the offspring and the mutual support of the spouses. (Id. ¶ 48.) Superintendent

Maureen Marsteller told Mr. Ference he was terminated because his same-sex marriage violates the tenets of the Catholic faith that marriage is between a man and a woman. (Id. ¶ 49.) In response to being told that he was terminated for being in a same-sex marriage, Mr. Ference believes he told Dr. Marsteller that the Catholic Church's views on marriage were antiquated and that it was very disappointing that they felt that way. (ECF No. 67 ¶ 34.) The decision makers for Mr. Ference's termination were Dr. Marsteller, Monsignor Riffle, and Bishop Kulick. (Id. ¶ 35.)

## III. Argument

### A. Diocesan Schools are the Catholic Faith

Diocese is an ecclesiastical entity, charged with the responsibility, *inter alia*, of teaching the Catholic Faith within its territorial boundaries. It is governed by the Roman Catholic Code of Canon Law, and by ecclesiastical statutes and other enactments adopted by the competent ecclesiastical authorities within the Catholic Church. The Roman Catholic Church believes that its schools are the principal means for transmitting the Catholic Faith to new generations of Catholics. Catholic schools do not segment their functions into religious and secular components; at all times, the Catholic school is engaged in the process of catechesis and the formation of the Christian personality, a process which is integrated within the curriculum of the Catholic schools.

Civil courts have repeatedly recognized that Catholic schools, unlike public or nonsectarian schools, exist for a religious mission to which everything in the life and operation of the school is subordinate. Moreover, the U.S. Supreme Court has repeatedly defined Catholic schools, not as secular off-shoots of the Church, but as the Church itself. Lemon v. Kurtzman, 403 U.S. 602 (1971); Meek v. Pittenger, 421 U.S. 349 (1975); Tilton v. Richardson, 403 U.S. 672 (1971); Aguilar v. Felton, 473 U.S. 402 (1985). The characteristics of Catholic schools most frequently relied upon by the Supreme Court and other courts in discussing the religious nature of these

entities all apply to Aquinas and the Diocese. As an integral part of the religious teaching ministry of the Roman Catholic Church and the Diocese, Aquinas:

a. is a religious enterprise and is conducted as "an integral part of the religious mission" of the Catholic Church. Lemon, 403 U.S. at 618; Meek, 421 U.S. at 366;

b. is an institution whose substantial, if not dominant, purpose is to inculcate Catholic religious values. Tilton, 403 U.S. at 685;

c. is an institution in which religion is so pervasive that a substantial portion of its function is subsumed in the religious mission of its sponsoring parish, which is the only reason for the school's existence. Meek, 421 U.S. at 366;

d. is an institution whose affirmative, if not dominant, policy of instruction for school children is to assure future adherents to the Catholic faith by having control of their education at an early age. Tilton, 403 U.S. at 685–86;

e. carries on religious activities, including instruction and worship, prayer, and Catholic Christian witness. Lemon, 403 U.S. at 618;

f. conducts and sponsors religiously oriented extracurricular activities for faculty and students. Lemon, 403 U.S. at 615;

g. is housed in a building whose exteriors contain identifying religious symbols, and whose interiors, such as classrooms and hallways, contain Catholic religious symbols, as well as inspirational quotations from Scripture and other religious doctrinal sources. Lemon, 403 U.S. at 615;

h. is an institution which has an atmosphere in which religious instruction and religious vocations are integrated into the total educational function. Lemon, 403 U.S. at 615;

i. is an institution which is a vehicle for transmitting the Catholic faith to the next generation. Lemon, 403 U.S. at 616;

j. conducts regular religious services and exercises. Lemon, 403 U.S. at 615;

k. employs teachers and other employees who are subject to the direction and discipline of religious authority which necessarily pervades the school and who are required to subscribe to the School's doctrinal statements, and conform themselves, both on and off campus, to high standards of Catholic Christian behavior. Lemon, 403 U.S. at 617–18; Meek, 421 U.S. at 371; and Little v. Wuerl, 929 F.2d 944, 948 n.6 (3d Cir. 1991);

l. employs teachers and other employees who work in a school which is operated to inculcate the tenets of the Catholic religion and which is dedicated to rearing children in that faith. Lemon, 403 U.S. at 618; Meek, 421 U.S. at 371;

m. employs teachers and other employees who are responsible by their teaching and conduct to impart the Word of God, and the principles of the Catholic faith. Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 379 (1985);

n. employs teachers who are expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They do so by, *inter alia*, praying with their students, attending Mass with the students, and preparing the children for their participation in other religious activities. Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2066 (2020);

o. does not divide instruction into "religious" and "secular" components, the entire ongoing life of the church-school community being religious. Meek, 421 U.S. at 366; and

p. operates as a "faith community" with all persons therein being expected to provide Catholic Christian nurture and to encourage, by work and action, reverence for and adherence to Catholic religious principles. McCormick v. Hirsch, 460 F. Supp. 1337, 1352 (M.D. Pa. 1978).

As summarized by the Supreme Court, the "raison d'etre" of Diocesan Church schools "is the propagation of a religious faith." NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 503 (1979). Moreover, Aquinas and the Diocese are indisputably religious organizations based on the factors set forth in LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 226 (3d Cir. 2007) and Garcia v. Salvation Army, 918 F.3d 997, 1003 (9th Cir. 2019). (ECF No. 67 ¶¶ 1–7, 13–15, 21, 30–34; ECF No. 75 ¶¶ 1–29, 33–36, 40–47.)

**B. Title VII's Exemptions Cover Diocese's Decision to Terminate Plaintiff Because He is Married to a Man**

Defendants cannot be liable under Title VII for terminating Mr. Ference because he is married to a man. This conclusion follows from Title VII's text and precedential case law interpreting Title VII.

Title VII defines religion as "all aspects of religious observance and practice, as well as belief . . . ." 42 U.S.C. § 2000e(j). While Title VII usually prohibits religion-based employment discrimination, two exemptions explicitly permit such discrimination. First, Title VII's prohibition of religion-based discrimination does not apply "to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a); see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 329 (1987) (holding that 42 U.S.C. § 2000e-1(a) "exempts religious organizations from Title VII's

prohibition against discrimination in employment on the basis of religion."). Second, Title VII does not prohibit a religious educational institution from hiring

> employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

Precedential case law permits religious organizations to discriminate in employment decisions on the basis of religion. The Third Circuit construed the above provisions and held that

> Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's "religious activities." Against this background and with sensitivity to the constitutional concerns that would be raised by a contrary interpretation, we read the exemption broadly. We conclude that the permission to employ persons "of a particular religion" includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles.

Wuerl, 929 F.2d at 951 (holding that Title VII's exemptions protected a parish's decision to not rehire a teacher who remarried without the new marriage being validated by the Catholic Church).

This Court is bound by Wuerl and must apply it to Mr. Ference's case. Defendants fired Mr. Ference because it found out that he is married to a man. (ECF No. 75 ¶¶ 48–49; ECF No. 67 ¶ 34.) Mr. Ference acknowledged the religious nature of his employer by signing employment forms that, among other things, indicated he was "Church" personnel and could be fired for violating Church laws on marriage and espousing views contrary to the Church's on

homosexuality. (ECF No. 67 ¶¶ 13–15; ECF No. 68-4 pp. 6–7; ECF No. 75 ¶¶ 19–28.) Defendants' termination of Mr. Ference because he is married to a man is legal under Title VII as Mr. Ference's conduct contradicted Defendants' religious principles. (ECF No. 75 ¶¶ 19–28, 48–49; ECF No. 67 ¶¶ 13–15, 34); Wuerl, 929 F.2d at 951.

Title VII's religious exemptions create an exemption to all forms of discrimination under Title VII, not just religious discrimination claims, so long as the employment decision was rooted in religious belief. Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 141 (3d Cir. 2006); EEOC v. Mississippi College, 626 F.2d 477 (5th Cir. 1980); Maguire v. Marquette Univ., 627 F. Supp. 1499 (E.D. Wis. 1986), aff'd in part on other grounds, vacated in part, 814 F.2d 1213 (7th Cir. 1987); Bear Creek Bible Church & Braidwood Mgmt., Inc., v. EEOC, 2021 WL 5449038, *6 (N.D. Tex. Oct. 31, 2021) ("The plain text of this exemption, therefore, is not limited to religious discrimination claims; rather, it also exempts religious employers from other forms of discrimination under Title VII, so long as the employment decision was rooted in religious belief."); Starkey v. Archdiocese of Indianapolis, 41 F.4th 931, 496 (7th Cir. 2022) (Easterbrook, J., concurring) ("The Diocese is a religious association, and the high school is a religious educational institution. Any temptation to limit this exception to authorizing the employment of co-religionists, and not any other form of religious selectivity, is squelched by the definitional clause in § 2000e(j), which tells us that religion includes "all aspects of religious observance and practice, as well as belief"). The Court should grant Defendants' motion for summary judgment based on Title VII's religious exemption.

### C. Mr. Ference's Title VII and PHRA Claims Fail as a Matter of Law due to the Supreme Court's Decision in 303 Creative LLC v. Elenis

The First Amendment protects Defendants from being forced to employ or penalized for not employing Mr. Ference due to his same-sex marriage contradicting their views on marriage.

The Supreme Court emphatically made that point about a year ago. In 303 Creative LLC v. Elenis, the Supreme Court held that a business owner cannot be compelled to create speech (custom wedding websites promoting same-sex marriages) that she does not believe in, even if she generally offers her commercial services to the public. 143 S. Ct. 2298, 2308, 2311–2318, 2321–22 (2023). The 303 Creative decision aligns with prior Supreme Court precedent permitting the exclusion of individuals from events or association with institutions when those individuals' views did not conform with the views of the event organizers or institution. Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. Of Boston, Inc., 515 U.S. 557, 572–73 (1995); Boy Scouts of America v. Dale, 530 U.S. 640, 654, 656 (2000).

The Supreme Court, in 1995, allowed veterans organizing a parade to exclude a group of gay, lesbian, and bisexual people from the event. Hurley, 515 U.S. at 560–61, 581. In so ruling, the Supreme Court acknowledged that the parade constituted expressive content and that the First Amendment protected the veterans' right to deliver the message that they wanted without their views being diluted "by views they did not share." 303 Creative, 143 S. Ct. at 2311 (citing Hurley, 515 U.S. at 572–73). It was the very presence of a gay, lesbian, and bisexual parade unit within the veterans' parade that the Supreme Court determined would interfere with the veterans' message. Hurley, 515 U.S. at 572–75.

The First Amendment's Free Speech Clause protects the "freedom to think as you will and to speak as you think." Dale, 530 U.S. at 660–61 (internal quotation marks omitted). In Dale, the Supreme Court upheld the Boy Scouts's right to exclude an assistant scoutmaster after they learned he was gay. Id. at 661. This is because the Boy Scouts were "an expressive association" shielded by the First Amendment. Id. at 656. Requiring the Boy Scouts to include the assistant scoutmaster would "interfere with [its] choice not to propound a point of view contrary to its beliefs." Id. at

656. It was the very presence of a gay assistant scoutmaster that would have caused the Boy Scouts to "propound a point of view contrary to its beliefs." Id. at 654.

The "First Amendment protects acts of expressive association." 303 Creative, 143 S. Ct. at 2312. The government cannot "compel a person to speak its own preferred messages," make a silent person speak a message he does not want to speak, or require "an individual to include other ideas with his own speech that he would prefer not to include." Id. If a business owner that generally offers her services to the public may refuse to communicate a message she does not agree with, then Defendants should not be forced to employ (or penalized for not employing) Mr. Ference as a teacher whose example and conduct undermine the doctrinal integrity of the teaching mission of the Church in the presence of impressionable children. (ECF No. 75 ¶¶ 19–28, 48–49; ECF No. 67 ¶¶ 13–15, 34.)

Mr. Ference's decision to enter into a same-sex marriage is inconsistent with Defendants' beliefs on marriage. (ECF No. 75 ¶¶ 48–49; ECF No. 67 ¶ 34.) Put differently, Mr. Ference does not model marriage in the manner that Defendants wish to communicate by word and deed to their students. (ECF No. 75 ¶¶ 1–29); 303 Creative, 143 S. Ct. at 2308, 2311–2318, 2321–22. Similar to the expression at issue in 303 Creative, Hurley, and Dale, Mr. Ference teaching at Aquinas, a Catholic school operated by Diocese, interferes with Defendants' First Amendment right to express their particular views. 303 Creative, 143 S. Ct. at 2308, 2311–2318, 2321–22; Hurley, 515 U.S. at 570, 572–75; Dale, 530 U.S. at 644, 648–51, 653–56, 659, 661. Religious Defendants have the First Amendment right to terminate Mr. Ference's role as an exemplar to children for living his life in violation of Catholic doctrine on marriage. The First Amendment overrides Title VII's and the PHRA's interest here in eliminating employment discrimination. Summary judgment should be entered against all aspects of Mr. Ference's suit with prejudice.

**D. The Church Autonomy Doctrine Precludes Mr. Ference's Sex Discrimination Claims**

Should the Court refuse to apply Wuerl and 303 Creative, it should instead apply the church autonomy doctrine to dismiss Mr. Ference's sex discrimination claims with prejudice. The church autonomy doctrine springs from the First Amendment.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. The Supreme Court has long warned against entanglements between government and religion that produce "confrontations and conflicts" between government and churches. Walz v. Tax Comm'n, 397 U.S. 664, 674 (1970). Over 150 years ago, the Supreme Court explained the basis of the church autonomy doctrine:

> "it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character, a matter over which the civil courts exercise no jurisdiction, in a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them, becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would,

> in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions."

Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713–14 (1976) (quoting Watson v. Jones, 80 U.S. 679, 733–34 (1872)).

The church autonomy doctrine (also known as the ecclesiastical abstention doctrine or religious autonomy) precludes claims challenging religious organizations' personnel decisions if "the alleged misconduct is 'rooted in religious belief.'" Bryce v. Episcopal Church in Diocese of Colorado, 289 F.3d 648, 657–58 (10th Cir. 2002) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)). The Religion Clauses of the First Amendment "protect[] a religious group's right to shape its own faith and mission through its appointments" and "prohibit[] government involvement in such ecclesiastical decisions." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 188–89 (2012); Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952); Serbian Eastern Orthodox Diocese, 426 U.S. at 709; Watson, 80 U.S. at 733 (Thus, matters that concern church discipline or "the conformity of members of the church to the standard of morals required of them" are matters "strictly and purely ecclesiastical in its character . . . over which the civil courts exercise no jurisdiction.").

The church autonomy doctrine applies when resolution of a case would require a court to decide a religious dispute, answer a religious question, or decide the meaning or application of church rules or processes. Catholic Bishop of Chicago, 440 U.S. at 502 ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); Wuerl, 929 F.2d at 949; Demkovich v. St. Andrew the Apostle Parish, 3 F.4th 968, 975–77 (7th Cir. 2021) (en banc); Garrick v. Moody Bible Inst., 412 F. Supp. 3d 859, 868–69, 871–72 (N.D. Ill. 2019); Curay-Cramer, 450 F.3d 130; Bryce, 289 F.3d at 655–59. If Title VII or the PHRA

were construed to apply to Defendants for terminating a teacher at a private Catholic school because that teacher violated Catholic principles, then the Court would be contradicting the church autonomy doctrine by effectively controlling or manipulating the religious-based employment decisions of private Catholic schools. Kedroff, 344 U.S. at 116; Wuerl, 929 F.2d at 948–49; Catholic Bishop of Chicago, 440 U.S. at 502; Curay-Cramer, 450 F.3d at 138–39; Bryce, 289 F.3d at 657–58; Butler v. St. Stanislaus Kostka Catholic Academy, 609 F. Supp. 3d 184, 191 (E.D. N.Y. 2022) ("The ministerial exception is not, however, the only mechanism limiting secular courts' intrusion into the employment decisions of religious institutions. The ministerial exception derives from, and is but one manifestation of, a broader (and well-settled) principle expressed in Supreme Court and Second Circuit jurisprudence—the principle of "church autonomy." This principle is process-oriented: it cabins a court's authority to interfere in a religious organization's "independence in matters of faith and doctrine and in closely linked matters of internal government," Our Lady of Guadalupe, 140 S. Ct. at 2061, even outside the discrimination context.").

The Third Circuit recognizes that the First Amendment's Establishment Clause prevents "excessive government entanglement with religion" while the First Amendment's Free Exercise Clause "protects not only the individual's right to believe and profess whatever religious doctrine one desires, but also a religious institution's right to decide matters of faith, doctrine, and church governance." Petruska v. Gannon Univ., 462 F.3d 294, 306, 311 (3d Cir. 2006) (internal citation and quotation marks omitted). Federal courts may only adjudicate disputes turning "on a question devoid of doctrinal implication" and that "employ neutral principles of law to adjudicate." Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc., 684 F.3d 413, 418–19 (3d Cir. 2012). Nor should federal courts "pars[e] the precise reasons" for a church

employee's termination if doing so "would intrude on internal church governance [and] require consideration of church doctrine . . . ." Lee v. Sixth Mount Zion Baptist Church of Pittsburgh, 903 F.3d 113, 121–22 (3d Cir. 2018).

Mr. Ference seeks to hold Defendants liable for terminating him because he is married to a man, an act violating Defendants' sincerely held religious belief that marriage can only be between a man and a woman. (ECF No. 75 ¶¶ 48–49; ECF No. 67 ¶ 34.) Yet, Mr. Ference contradictorily recognized Defendants' anti-same-sex-marriage religious beliefs when he signed his professional services agreement and acknowledgment of receipt of the code of pastoral conduct. (ECF No. 75 ¶¶ 14–17, 19–27; ECF No. 67 ¶¶ 13–15.) If the Court rules in Mr. Ference's favor, it will force Defendants to employ teachers in Catholic schools whose conduct violates Catholic religious precepts or will penalize Defendants for not employing such teachers. Such a result would eviscerate the First Amendment of the United States Constitution.

The Court should enter summary judgment for Defendants due to the church autonomy doctrine and dismiss all aspects of Mr. Ference's lawsuit with prejudice.

### E. Mr. Ference's Sex Discrimination Claims Fail as a Matter of Law Under the Ministerial Exception

The Court should dismiss Mr. Ference's sex discrimination claims with prejudice because they are not cognizable per the ministerial exception. The Supreme Court recently discussed the ministerial exception in two cases.

First, in Hosanna-Tabor, the Supreme Court recognized that "it is impermissible for the government to contradict a church's determination of who can act as its ministers." Hosanna-Tabor, 565 U.S. at 185. "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so," violates the Free Exercise and Establishment Clauses. Id. at 188–89, 194–95. The ministerial exception "is not limited to the head of a religious congregation . . .

." Id. at 190. Nor does the ministerial exception only apply to individuals that exclusively perform religious functions. Id. at 193.

The Supreme Court has not created "a rigid formula for deciding when an employee qualified as a minister." Id. at 190. It held in Hosanna-Tabor that the ministerial exception applied to a teacher at a Lutheran school for kindergarteners through eighth graders. Id. at 177–78, 190. In making that decision, the Supreme Court noted several facts. The teacher was held out as a minister in a role distinguished from most of the church's members. Id. at 191. To become a minister, the teacher undertook "a significant degree of religious training followed by a formal process of commissioning." Id. The teacher accepted the church's "formal call to religious service, *according to its terms*." Id. (emphasis added). And her job duties reflected her role in "conveying the [c]hurch's message and carrying out its mission." Id. at 192.

The Hosanna-Tabor court concluded its opinion with the following summary:

> The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission. When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way.

Id. at 196.

Eight years after the Supreme Court decided Hosanna-Tabor, it revisited the ministerial exception in Our Lady of Guadalupe. 140 S. Ct. 2049. The Supreme Court in Our Lady of Guadalupe held that the ministerial exception applied to two elementary school teachers in Catholic schools, even though those teachers lacked the title of "minister" and had less religious training than the plaintiff in Hosanna-Tabor. 140 S. Ct. at 2055. The Our Lady of Guadalupe court reasoned that

> [t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

Id. "A church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." Id. at 2060. Otherwise, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." Id.

It is not necessary for someone to be designated a "minister" for the ministerial exception to apply to them. Id. at 2063–64. If titles were dispositive, federal courts "would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail." Id. at 2064. This is also why a religious employee does not, in every case, have to meet "rigid academic requirements" to be subject to the ministerial exception. Id. The Our Lady of Guadalupe court stated that "[w]hat matters," in determining whether the ministerial exception applies, "is what an employee does." Id. "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." Id.

The Supreme Court recognized "abundant record evidence" that two Catholic school elementary teachers in Our Lady of Guadalupe "performed vital religious duties" and held that the ministerial exception applied to them. Id. at 2066. The Supreme Court also highlighted that those teachers' employment agreements "specified in no uncertain terms that they were expected to help the schools carry out" the mission of "[e]ducating and forming students in the Catholic faith." Id. The teachers "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They prayed with their students, attended Mass with

the students, and prepared the children for their participation in other religious activities." The Our Lady of Guadalupe court stated that the teachers' schools

> expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important.

Id.

Courts, when determining if the ministerial exception applies, should "take all relevant circumstances into account" and "determine whether each particular position implicated the fundamental purpose of the exception." Id. at 2067. An employee is not required to be a "'practicing' member of the religion with which the employer is associated" for the ministerial exception to apply. Id. at 2068–69. The Our Lady of Guadalupe court concluded that "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." Id. at 2069.

That Mr. Ference should be subject to the ministerial exception is confirmed by a recent Fourth Circuit decision. Billard v. Charlotte Catholic High Sch., 101 F.4th 316 (4th Cir. 2024). There, the court held that a male teacher of drama and English in a Catholic high school, who was fired after announcing his intent to marry a man, was a minister. Id. at 320–22, 324, 329–31. This was because the teacher was entrusted with "'vital religious duties,' making him a 'messenger' of its faith . . . ." Id. at 330 (quoting Our Lady of Guadalupe, 140 S. Ct. at 2063, 2066). The Catholic high school's educational mission was driven by the Catholic faith, teachers were expected to model the Catholic faith in all subject areas, and teachers were evaluated based on how they

integrated the faith in their classes. Id. at 331. The teacher in Billard "was expected to—and did—begin each class with prayer and attend Mass with his students . . . ." Id. While "Billard was not regularly tasked with providing specifically religious instruction," his "duties included conforming his instruction to Christian thought and providing a classroom environment consistent with Catholicism." Id. at 331–32. The Fourth Circuit held that "[t]he ministerial exception protects religious institutions in their dealings with individuals who perform tasks so central to their religious nature," including a drama and English teacher at a Catholic high school. Id. at 332–33.

Mr. Ference was not allowed to teach religion at Aquinas, but that does not mean he was not a minister. (ECF No. 67 ¶ 28.) Mr. Ference participated in and supervised his students during church services. (Id. ¶¶ 30–33; ECF No. 75 ¶¶ 19–29, 35, 39–42); Our Lady of Guadalupe, 140 S. Ct. at 2066 (ministerial exception applied to teachers at Catholic school that attended mass with students). He admitted that "a standard school day" at Aquinas "started and ended with prayers" and he was positioned in the front of the classroom to supervise and facilitate those prayers. (ECF No. 67 ¶ 33; ECF No. 75 ¶¶ 40–42); Our Lady of Guadalupe, 140 S. Ct. at 2066 (daily prayer occurred in the Catholic schools that the ministerial exception applied to in that case). In Mr. Ference's professional services agreement, he was required to "support and participate in all religious functions of the school, including school liturgy." (ECF No. 68-4 p. 7.) He accepted and "recognize[d] the religious nature of the Catholic school and agree[d]" that the Diocese had the right to dismiss him "for immorality, scandal, or rejection of the official teaching, doctrine[,] or laws of the Roman Catholic Church[.]" (ECF No. 75 ¶¶ 19–22.) He additionally acknowledged that he could be immediately terminated for violating "the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality." (Id. ¶¶ 21–23.) This is similar to the employment agreements between the

plaintiff teachers and Catholic schools that favored application of the ministerial exception in Our Lady of Guadalupe, in which the teachers were to be an example of living their lives in accordance with the Catholic faith. 140 S. Ct. at 2066.

An appendix attached to the professional services agreement further described Mr. Ference's role as a teacher. (ECF No. 68-4 pp. 6–7.) Teachers must "serve[] the school in this Catholic Ministry within instructional and extra-curricular capacities . . . ." (Id. p. 6.) They further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students in a Christ-like manner . . . ." (Id.) The requirements of being a teacher for Diocese include having "an understanding and acceptance of Catholic School Philosophy, goals, and objectives," abiding "by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church." (Id. p. 7.) Had Mr. Ference remained employed, he would have received additional catechetical training on the tenets of the Catholic faith, which he was required to apply in the classroom. (ECF No. 75 ¶ 31.) This is also like the plaintiff teachers in Our Lady of Guadalupe that the ministerial exception applied to. 140 S. Ct. at 2066.

The undisputed facts supporting Defendants' motion are sufficient for this Court to hold that the ministerial exception applies to Mr. Ference. He apparently believes that he can agree to live by Catholic principles, teach in a Catholic school, and follow the code of pastoral conduct, yet be shielded from the ministerial exception when he sues for wrongful termination on the basis of his same-sex marriage—a form of conduct that violates all of the religious principles he promised to faithfully foster. Moreover, the PHRA expressly permits the Defendants "to hire or employ on the basis of sex in those certain instances where sex is a bona fide occupational qualification because of the religious beliefs, practices, or observances of the corporation, or association."

43 P.S. § 955(a). The Court should grant Defendants' summary judgment motion and dismiss all of Mr. Ference's sex discrimination claims with prejudice.

**IV. Conclusion**

Mr. Ference's suit fails as a matter of law for several reasons. Defendants are exempt from Title VII due to their status as religious employers seeking to employ people whose conduct is consistent with their religious beliefs. Under 303 Creative, the First Amendment bars this claim. The church autonomy doctrine forbids the Court from penalizing Diocese for terminating Mr. Ference as a Catholic school teacher because Mr. Ference's same-sex marriage contradicts church doctrine. The ministerial exception applies to Mr. Ference because, by accepting a teaching position for Diocese, he agreed to be an exemplar of the faith in word and deed to Diocese's students. By being in a same-sex marriage, he failed to meet that standard and was lawfully fired.

The legal standards for adjudicating claims under Title VII and the PHRA are the same. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999). The Court should enter summary judgment against Mr. Ference on his Title VII and PHRA claims.

**MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, P.L.L.C.**

/s/ Bernard P. Matthews, Jr., Esq.
**BERNARD P. MATTHEWS, JR., ESQ.**
PA. I.D. #54880
bmatthews@mdbbe.com
**ALEXANDER W. BROWN, ESQ.**
PA. I.D. #322661
abrown@mdbbe.com
40 North Pennsylvania Ave., Suite 410
Greensburg, PA 15601
Telephone No.: (724) 836-4840
Fax No.: (724) 836-0532
*(Attorneys for Defendants)*

**BALL, MURREN & CONNELL, LLC**

/s/ Philip J. Murren, Esq.
**PHILIP J. MURREN, ESQ.**
PA. I.D. #21426
bmc-law2@msn.com
**KATHERINE M. FITZ-PATRICK, ESQ.**
PA. I.D. #208863
fitz-patrick@bmc-law.net
**DAVID R. DYE, ESQ.**
PA. I.D. #88665
dye@bmc-law.net
2303 Market Street
Camp Hill, PA 17011
Telephone No.: (717) 232-8731
Fax No.: (717) 232-2142
*(Attorneys for Defendants)*