**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KENNETH FERENCE,<br><br>Plaintiff,<br><br>v.<br><br>ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY,<br><br>Defendants. | **ELECTRONICALLY FILED**<br><br>No. 2:22-cv-00797-NR-MPK<br><br>District Judge J. Nicholas Ranjan<br>Magistrate Judge Maureen P. Kelly<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS & PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS**

AND NOW, comes Plaintiff, Kenneth Ference, by and through his attorneys, HORNE DALLER LLC, pursuant to the Federal Rules of Civil Procedure and Local Rule 56.C.1, and files the following Response to Defendants' Concise Statement of Material Facts and Plaintiff's Counterstatement of Material Facts:

**RESPONSE TO DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS**

1) The Roman Catholic Church believes that its schools are the principal means for transmitting the Catholic Faith to new generations of Catholics. Ex. A pp. 91–92.

**ANSWER: Admitted.**

2) Catholic schools do not segment their functions into religious and secular components; at all times, the Catholic school is engaged in the process of catechesis and the formation of the Christian personality, a process which is integrated within the curriculum of all subjects taught in Catholic schools, including Aquinas Academy ("Aquinas"). Id.

**ANSWER: Denied. Aquinas segmented Mr. Ference into a secular teaching role due to his non-Catholic status. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, Ference Deposition, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, Ference Declaration, ¶ 3). When Mr. Ference's students**

**recited prayers in the classroom, he monitored their behavior but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, Marstellar Deposition, 46:20-22; Ex. 4, Riffle Deposition, 60:21-61:5). Ms. Davis, Aquinas's other sixth-grade teacher, also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, Davis Deposition, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5). From Defendants' perspective, Mr. Ference, as a non-Catholic, was not equipped to provide prayer instruction to Aquinas's students. (Ex. 3, 44:13-16; Ex. 4, 60:4-7). Further, Mr. Ference was not tasked with providing spiritual direction as part of his teaching duties. (Ex. 4, 81:7-9). Defendants only entrust members of their faith to pass on their faith to students. (Ex. 4, 23:10-19). Ultimately, due to Mr. Ference's lack of Catholic faith, he was not considered a catechetical teacher. (Ex. 3, 25:3-6).**

3) Aquinas is a Pennsylvania charitable trust and a nonprofit entity. Id. at p. 90.

**ANSWER: Admitted.**

4) The Roman Catholic Diocese of Greensburg ("Diocese") is a Pennsylvania charitable trust and a nonprofit entity. Id. at p. 91.

**ANSWER: Admitted.**

5) Bishop Larry Kulick is the trustee of the Aquinas and Diocese charitable trusts. Id.

**ANSWER: Admitted.**

6) A Board of Trust Administrators has responsibility for overseeing the operation of Aquinas. Id. at pp. 92–93.

**ANSWER: Admitted.**

7) Aquinas's trust administrators are Monsignor Raymond Riffle (Chairman of the Board, Vicar General of the Diocese, and Moderator of the Curia), Father Daniel Blout (Pastor of Our Lady of Grace Parish), Father Lawrence Manchas (Pastor of St. Paul and St. Bruno parishes), Father Rod Rodriguez (Pastor of Holy Cross Parish), and Deacon William Newhouse (Administrator of Scared Heart and Ascension parishes). Id.

**ANSWER: Admitted.**

8) Aquinas's trust administrators have responsibilities to oversee their respective parishes, which serve as "feeder parishes" to Diocesan Catholic schools. Id. at pp. 92–93.

**ANSWER: Admitted.**

9) Feeder parishes send children in their parishes to be educated in Catholic schools operated by the Diocese. Id.

**ANSWER: Admitted.**

10) The Diocese provides an approximately 6 million dollar annual financial subsidy to the schools in the Diocese, including Aquinas. Id. at pp. 94–95.

**ANSWER: Admitted.**

11) The mission of Aquinas is an extension of the Catholic Church's faith formation. Id. at pp. 91–92.

**ANSWER: Admitted in part and denied in part. It is admitted that Aquinas's sixth-grade students attend a religious instruction class. To the extent that Defendants claim that religious instruction in the tenets of the Catholic faith occurred in the secular subjects taught to sixth-grade students, that is denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5).**

12) Aquinas, as part of its curriculum, has religious instruction in the tenets of the Catholic faith. Id.

**ANSWER: Admitted in part and denied in part. It is admitted that Aquinas's sixth-grade students attend a religious instruction class. To the extent that Defendants claim that religious instruction in the tenets of the Catholic faith occurred in the secular subjects taught to sixth-grade students, that is denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content**

**because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5).**

13) Aquinas is a Catholic school where parents send their children to learn about the faith, not only in a designated religion class, but in every subject that is taught and every activity that is conducted. Id.

**ANSWER: Admitted in part and denied in part. It is admitted that Aquinas's sixth-grade students attend a religious instruction class. To the extent that Defendants claim that religious instruction in the tenets of the Catholic faith occurred in the secular subjects taught to sixth-grade students, that is denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5). When asked what Catholic beliefs, if any, Mr. Ference would educate his students in, Monsignor Riffle responded, "I don't know that I have an answer specifically." (Ex. 4, 61:21-62:23). When Ms. Watkins was similarly asked about Mr. Ference's role in fostering Catholic values and beliefs in his classes, she explained that she expected him to act in the same manner as a public-school teacher. (Ex. 6, Watkins Deposition, 74:17-75:2).**

14) In a Catholic school, the presence of God is infused into all subjects that are taught. Id.

**ANSWER: Denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5). When asked what Catholic beliefs, if any, Mr. Ference would educate his students in, Monsignor**

**Riffle responded, "I don't know that I have an answer specifically." (Ex. 4, 61:21-62:23). When Ms. Watkins was similarly asked about Mr. Ference's role in fostering Catholic values and beliefs in his classes, she explained that she expected him to act in the same manner as a public-school teacher. (Ex. 6, 74:17-75:2).**

15) As one example, there are many scientific theories about the origin and creation of the universe, however, in a Catholic school, it is taught that God is the prime mover of all creation. Id. at pp. 91–92.

**ANSWER: Denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught, including science. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5). When asked what Catholic beliefs, if any, Mr. Ference would educate his students in, Monsignor Riffle responded, "I don't know that I have an answer specifically." (Ex. 4, 61:21-62:23). When Ms. Watkins was similarly asked about Mr. Ference's role in fostering Catholic values and beliefs in his classes, she explained that she expected him to act in the same manner as a public-school teacher. (Ex. 6, 74:17-75:2).**

16) In a Catholic school art class, it is taught that the beauty of art is attributed to God. Id. at p. 92.

**ANSWER: Denied as immaterial. Mr. Ference and Ms. Davis did not teach art to the sixth-grade students. (ECF 67 ¶¶ 26-27).**

17) In a Catholic school, children are taught to give primacy to God and develop ways of behavior that give witness to those beliefs. Id.

**ANSWER: Admitted in part and denied in part. It is admitted that Aquinas's sixth-grade students attend a religious instruction class. To the extent that Defendants claim that religious instruction in the tenets of the Catholic faith occurred in the secular subjects taught to sixth-grade students, that is denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts.**

**(Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5). When asked what Catholic beliefs, if any, Mr. Ference would educate his students in, Monsignor Riffle responded, "I don't know that I have an answer specifically." (Ex. 4, 61:21-62:23). When Ms. Watkins was similarly asked about Mr. Ference's role in fostering Catholic values and beliefs in his classes, she explained that she expected him to act in the same manner as a public-school teacher. (Ex. 6, 74:17-75:2).**

18) All Catholic and non-Catholic students who attend Diocesan Catholic schools are required to participate in organized prayer and attend Catholic Mass together. Id. at p. 96.

**ANSWER: Admitted.**

19) Kenneth Ference ("Ference") was instructed and trained regarding the tenets of the Catholic faith when he reviewed, understood, and agreed with the terms of the following documents he executed or was provided when he was hired: Teacher's Contract documents, Code of Pastoral Conduct, Aquinas Handbook, and Virtus Training. Ex. A, pp. 39–42; Ex. D, pp. 58–65.

**ANSWER: Admitted in part and denied in part. It is admitted that Defendants provided Mr. Ference with the following documents and training: "Teacher's Contract" (as that phrase is defined in #20); Code of Pastoral Conduct; and Virtus Training. Additionally, Mr. Ference executed the Teacher's Contract. Mr. Ference never received the Aquinas Faculty Handbook ("Aquinas Handbook"), nor was instructed how to read it or locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19). None of the documents and training provided to Mr. Ference were intended to instruct and train him in the tenets of the Catholic faith. Specifically, receiving and signing the Teacher's Contract did not enable Mr. Ference to educate his students in the beliefs of the Catholic religion. (Ex. 4, 64:11-15). Further, it is not the purpose of the Code of Pastoral Conduct to educate individuals in Catholic belief systems. (Ex. 4, 41:2-13). Reading that document will not educate the reader in the Catholic faith. *Id*. For Virtus training, Mr. Ference attended Keeping the Promise Alive 3.0, which lasted for approximately 25-30 minutes. (ECF 67, ¶ 15; ECF 73; Ex. 4, 34:16-35:4). A review of the training content demonstrates that it is focused on preventing sexual predators and not religious instruction. (ECF 73). It is simply not the purpose of that training to give a person a foundation to help spread the Catholic faith. (Ex. 4, 35:23-36:8; Ex. 5, 23:15-19).**

20) Exhibit C, AQUINAS.0001 – 0006, are the documents that comprised Ference's teacher's contract at Aquinas. Ex. B, p. 52

**ANSWER: Admitted.**

21) Ference's job duties, specifications, and requirements are spelled out in his

Teacher's contract, and included: following the laws, doctrines and teachings of the Catholic Church; participating in Protecting God's Children and Training and Catechetical certification; and supporting and participating in all religious functions of the school including school liturgy. Ex. C, AQUINAS.0006.

**ANSWER: Admitted in part and denied in part. It is admitted that Mr. Ference participated in the Keeping the Promise Alive 3.0 training. Further, it is admitted that when Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, 46:20-22; Ex. 4, 60:21-61:5). It is denied that the Teacher's Contract provides an accurate picture of Mr. Ference's position with Defendants. First, at the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Based on that conversation, Mr. Ference understood that the Teacher's Contract's religious-related provisions, except as related behavior supervision, would not apply to him. (Ex. 1, 54:7-14, 70:23-71:5). Second, Defendants never instructed Mr. Ference in the laws, doctrines, and teachings of the Catholic Church. (Ex. 2, ¶ 12). Response to #19 is also incorporated herein. When asked where Mr. Ference would find the laws, doctrines, and teachings of the Catholic Church, Ms. Watkins replied that those were located in the Aquinas Handbook. (Ex. 6, 96:23-25). Mr. Ference never received the Aquinas Handbook, nor was instructed how to read it or locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19). In contradiction to Ms. Watkins, Monsignor Riffle believed that the laws, doctrines, and teachings of the Catholic Church would be taught in catechetical training. (Ex. 4, 78:13-21). Finally, Mr. Ference never attended catechetical training, nor was he told a timeline for its commencement/completion to become certified. (Ex. 2, ¶ 5). According to Ms. Watkins, the Diocese was responsible for tracking attendance for catechetical training, but Ms. Marstellar said that Ms. Watkins held that responsibility. (Ex. 6, 71:17-23; Ex. 3, 30:18-31:12). As a result, it is unclear when and if Mr. Ference would have attended/completed catechetical training. Even if Mr. Ference had attended catechetical training, it would not have enabled him to teach religion to his students. (Ex. 4, 23:10-19).**

22) In recognition of Aquinas's mission as a Catholic religious institution, Ference agreed and acknowledged through execution of his contract, at paragraph 1.j-l, that: Aquinas had the right to dismiss him for immorality, scandal, or rejection of the official teaching, doctrine, or laws of the Roman Catholic Church, including but not limited to, violation of the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of homosexuality and abortion. Id. These contract provisions demonstrate the

nexus between the religious mission of the Church and the Church's resulting expectations regarding the speech, conduct and behavior of the teachers in Church-schools.

**ANSWER: Admitted in part and denied in part. It is admitted that Mr. Ference executed the Teacher's Contract. It is denied that Defendants accurately capture the cited paragraphs of the Contract. Further, Defendants' legal arguments regarding the nexus between religious mission and speech are irrelevant and therefore are denied.**

23) Ference agreed and acknowledged through execution of his Teacher's contract, at paragraph 1.l, that "failure to comply with the doctrine or laws of the Roman Catholic Church shall be immediate grounds for termination by the Employer." Id.

**ANSWER: Admitted.**

24) Ference acknowledged that he read, understood, and agreed that his employment was subject to his compliance with the Code of Pastoral Conduct. Id., AQUINAS 0007.

**ANSWER: Denied. It is denied that Defendants accurately capture the language of the Acknowledgement of Receipt of the Code of Pastoral Conduct.**

25) By agreeing to follow the Code of Pastoral Conduct, Ference agreed that he would "[act] in a manner that is consistent with the disciplines and teachings of the Catholic Church." Id.

**ANSWER: Admitted in part and denied in part. It is admitted that the Acknowledgement of Receipt of the Code of Pastoral Conduct contains the quoted content. It is denied that the Code of Pastoral Conduct instructed Mr. Ference in the disciplines and teachings of the Catholic Church. It is not the purpose of the Code of Pastoral Conduct to educate individuals in Catholic belief systems. (Ex. 4, 41:2-13). Reading that document will not educate the reader in the Catholic faith. *Id.* Furthermore, Mr. Ference was never instructed in the disciplines and teachings of the Catholic Church. (Ex. 2, ¶ 12). According to Monsignor Riffle, Mr. Ference would learn the disciplines and teachings of the Catholic Church in catechetical training, which Mr. Ference never attended. (Ex. 4, 80:5-10; Ex. 2, ¶ 5). In contradiction to Monsignor Riffle, Ms. Watkins claimed that the disciplines and teachings of the Catholic Church were contained in the Code of Pastoral Conduct and the Cardinal Clause. (Ex. 6, 101:20-102:6).**

26) The "Aquinas Faculty Handbook" was placed in Ference's classroom and he was instructed by Aquinas's Principal, Kelly Watkins ("Watkins"), to read it. Ex. D, pp. 76–77.

**ANSWER: Denied. Mr. Ference never received the Aquinas Handbook, nor was**

**instructed how to read it or locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19).**

27) The "Aquinas Faculty Handbook" reiterated the requirements of the "Cardinal Clause" set forth in Ference's Teacher contract, and states: "When hiring teachers and administrators for all Catholic Schools in the Diocese of Greensburg, including private schools, teachers and administrators are required to sign the Cardinal Clause. During the hiring process for teachers and administrators, teachers and administrators are required to read the Cardinal Clause and ask any questions before signing the form. Ex. E, AQUINAS 00090-00091. The employee recognizes the religious nature of the religious nature of the Diocese of Greensburg and agrees the employer has the right to dismiss an employee for public immorality, public scandal or public rejection of the teachings, doctrines or laws of the Roman Catholic Church, hereby terminating any and all rights that the employee may have hereunder, subject, however to the personal due process promulgated by the Roman Catholic Church. Id. Examples of the violation of this clause would include, but are not limited to, participation by an employee in a marriage which is not recognized as being valid by the Roman Catholic Church, support of activities which espouse beliefs contrary to Catholic Church teachings and laws such as advocacy of a practice such as abortion, or the holding up to doubt or question the official teaching, doctrine or laws of the Catholic Church." Id.

**ANSWER: Denied as immaterial. Mr. Ference never received the Aquinas Handbook, nor was instructed how to read it or locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19).**

28) The "Aquinas Faculty Handbook" also stated that Ference was expected to participate in prayer with his students. It states: "Prayer: Prayer should be used in each class. This is to help develop a personal relationship with God, and students will need to be taught how and when to pray." Id. at AQUINAS 00137.

**ANSWER: Denied as immaterial. Mr. Ference never received the Aquinas Handbook, nor was instructed how to read it or locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19).**

29) Watkins expected Ference to participate in the liturgy of the Mass and pray during class with his students. Ex. D. at pp. 77–82.

**ANSWER: Denied. When Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1). Ms. Watkins never instructed Mr. Ference to pray in class with his students. (Ex. 2, ¶ 4). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, 46:20-22; Ex. 4, 60:21-61:5).**

30) Both Ference and Watkins agree that the only limitation placed on Ference's job duties was that he would not teach the religion class because he was not a practicing Catholic. Ex. B, p. 68, Ex. D, p. 25.

**ANSWER: Denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Mr. Ference understood that restriction to include a prohibition on religious content in any of his classes. (Ex. 2, ¶ 2). When Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, 46:20-22; Ex. 4, 60:21-61:5).**

31) Had Ference remained a teacher at Aquinas, he would have received additional catechetical training on the tenets of the Catholic faith, which he was to apply in his teaching position as outlined in the Aquinas Faculty Handbook. Ex. E at AQUINAS 00093–00094.

**ANSWER: Denied as immaterial. Mr. Ference never received the Aquinas Handbook, nor was instructed how to read it or locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19). Further, Mr. Ference never attended catechetical training, nor was he told a timeline for its commencement/completion. (Ex. 2, ¶ 5). According to Ms. Watkins, the Diocese was responsible for tracking attendance for catechetical training, but Ms. Marstellar said that Ms. Watkins held that responsibility. (Ex. 6, 71:17-23; Ex. 3, 30:18-31:12). As a result, it is unclear when and if Mr. Ference would have attended/completed catechetical training. Even if Mr. Ference had attended catechetical training, it would not have enabled him to teach religion to his students. (Ex. 4, 23:10-19).**

32) Had Ference remained a teacher at Aquinas, additional catechetical training on the Catholic faith would have been provided to him beginning during his first year of employment and continuing on an ongoing basis thereafter. Ex. D, pp. 70–73; Ex. G, pp. 29–31.

**ANSWER: Denied as immaterial. Mr. Ference never attended catechetical training, nor was he told a timeline for its commencement/completion. (Ex. 2, ¶ 5). According to Ms. Watkins, the Diocese was responsible for tracking attendance for catechetical training, but Ms. Marstellar said that Ms. Watkins held that responsibility. (Ex. 6, 71:17-23; Ex. 3, 30:18-31:12). As a result, it is unclear when and if Mr. Ference would have attended/completed catechetical training. Even if Mr. Ference had attended catechetical training, it would not have enabled him to teach religion to his students. (Ex. 4, 23:10-19).**

33) The Aquinas curriculum for math, science, and social studies taught by Ference to sixth grade students during the 2021-2022 school year is attached as Exhibit F, AQUINAS.00770–00834.

**ANSWER: Denied. Defendants never provided the attached curriculum to Mr. Ference. (Ex. 2, ¶ 8). As a result, Mr. Ference did not teach the attached curriculum. (*Id*).**

34) The Aquinas curriculum for science and social studies taught by Ference to sixth grade students during the 2021–2022 school year infuses the presence of God in these subjects. Id. at pp. AQUINAS 00787, 00791, 00795, 00816; Ex. G. pp. 16–19; Ex. H, pp. 35–37.

**ANSWER: Denied. Defendants never provided the attached curriculum to Mr. Ference. (Ex. 2, ¶ 8). As a result, Mr. Ference did not teach the attached curriculum. (*Id*). Furthermore, at the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3).**

35) Aquinas and the Diocese require teachers to discuss and infuse God and the tenets of the Catholic faith when teaching all subjects, including social studies, science, and language arts as part of the curriculum. Ex. H, pp. 35–37.

**ANSWER: Denied. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). Also, Mr. Ference never received curriculum that included religious instruction as a required topic in his classes. (Ex. 2, ¶ 8). Ms. Davis also segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5).**

36) For example, sixth grade teacher Jennifer Davis infuses Gospel values into her teaching about polytheistic civilizations during social studies classes. Id.

**ANSWER: Denied. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5).**

37) By using the word "secular" in his complaint to describe his teaching duties at Aquinas, Ference meant only that he did not teach the religion class that his students attended once daily. Ex. B, p. 68.

**ANSWER: Admitted in part and denied in part. It is admitted that the word "secular" was used in reference to the fact that Mr. Ference was not permitted to teach the religion class to his students. However, it is denied that Mr. Ference was "only" referring to that restriction. At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Mr. Ference understood that restriction to include a prohibition on religious content in any of his classes. (Ex. 2, ¶ 2). When Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, 46:20-22; Ex. 4, 60:21-61:5).**

38) Watkins never told Ference that "religious rituals" were not part of his teaching duties at Aquinas. Id. at pp. 68–69.

**ANSWER: It is admitted that Ms. Watkins never used the exact phrase "religious rituals" when speaking to Mr. Ference. However, when Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, 46:20-22; Ex. 4, 60:21-61:5).**

39) Ference never told Watkins that he objected to performing the teaching duties described in his Teacher's contract. Id. at p. 72.

**ANSWER: Admitted in part and denied in part. It is admitted that Mr. Ference did not affirmatively state to Ms. Watkins that he objected to the language of the Teacher's Contract. It is denied that Mr. Ference's Contract provides an accurate picture of his position with Defendants. First, at the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was**

**Lutheran. (Ex. 1, 63:24-65:10). Based on that conversation, Mr. Ference understood that the Teacher's Contract's religious-related provisions, except as related behavior supervision, would not apply to him. (Ex. 1, 54:7-14, 70:23-71:5).**

40) Ference was present, positioned in the front of the classroom, and supervised his students when they said prayers to begin and end each school day. Id.

**ANSWER: Denied. The cited portion of Mr. Ference's transcript does not contain any reference to the fact alleged.**

41) Ference's students said the Our Father and Hail Mary prayers, with which he was familiar, when beginning and ending each day with prayers. Id. at pp. 82–87.

**ANSWER: Admitted.**

42) Supervising his students in the classroom when they said prayers to begin and end each day did not make Ference uncomfortable. Id. at pp. 88–89.

**ANSWER: Denied. Monitoring his students' behaviors while they said prayers to begin and end each day did not make Mr. Ference uncomfortable. (Ex. 1, 88:15-89:1).**

43) As a teacher at Aquinas, Ference understood that he could not question the validity of the tenets of the Catholic faith when teaching his students. Id. at p. 91.

**ANSWER: Denied. Mr. Ference did not believe that he had the right to raise questions with his students about the validity of any of the tenets of the Catholic faith. (Ex. 1, 91:3-7).**

44) Teachers serve as role models for the children they teach. Id. at p. 95.

**ANSWER: Denied. To a degree, sixth-grade students can look to their teachers as role models. (Ex. 1, 95:6-9).**

45) Serving as a sixth grade teacher imparts values on impressionable children. Id.

**ANSWER: Denied. Mr. Ference believes that a teacher's conduct during the classroom imparts certain values on those students based upon the way that they teach. (Ex. 1, 95:12-16).**

46) The Rubric Assessment form for evaluating the performance of Aquinas sixth grade teachers during the 2021-2022 school year is attached as Exhibit I, AQUINAS 00835-00848. This document was produced in response to Ference's supplemental discovery requests. Ex. J.

**ANSWER: Denied. Mr. Ference never received the attached document and was never informed that he would be evaluated on the criteria contained within it. (Ex. 2, ¶ 14). At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). From Ms. Watkins's observations of Mr. Ference teaching, she concluded that he was an "absolutely amazing teacher" who was meeting his job requirements. (Ex. 6, 98:16-99:7; Ex. 8, Aquinas 746). Mr. Ference's only deviation from his job duties was being in a same-sex marriage. (Ex. 6, 108:5-9). Also, according to Ms. Davis, the teacher evaluations did not have a faith-based component to them. (Ex. 5, 25:3-26:7). Defendants used the Charlotte Danielson observation method, which could be used in either a public or private school. *Id.* Ms. Davis segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5).**

47) The Rubric Assessment includes an evaluation of how all teachers infuse the presence of God and tenets of the Catholic Faith into their classroom instruction. Ex. I at AQUINAS 00837, 00839, 00841, 00843, 00845, 00846; Ex. G, pp. 7–11.

**ANSWER: Denied. Mr. Ference never received the attached document and was never informed that he would be evaluated on the criteria contained within it. (Ex. 2, ¶ 14). At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10). Acting in conformity with that instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3). From Ms. Watkins's observations of Mr. Ference teaching, she concluded that he was an "absolutely amazing teacher" who was meeting his job requirements. (Ex. 6, 98:16-99:7; Ex. 8). Mr. Ference's only deviation from his job duties was being in a same-sex marriage. (Ex. 6, 108:5-9). Also, according to Ms. Davis, the teacher evaluations did not have a faith-based component to them. (Ex. 5, 25:3-26:7). Defendants used the Charlotte Danielson observation method, which could be used in either a public or private school. *Id.* Ms. Davis segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5). [redacted] (Ex. 7, Aquinas 849).**

48) It is a genuinely held tenet and belief of the Roman Catholic faith that marriage is a conjugal union between a man and a woman, both in legal status, in which they establish a perpetual and indissoluble union of lives and that the two goals of this union are procreation and

education of the offspring and the mutual support of the spouses. Ex. J, Answer to Rogs 4–5.

**ANSWER: Admitted.**

49) Superintendent Maureen Marsteller told Ference he was terminated because his same-sex marriage violates the tenets of the Catholic faith that marriage is between a man and a woman. Ex. G, pp. 53–55.

**ANSWER: Denied. In terminating Mr. Ference, Ms. Marstellar told him that "perhaps [he] didn't understand because [he] wasn't Catholic that being in the same-sex relationship was not okay." (Ex. 1, 93:9-21).**

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

50) When Mr. Ference applied for the sixth-grade teacher position at Aquinas, he was a practicing Lutheran. (Ex. 1, 36:3-6).

51) During Mr. Ference's job interview with Kelly Watkins, he told her that he was a practicing Lutheran. (Ex. 2, ¶ 1).

52) Mr. Ference was not familiar with the tenets and beliefs of the Catholic Church when he applied at Aquinas. (Ex. 1, 33:11-14).

53) Within 30 minutes of submitting his job application to Aquinas, Aquinas requested to interview Mr. Ference that same day, which he accepted and interviewed with Ms. Watkins. (Ex. 1, 41:8-22).

54) The Diocese hires non-Catholic teachers for its schools because of the need for qualified professionals in the classroom. (Ex. 3, 23:4-7).

55) At the start of Mr. Ference's employment with Defendants, he was told by Ms. Watkins that he was not able to teach religious content because he was Lutheran. (Ex. 1, 63:24-65:10).

56) Mr. Ference understood Ms. Watkins's restriction to include a prohibition on religions content in any of his classes. (Ex. 2, ¶ 2).

57) Acting in conformity with Ms. Watkins's instruction, Mr. Ference did not teach or infuse any religious content in the subjects he taught. (Ex. 1, 65:1-10; Ex. 2, ¶ 3).

58) Mr. Ference, with agreement from Ms. Watkins, attended Mass with his students solely as a chaperone to monitor their behavior. (Ex. 1, 43:4-16, 72:20-73:22; Ex. 3, 46:20-22; Ex. 4, 60:21-61:5).

59) Ms. Davis attended Mass with Mr. Ference, during which Mr. Ference watched the students. (Ex. 5, 33:12-16).

60) Ms. Davis never saw Mr. Ference take Communion, pray with his students, or lead the students in hymns during Mass. (Ex. 5, 33:17-24).

61) When Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students. (Ex. 1, 88:15-89:1).

62) Mr. Ference, as a non-Catholic, was not equipped to provide prayer instruction to Aquinas's students. (Ex. 3, 44:13-16; Ex. 4, 60:4-7).

63) Ms. Watkins observed Mr. Ference teaching and does not recall ever witnessing Mr. Ference talk to his students about prayer or religion. (Ex. 6, 108:18-109:21).

64) The only duty that Ms. Watkins saw Mr. Ference perform that was unique to a Catholic school was going to church. (Ex. 6, 109:22-24).

65) The following language in the professional services agreement: "support and participate in all religious functions of the school, including school liturgy," referred to supporting prayers, mass, and prayer services. (Ex. 6, 97:7-11).

66) Mr. Ference was not tasked with providing spiritual direction as part of his teaching duties. (Ex. 4, 81:7-9).

67) Defendants only entrust members of their faith to pass on their faith to students. (Ex. 4, 23:10-19).

68) Mr. Ference never attended catechetical training, nor was he told a timeline for its commencement/completion. (Ex. 2, ¶ 5).

69) According to Ms. Watkins, the Diocese was responsible for tracking attendance for catechetical training. (Ex. 6, 71:17-23).

70) According to Ms. Marstellar, Ms. Watkins was responsible for tracking attendance for catechetical training. (Ex. 3, 30:18-31:12).

71) Completing catechetical training would not have enabled Mr. Ference to teach religion to his students. (Ex. 4, 23:10-19).

72) In English when someone uses the word "or," they can take -- either of those can stand in its place. (Ex. 6, 92:16-23).

73) According to Ms. Watkins, the following language in the Teacher's Contract: "Catholic School Philosophy, goals, and objectives," referred to content that was contained in Aquinas's handbook. (Ex. 6, 94:23-95:8).

74) Mr. Ference never received Aquinas's Handbook, nor was instructed to read it or how to locate it. (Ex. 2, ¶ 6; Ex. 6, 63:20-64:5, 77:5-19).

75) According to Monsignor Riffle, the following language in the Teacher's Contract: "Catholic School Philosophy, goals, and objectives," referred to content that could largely be obtained from the "About Us" section of Aquinas's website. (Ex. 4, 75:4-25).

76) Mr. Ference was never directed by Defendants to read content from Aquinas's website, including the "About Us" section of it. (Ex. 2, ¶ 7).

77) According to Monsignor Riffle, the laws, doctrines, and teachings of the Catholic Church would be taught to Mr. Ference in catechetical training. (Ex. 4, 78:13-21).

78) According to Ms. Watkins, Mr. Ference would learn the laws, doctrines, and teachings of the Catholic Church from reading Aquinas's Handbook. (Ex. 6, 96:23-25).

79) Mr. Ference never received curriculum that included religious instruction as a required topic in his classes, including the documents marked Aquinas 00770-00834. (Ex. 2, ¶ 8).

80) Mr. Ference taught his subjects for Defendants in the same manner that he taught in public schools. (Ex. 2, ¶ 9).

81) When asked what Catholic beliefs, if any, Mr. Ference would educate his students in, Monsignor Riffle responded, "I don't know that I have an answer specifically." (Ex. 4, 61:21-62:23).

82) For Mr. Ference's role in fostering Catholic values and beliefs in his classes, Ms. Watkins explained that she expected him to act in the same manner as a public-school teacher. (Ex. 6, 74:17-75:2).

83) Defendants' teacher evaluations did not have a faith-based component to them. (Ex. 5, 25:3-26:7).

84) Defendants used the Charlotte Danielson observation method for their teacher evaluations, which could be used in either a public or private school. *Id.*

85) Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (Ex. 5, 19:11-13, 20:7-11, 37:24-38:4, 38:20-23, 39:2-5).

86) Mr. Ference did not begin any of his classes with prayer. (Ex. 2, ¶ 10).

87) Mr. Ference did not take communion in Mass with his students. (Ex. 2, ¶ 11).

88) Receiving and signing the Teacher's Contract documents did not enable Mr. Ference to educate his students in the beliefs of the Catholic religion. (Ex. 4, 64:11-15).

89) Reading the Diocese's Code of Pastoral Conduct will not educate the reader in the Catholic faith. (Ex. 4, 40:5-41:13).

90) Defendants never instructed Mr. Ference in the laws, doctrines, and teachings of the Catholic Church. (Ex. 2, ¶ 12).

91) Because of Mr. Ference's conversation with Ms. Watkins about not teaching religious content, he understood that religious-related provisions of the Teacher's Contract, except as related behavior supervision, would not apply to him. (Ex. 1, 54:7-14, 70:23-71:5).

92) There is a shortage of Catholic teachers. (Ex. 3, 23:8-9).

93) Mr. Ference did not believe that he had the right to raise questions with his students regarding the validity of any of the tenets of the Catholic faith because he was told that he was not to do anything with religion. (Ex. 1, 91:3-10).

94) Due to Mr. Ference's lack of Catholic faith, he was not considered a catechetical teacher. (Ex. 3, 25:3-6).

95) For Virtus training, Mr. Ference attended Keeping the Promise Alive 3.0, which lasted for approximately 25-30 minutes. (ECF 67, ¶ 15; ECF 73; Ex. 4, 34:16-35:4).

96) The Keeping the Promise Alive 3.0 training content is focused on preventing sexual predators and not religious instruction. (ECF 73).

97) It is simply not the purpose of Keeping the Promise Alive 3.0 to give a person a foundation to help spread the Catholic faith. (Ex. 4, 35:23-36:8; Ex. 5, 23:15-19).

98) Ms. Davis never witnessed Mr. Ference provide religious instruction to his sixth-grade students. (Ex. 1, 34:18-20).

99) Throughout Mr. Ference's employment with Defendants, Ms. Davis was not responsible for training him in anything in an official capacity, nor did she provide him instruction as it relates to the Catholic faith or religion. (Ex. 5, 29:15-30:24).

100) From Ms. Watkins's observations of Mr. Ference teaching, she concluded that he was an "absolutely amazing teacher" who was meeting his job requirements. (Ex. 6, 98:6-99:7; Ex. 8).

101) Mr. Ference's only deviation from his job duties was being in a same-sex marriage. (Ex. 6, 108:5-9).

102) Ms. Watkins never instructed Mr. Ference to pray in class with his students. (Ex. 2, ¶ 4).

103) Defendants terminated Mr. Ference because of his same-sex marriage and not because he is Lutheran. (Ex. 4, 81:24-82:5).

104) In terminating Mr. Ference, Ms. Marstellar told him that "perhaps [he] didn't understand because [he] wasn't Catholic that being in the same-sex relationship was not okay." (Ex. 1, 93:9-21).

105) [redacted] (Ex. 7).

106) Mr. Ference never received a Rubric Assessment, including the documents marked Aquinas 00835-00848, during his employment with Defendants and was never informed that he would be evaluated on criteria contained in those documents. (Ex. 2, ¶ 14).

107) Prior to Mr. Ference's arrival, Ms. Davis also had experience teaching sixth-grade science and social studies. (Ex. 5, 20:1-23).

Date: August 9, 2024

Respectfully submitted,

/s/ *Nicholas W. Kennedy*
Nicholas W. Kennedy, Esq. (Pa. 317386)
Nicole Daller, Esq. (Pa. 312224)
Giulia R. Schaub, Esq. (Pa. 330375)

HORNE DALLER LLC
1380 Old Freeport Road, Suite 3A
Pittsburgh, PA 15238
Phone: (412) 967-9400
Fax: (724) 837-1348
nkennedy@hornedaller.com
ndaller@hornedaller.com
gschaub@hornedaller.com

*Attorneys for Plaintiff*