**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KENNETH FERENCE, | **FILED ELECTRONICALLY** |
| Plaintiff, | No. 2:22-cv-00797 |
| v. | District Judge J. Nicholas Ranjan<br>Magistrate Judge Maureen P. Kelly |
| ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY, | |
| Defendants. | **JURY TRIAL DEMANDED** |

**<u>PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

AND NOW, comes Plaintiff, Kenneth Ference, by and through his attorneys, HORNE DALLER LLC, and files the following Brief in Opposition to Defendants' Motion for Summary Judgment and provides as follows:

**TABLE OF CONTENTS**

**I. STATEMENT OF MATERIAL FACTS** ........................................ 1

**II. LEGAL STANDARD** ........................................ 3

**III. ARGUMENT** ........................................ 4

A. Diocesan Schools are governed by the Roman Catholic Church ........................................ 4

B. Title VII prohibits Defendants from discriminating against Mr. Ference on the basis of his sex ........................................ 4

C. The church autonomy doctrine does not prohibit the application of Title VII to Mr. Ference's termination ........................................ 7

D. Mr. Ference's Title VII and PHRA claims are unaffected by the *303 Creative* ruling ........................................ 10

E. Defendants did not employ Mr. Ference as a minister ........................................ 12

**IV. CONCLUSION** ........................................ 21

# TABLE OF AUTHORITIES

## Case Law

*303 Creative LLC. Co. v. Elenis*, 600 U.S. 570 (2023) ........10, 11

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) ........15

*Askew v. Trs. of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 684 F.3d 413 (3d Cir. 2012) ........9

*Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021)........7

*Bell v. Judge Mem'l Catholic High Sch.* No. 2:20-cv-00829-RJS-JCB, 2023 U.S. Dist. LEXIS 90351, (D. Utah May 22, 2023) ........18, 20

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ........5, 6

*Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024) ........5, 6, 19, 20

*Billard v. Charlotte Catholic High Sch.*, No. 3:17-cv-00011, 2021 U.S. Dist. LEXIS 167418 (W.D.N.C. Sep. 3, 2021)........5, 8, 11

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ........11, 12

*Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184 (E.D.N.Y. 2022) ........9

*Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002) ........8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........4

*Curay-Cramer v. Ursuline Acad. Of Wilmington, Delaware, Inc.*, 450 F.3d 130 (3d Cir. 2006) ........6, 9

*Demkovich v. St. Andrew the Apostle Par., Calumet City*, F.4th 968, 975 (7th Cir. 2021) ........8

*Doe v. Catholic Relief Servs.*, 618 F. Supp. 3d 244 (D. Md. 2022) ........8

*EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980)........6

*Garrick v. Moody Bible Inst.,* 412 F. Supp. 3d 859 (N.D. Ill. 2019). ........8, 9

*Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 328 (3d Cir. 1993) ........6, 8

*Herx v. Diocese of Fort Wayne-S. Bend, Inc.,* 772 F.3d 1085 (7th Cir. 2014) ........5

*Herx v. Diocese of Fort Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168 (N.D. Ind. 2014)........5, 6

*Hickey v. Pa. State Police*, 2009 Pa. Commw. Unpub. LEXIS 165 (Commw. Ct. Jan. 14, 2009) ....................21

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ....................10, 11, 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) ....................8, 12, 19

*Hough v. Roman Catholic Diocese of Erie*, Civil Action No. 12-253Erie, 2014 U.S. Dist. LEXIS 27159 (W.D. Pa. Mar. 4, 2014) ....................9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557 (1995). ....................12

*Kanish v. Crawford Area Transportation Auth*., No. 1:19-cv-00338 (Erie), 2021 U.S. Dist. LEXIS 73554 (W.D. Pa. Apr. 16, 2021) ....................12

*Kanish v. Crawford Area Transp. Auth*., No. 1:19-cv-338, 2021 U.S. Dist. LEXIS 59553 (W.D. Pa. Mar. 26, 2021) ....................12

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952) ....................9

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113 (3d Cir. 2018) ....................9

*Leechburg Area Sch. Dist. v. Commonwealth, Human Relations Com.*, 339 A.2d 850 (Pa. Commw. 1975) ....................21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ....................7

*Little v. Wuerl*, 929 F.2d 944, 947-48 (3d Cir. 1991) ....................6

*Maguire v. Marquette Univ.*, 627 F. Supp. 1499, 1504-05 (E.D. Wis. 1986) ....................6

*Marzano v. Computer Science Corp., Inc*., 91 F.3d 497 (3d Cir. 1996) ....................3, 4

*N.L.R.B. v. Cath. Bishop of Chicago,*440 U.S. 490 (1979) ....................8

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732 (2020) ....................7, 12, 13, 14, 15, 18, 20

*Petruska v. Gannon Univ*. 462 F.3d 294 (3d Cir. 2006) ....................4, 5, 6, 7

*Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376 (1973) ....................11

*Ratliff v. Wycliffe Assocs., Inc.*, No. 6:22-cv-1185-PGB-RMN, 2023 U.S. Dist. LEXIS 92811 (M.D. Fla. May 26, 2023) ....................15

*Rayburn v. Gen'l Conf. of Seventh Day Adventists*, 772 F.2d 1164 (4th Cir. 1985)....................5, 8

*Robinson v. PPG Indus. Inc.*, 23 F.3d 1159 (7th Cir. 1994)..........................................................4

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,* 41 F.4th 931 (7th Cir. 2022) .........7

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
496 F. Supp. 3d 1195 (S.D. Ind. 2020) ...................................................................5, 8, 11

*Stewart v. Rutgers State Univ.*, 120 F.3d 426 (3d Cir. 1988) .........................................................4

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993).....................................................................................11

**Federal and State Statutes and Federal Rules**

42 U.S.C. § 2000e, *et seq*......................................................................................................21

43 P.S. § 955.........................................................................................................................21

16 Pa. Code § 41.71(c) ........................................................................................................21

16 Pa. Code § 41.71(d) .......................................................................................................21

## I. STATEMENT OF MATERIAL FACTS

Mr. Ference applied for the sixth-grade teacher position at Aquinas Academy on August 20, 2021. (ECF 67 ¶ 8). When Mr. Ference applied for the position at Aquinas, he was a practicing Lutheran and not familiar with the tenets and beliefs of the Catholic Church. (ECF 82 ¶¶ 50, 52). The same day that Mr. Ference applied, Kelly Watkins, Aquinas's Principal, interviewed him for the position. (ECF 67 ¶ 9). During the job interview, Mr. Ference told Ms. Watkins that he was not Catholic, but instead practiced Lutheranism. (ECF 82 ¶ 51). Because Mr. Ference was not Catholic, Ms. Watkins instructed him that he was not permitted to teach religious content. (ECF 82 ¶ 55). Mr. Ference understood Ms. Watkins's restriction to include a prohibition on religions content in any of his classes. (ECF 82 ¶ 56). Mr. Ference was not tasked with providing spiritual direction as part of his teaching duties because Defendants only entrust members of their faith to pass on their faith to students. (ECF 82 ¶¶ 66-67). As a non-Catholic, Defendants did not consider Mr. Ference to be a catechetical teacher. (ECF 82 ¶ 94). Ms. Watkins and Mr. Ference also agreed that he would chaperone his students to Mass, with the understanding that his role would be limited to monitoring the students' behavior during Mass. (ECF 82 ¶ 58).

One business day after Mr. Ference's job interview, his employment began on August 23, 2021, teaching math, science, and social studies to Aquinas's sixth-grade students. (ECF 67 ¶¶ 12, 26). The Diocese hires non-Catholic teachers for its schools because of the need for qualified professionals in the classroom and the shortage of Catholic teachers. (ECF 82 ¶¶ 54, 92). Mr. Ference executed employment onboarding documents in connection with the start of his employment, including his Teacher's Contract and Acknowledgment of Receipt of the Code of Pastoral Conduct. (ECF 67 ¶¶ 13-14). Neither of those documents educated Mr. Ference in the

Catholic faith, nor enabled him to teach his students Catholic beliefs. (ECF 82 ¶¶ 88-90). Because of Mr. Ference's conversation with Ms. Watkins about not teaching religious content, he understood that the religious-related provisions of the Teacher's Contract, except as related behavior supervision, would not apply to him. (ECF 82 ¶ 91). Mr. Ference never received Aquinas's Faculty Handbook ("Aquinas Handbook"), nor was instructed to read it or how to locate it. (ECF 82 ¶ 74). In addition to executing documents, Mr. Ference completed the Virtus training "Keeping the Promise Alive 3.0." (ECF 67 ¶ 15). The training lasted approximately 25-30 minutes and focused on preventing sexual predators and not religious instruction. (ECF 82 ¶¶ 95-97). The purpose of the Virtus training was not to give Mr. Ference a foundation to help spread the Catholic faith. (ECF 82 ¶¶ 96-97). Defendants never instructed Mr. Ference in the laws, doctrines, and teachings of the Catholic Church. (ECF 82 ¶ 90).

Due to Ms. Watkins prohibiting Mr. Ference from teaching religious content, he did not teach or infuse any religious content in the subjects he taught. (ECF 82 ¶ 57). Mr. Ference taught his subjects for Defendants in the same manner that he taught in public schools and never received curriculum for his classes that included religious instruction as a required topic. (ECF 82 ¶¶ 79-80). When Mr. Ference's students recited prayers to start and end the school day, he monitored their behavior, but did not participate in the prayers with the students. (ECF 67 ¶ 33), (ECF 82 ¶ 61). Mr. Ference, as a non-Catholic, was not equipped to provide prayer instruction to Aquinas's students, and Ms. Watkins never instructed Mr. Ference to pray in class with his students. (ECF 82 ¶ 62, 102). Also, Mr. Ference did not believe that he had the right to raise questions with his students regarding the validity of any of the tenets of the Catholic faith because he was told that he was not to do anything with religion. (ECF 82 ¶ 93).

During Mr. Ference's tenure at Aquinas, Jennifer Davis was Aquinas's other sixth-grade

teacher, and she taught English, writing, and a daily religion class for the sixth-grade students. (ECF 67 ¶ 27). Prior to Mr. Ference's arrival, Ms. Davis also had experience teaching sixth-grade science and social studies. (ECF 82 ¶ 107). Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (ECF 82 ¶ 85). Throughout Mr. Ference's employment with Defendants, Ms. Davis was not responsible for training him in anything in an official capacity, nor did she provide him instruction as it relates to the Catholic faith or religion. (ECF 82 ¶ 99).

Defendants use the Charlotte Danielson observation method for their teacher evaluations, which could be used in either a public or private school. (ECF 82 ¶ 84). Defendants' teacher evaluations do not have a faith-based component to them. (ECF 82 ¶ 83). From Ms. Watkins's observations of Mr. Ference teaching, she concluded that he was an "absolutely amazing teacher" who was meeting his job requirements. (ECF 82 ¶ 100). Mr. Ference's only deviation from his job duties was being in a same-sex marriage. (ECF 82 ¶ 101). Once Defendants discovered Mr. Ference's marriage, they terminated his employment because of his same-sex marriage and not because he is Lutheran. (ECF 82 ¶ 103). In terminating Mr. Ference, Maureen Marsteller, Defendants' Superintendent, told him that "perhaps [he] didn't understand because [he] wasn't Catholic that being in the same-sex relationship was not okay." (ECF 82 ¶ 104).

## II. LEGAL STANDARD

Summary judgment should be granted only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Marzano v. Computer Science Corp., Inc*., 91 F.3d 497, 501 (3d Cir. 1996). Of course, the party "seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted). Further, it is the moving party's burden to establish that there are no genuine issues of material fact. *Id*. The court is required to view the record in the light most favorable to the non-moving party, resolving against the moving party any doubts as to the existence of a genuine issue of material fact. *Marzano*, 91 F.3d at 497. "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers State Univ.*, 120 F.3d 426, 431 (3d Cir. 1988) (quoting *Robinson v. PPG Indus. Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994)).

## III. ARGUMENT

### A. Diocesan Schools are governed by the Roman Catholic Church.

Plaintiff does not contest that Defendants are religious organizations but does challenge the unsupported claim that they do not segment their functions into religious and secular components. This argument is addressed in Section E.

### B. Title VII prohibits Defendants from discriminating against Mr. Ference on the basis of his sex.

In an almost verbatim sequel to their original Motion to Dismiss, Defendants ask this Court to interpret Title VII's religious exemptions by ignoring the elephant in the room—*Petruska v. Gannon Univ*. 462 F.3d 294 (3d Cir. 2006). As this Court correctly found in 2023, *Petruska* dictates the following conclusion: "Title VII's exemption for discrimination based on employee's religion may not be relied on to excuse an allegedly unlawful employment practice based on the employee's sex (including sexual orientation)." (Ex.10, p. 7). Mr. Ference is asking the Court to reaffirm that conclusion now.

Title VII provides exemptions that relieve "religious entities and educational organizations from its non-discrimination mandate to the extent that an employment decision is based on *an individual's religious preferences*." *Petruska*, 462 F.3d at 303. (emphasis added). According to *Petruska*, the plain text of Title VII dictates that its religious exemptions do not extend to claims for sex discrimination and retaliation against religious institutions. ("Although Congress has several times revisited the scope of the exemption for religious employers, it has never extended to such institutions the authority to discriminate on the basis of sex."). *Id*. at 303 n.4. Surrounding caselaw is steadfast in that Title VII "does not confer upon religious organizations the right to make those same decisions on the basis of race, sex, or national origin." *Rayburn v. Gen'l Conf. of Seventh Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985).

In Mr. Ference's case, there is no question that Defendants terminated his employment because of his sex and not because of his religion. Monsignor Riffle plainly admitted that Mr. Ference was terminated "because of his status as being in a same-sex marriage and not because he's Lutheran." (ECF 82 ¶ 103). "If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020). This remains true even if the employer attempts to frame the discrimination as being rooted in religious belief. *See, generally, Herx v. Diocese of Fort Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1178 (N.D. Ind. 2014), appeal dismissed, *Herx v. Diocese of Fort Wayne-S. Bend, Inc.,* 772 F.3d 1085 (7th Cir. 2014); *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195, 1203 (S.D. Ind. 2020); *Billard v. Charlotte Catholic High Sch*., No. 3:17-cv-00011, 2021 U.S. Dist. LEXIS 167418 at *24-25 (W.D.N.C. Sep. 3, 2021) (rev'd on separate grounds, 101 F.4th 316 (4th Cir.

2024)). Direct evidence of sex discrimination "must lead directly and without speculation to the conclusion that the decision-maker was motivated by a prohibited factor such as sex." *Herx*, 48 F. Supp. 3d at 1178.

Defendants again argue that Title VII's exemptions protect them from Mr. Ference's claims because these exemptions permit discrimination against Mr. Ference on the basis of religion. This argument must fail because Defendants knew Mr. Ference was not Catholic and hired him anyway. (ECF 82 ¶ 51). Defendants routinely hire non-Catholic teachers as they need qualified professionals to teach their students. (ECF 82 ¶ 54). Ultimately, but for his being a man, Mr. Ference would not have been terminated. (ECF 82 ¶ 103). This is a textbook example of discrimination on the basis of sex. *Bostock*, 590 U.S. at 659.

In support of their argument, Defendants rely on the same caselaw cited in their prior Brief in Support of Motion to Dismiss. In the interest of brevity, we provide the following rebuttal to the cases relied upon by Defendants and incorporate the arguments made in Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss (Ex. 9):

> First, in *Little v. Wuerl,* the court recognized that "Title VII has been interpreted to bar race and sex discrimination by religious organizations towards their nonminister employees." 929 F.2d 944, 947-48 (3d Cir. 1991). Also, *Wuerl* involved a claim for religious discrimination, not sex discrimination. *Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 328 (3d Cir. 1993). Next, *Curay-Cramer v. Ursuline Acad. Of Wilmington, Delaware, Inc.* was decided eight months before *Petruska* and on First Amendment Grounds, not Title VII's text. 450 F.3d 130, 137 (3d Cir. 2006). *EEOC v. Miss. Coll.* required a pretext analysis, which is not relevant to Mr. Ference's case. 626 F.2d 477, 485 (5th Cir. 1980). In *Maguire*

*v. Marquette Univ.*, the district court case was decided on First Amendment grounds and involved an employee hired for a ministerial position. 627 F. Supp. 1499, 1504-05 (E.D. Wis. 1986). *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021) applied an extremely broad interpretation of Title VII that contradicts the precedent that is binding on this court. *See Petruska*, 462 F.3d at 303. Finally, *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, was decided on First Amendment grounds and involved an employee hired for a ministerial position. 41 F.4th 931, 942 (7th Cir. 2022).

As this Court found once before, and now with further support from a complete record, this Court should reaffirm its holding that Defendants are not exempt from Title VII sex discrimination claims.

**C. The church autonomy doctrine does not prohibit the application of Title VII to Mr. Ference's termination.**

Defendants' church autonomy argument again requests that the Court expand the doctrine outside of the ministerial exception context, in contradiction of the established principle that religious institutions do not "enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, 746 (2020). "There is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 706 n.1 (2020) (Kagan, J., concurring). As this Court recognized, "the Diocese's interpretation represents a significant expansion of immunity for religious institutions beyond the recognized categories of church governance and ministerial leadership." (Ex.10, pp. 8-9).

The analysis in Section E demonstrates that Mr. Ference was not employed in a ministerial role by Defendants. If the Court agrees that Mr. Ference was not a minister, then the church autonomy doctrine is not implicated as Defendants did not select Mr. Ference for a position of "substantial religious importance." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J. and Kagan, J., concurring). That conclusion is consistent with multiple other courts who have tackled an argument like Defendants' and rejected it. *See Doe v. Catholic Relief Servs.*, 618 F. Supp. 3d 244, 253 (D. Md. 2022); *Billard,* 2021 U.S. Dist. LEXIS 167418, at *35; *Starkey*, 496 F. Supp. 3d at 1206-07.

In support of their expansive church autonomy argument, Defendants once again cite the same cases from their Brief in Support of Motion to Dismiss. Mr. Ference previously explored the inapplicability of that precedent and therefore incorporates his Brief in Opposition to Defendant's Motion to Dismiss. (Ex. 9, pp. 11-14). The following is a brief synopsis of those arguments:

In *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) the court made clear that "rooted in religious belief" does not exempt religious organizations from Title VII scrutiny, where the challenged "decision does not involve the church's spiritual functions." (quoting *Rayburn*, 772 F.2d at 1171). For *N.L.R.B. v. Cath. Bishop of Chicago*, the Supreme Court did not apply church autonomy doctrine. 440 U.S. 490 (1979). *Wuerl*, as described above, is easily distinguished because the plaintiff raised religious discrimination claims. *Geary*, 7 F.3d at 328. *Demkovich v. St. Andrew the Apostle Par., Calumet City* is a ministerial exception case that acknowledged that the "ministerial exception follows naturally from the church autonomy doctrine." 3 F.4th 968, 975 (7th Cir. 2021). In *Garrick v. Moody Bible Inst.*, the court held that sex discrimination claims did

not automatically run afoul of church autonomy principles and that "Title VII's exemptions are limited specifically to claims of discrimination premised upon religious preferences." 412 F. Supp. 3d 859, 869-70, 872 (N.D. Ill. 2019). *Curay-Carmer* is described above, predated the establishment of the ministerial exception by the Supreme Court, and concerned a comparator analysis that implicated church doctrine, which is not at issue here. 450 F.3d at 141-142. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952) discusses the freedom of religious organizations in their government and faith functions, which are not at issue here because Mr. Ference was not a minister. For *Butler v. St. Stanislaus Kostka Cath. Acad*., the language cited by Defendant is *dicta*, as the court decided summary judgment based on the ministerial exception, and that dicta ignores the purpose of the ministerial exception. 609 F. Supp. 3d 184, 198 (E.D.N.Y. 2022). Finally, *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113 (3d Cir. 2018) and *Askew v. Trs. of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 684 F.3d 413 (3d Cir. 2012) both have no relation to the issues raised in this case.

Defendants' argument wholly ignores that "[t]he ministerial exception arises from the conflict between federal employment discrimination statutes and constitutional principles of church autonomy guaranteed by the First Amendment's Religion Clauses." *Hough v. Roman Catholic Diocese of Erie*, Civil Action No. 12-253Erie, 2014 U.S. Dist. LEXIS 27159, at *6 (W.D. Pa. Mar. 4, 2014). Simply put, the ministerial exception is the vehicle Defendants have for raising church autonomy concerns. Because the facts do not support their ministerial exception argument, Defendants ask this Court to invent a new test for the church autonomy doctrine and eviscerate the ministerial exception in the process—an unsustainable position.

### D. Mr. Ference's Title VII and PHRA claims are unaffected by the *303 Creative* ruling.

Defendants' argument that *303 Creative LLC. Co. v. Elenis*, 600 U.S. 570 (2023) erases Title VII's protections is unsupported by the Opinion's text and prior Supreme Court precedent. According to the Supreme Court, "[invidious] private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (citation omitted). In *303 Creative,* the Supreme Court affirmatively stated that its holding does not endorse "a 'separate but equal' regime that would allow law firms to refuse women admission into partnership, restaurants to deny service to Black Americans, or businesses seeking employees to post something like a 'White Applicants Only' sign." 600 U.S. at 598.

The defining characteristic that Defendants' disregard about the *303 Creative Opinion* is that the parties stipulated that the speech at issue constitutes **pure speech**. *Id*. *303 Creative* solidified the line between unconstitutional direct burdens on pure speech, which "force an individual to 'utter what is not in [her]mind' about a question of political and religious significance," and incidental burdens on speech, which are constitutionally permissible. *Id*. at 596. In this case, there is no stipulation that requiring the nondiscriminatory act of employing Mr. Ference would constitute pure speech, and Defendants provide no support for this comparison to the speech evaluated in *303 Creative*. Title VII does not compel Defendants to express any message or to admit anyone as members of their church, nor does it require Defendants to alter their message with respect to marriage. Furthermore, *303 Creative* did not involve an employer-employee relationship and context matters for speech cases. *Id*. at 599.

For the interaction of First Amendment speech and employment discrimination statutes *Hishon* controls. There is also a Supreme Court precedent tackling those issues from our

backyard. In *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376 (1973), the Supreme court denied a First Amendment challenge to an ordinance banning sex discrimination in the employment context. According to the Court, "Discrimination in employment is not only commercial activity, it is illegal commercial activity…." *Id*. at 388. In light of *Pittsburgh Press and Hishon*, it is clear that laws prohibiting facially discriminatory employment practices pass muster. Indeed, Title VII has been regarded as permissible content-neutral regulation of conduct as it relates to First Amendment rights. *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993).

In addition to *303 Creative*, Defendants rely chiefly on two Supreme Court cases that found public accommodation laws, outside of the employment context, unconstitutional in their regulation of a voluntary association's membership or speech. One of the cases Defendants cite to is *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). In *Dale*, the Court specified that its holding was "not to say an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653. In the employment context, courts have found *Dale* to be inapplicable. *See Starkey*, 496 F. Supp. 3d at 1208 (finding that "*Dale* does not require anti-discrimination laws to give way automatically in the face of a freedom of association defense asserted by an expressive organization."); *Billard*, 2021 U.S. Dist. LEXIS 167418, at *71-72 (holding that a religious institution cannot establish an expressive association defense as this argument "disregards clear precedent that freedom of expressive association is inapplicable in commercial contexts where Title VII's antidiscrimination provisions apply, ignores critical aspects of the *Dale* decision that make it inapplicable to this case, and fails to consider the overall purpose of the freedom of expressive association").

Defendants also cite *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557 (1995). Importantly, like *Dale*, *Hurley* did not involve an employer-employee relationship. Therefore, *Hishon* remains the controlling precedent when evaluating an employer's First Amendment speech rights in relation to Title VII claims. The same arguments regarding the inapplicability of *Dale* equally apply for *Hurley.*

In the end, Defendants have failed to support their argument that Title VII is rendered meaningless when an employer seeks to exclude a secular employee on free speech grounds.

**E. Defendants did not employ Mr. Ference as a minister.**

Because Defendants never entrusted Mr. Ference, a non-Catholic, with educating and forming their students in the Catholic faith, he was not one of their ministers. In evaluating whether an individual is a minister for purposes of the ministerial exception, "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753 (2020). The ministerial exception operates as an affirmative defense. *Hosanna-Tabor* 565 U.S. at 195 n.4. "[W]here the defendant seeks summary judgment based on an affirmative defense concerning which 'it would bear the burden of proof at trial,' it 'must show that it has produced enough evidence to support the findings of fact necessary to win.'" *Kanish v. Crawford Area Transportation Auth*., No. 1:19-cv-00338 (Erie), 2021 U.S. Dist. LEXIS 59553, at *7-8 (W.D. Pa. Mar. 26, 2021) (*report and recommendation adopted*, No. 1:19-cv-338, 2021 U.S. Dist. LEXIS 73554, at *3 (W.D. Pa. Apr. 16, 2021) (citation omitted). In the case of the ministerial exception, Defendants must produce sufficient evidence to show that Mr. Ference's teaching duties included "educating and forming students in the faith." *Our Lady of Guadalupe Sch.*, 591 U.S. at 762.

The following are the points made by Defendants in support of their ministerial exception argument with rebuttal provided to each:

- Mr. Ference participated in and supervised his students during church services. As acknowledged, Mr. Ference did attend church services, but solely as a chaperone to monitor his students' behavior. (ECF 82 ¶ 58). According to Mr. Ference, he agreed to that arrangement during a conversation with Ms. Watkins at the start of his employment. *Id*. Contrary to Mr. Ference's testimony, and placing this fact in dispute, Ms. Watkins claimed that she never had a discussion with Mr. Ference about limitations on his role in church services. (Ex. 6, 81:17-19). Consistent with Mr. Ference's testimony, Ms. Davis attended Mass with Mr. Ference, during which Mr. Ference watched the students. (ECF 82 ¶ 59). Ms. Davis never saw Mr. Ference take Communion, pray with his students, or lead the students in hymns during Mass. (ECF 82 ¶ 60). Defendants' attempt to analogize Mr. Ference's activities to those of the teachers in *Our Lady of Guadalupe* does not survive minimal scrutiny. As opposed to Mr. Ference, the teachers were not passive chaperones, but instead taught their students how to be "active participants" at Masses and prayed with their students at those Masses. 591 U.S. at 741, 744. In no way did Mr. Ference's role in church services demonstrate educating and forming his students in the faith.
- He admitted that "a standard school day" at Aquinas "started and ended with prayers" and he was positioned in the front of the classroom to supervise and facilitate those prayers. As with attending church services, Mr. Ference's role with prayer in the classroom was limited to monitoring student behavior, and he did not participate in prayer with his students. (ECF 82 ¶ 61). From Defendants' perspective, Mr. Ference, as a non-Catholic,

was not equipped to provide prayer instruction to Aquinas's students. (ECF 82 ¶ 62). Ms. Watkins observed Mr. Ference teaching and does not recall ever witnessing Mr. Ference talk to his students about prayer or religion. (ECF 82 ¶ 63). The only duty that Ms. Watkins saw Mr. Ference perform that was unique to a Catholic school was going to church. (ECF 82 ¶ 64). Again, there was no role for Mr. Ference in spreading Defendants' faith. Also, the teachers in *Our Lady of Guadalupe* had drastically different roles from Mr. Ference when it came to prayer. Unlike Mr. Ference, those teachers actively prayed with their students and instructed them in prayer. 591 U.S. at 741,744.

- In Mr. Ference's professional services agreement, he was required to "support and participate in all religious functions of the school, including school liturgy." This provision of the professional services agreement referred to supporting prayers, Mass, and prayer services. (ECF 82 ¶ 65). When Mr. Ference's students recited prayers in the classroom, he monitored their behavior, but did not participate in the prayers with the students, and he was never told to pray with his students. (ECF 82 ¶¶ 61, 102). Similarly, Mr. Ference attended Mass with his students solely as a chaperone to monitor their behavior. (ECF 82 ¶ 58). From Defendants' perspective, Mr. Ference, as a non-Catholic, was not equipped to provide prayer instruction to Aquinas's students. (ECF 82 ¶ 62). Further, Mr. Ference was not tasked with providing spiritual direction as part of his teaching duties. (ECF 82 ¶ 66). Defendants only entrust members of their faith to pass on their faith to students. (ECF 82 ¶ 67). Defendants limited Mr. Ference's support and participation to secular roles.
- He accepted and "recognize[d] the religious nature of the Catholic school and agree[d]" that the Diocese had the right to dismiss him "for immorality, scandal, or rejection of the

official teaching, doctrine[,] or laws of the Roman Catholic Church[.]". This prospective waiver of Mr. Ference's Title VII rights is irrelevant to the question of whether Mr. Ference was a minister as it in no way supports Defendants' argument that Mr. Ference engaged in spreading Defendants' faith to his students. Further, an employee cannot prospectively waive their right to be free from discrimination under Title VII. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII."). *Ratliff v. Wycliffe Assocs., Inc.*, No. 6:22-cv-1185-PGB-RMN, 2023 U.S. Dist. LEXIS 92811, at *13 (M.D. Fla. May 26, 2023) ("Nevertheless, simply inserting such a blanket exception into an employment contract will not insulate Defendant from lawful claims.")

- He additionally acknowledged that he could be immediately terminated for violating "the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality." This is the same argument as the point above. This has nothing to do with establishing Mr. Ference as a minister and is an invalid prospective waiver of Mr. Ference's Title VII rights.
- This is similar to the employment agreements between the plaintiff teachers and Catholic schools that favored application of the ministerial exception in *Our Lady of Guadalupe*, in which the teachers were to be an example of living their lives in accordance with the Catholic faith. The Supreme Court found the teachers in *Our Lady of Guadalupe* to be ministers because of the actual religious duties they performed and not because of the language in their contracts. 591 U.S. at 756 ("There is abundant record evidence that they both performed vital religious duties."). Unlike those teachers, Defendants cannot point to undisputed record evidence that Mr. Ference performed any religious duties. Further

distinguishing Mr. Ference from the *Our Lady of Guadalupe* teachers, he received explicit instructions at the start of his employment to not teach religious content and limited his role in prayer and religious services to behavior supervision. (ECF 82 ¶¶ 55-58, 61). As a result, Defendants' reliance on employment documents is mistaken since Ms. Watkins instructed Mr. Ference in a manner that limited the documents' coverage.

- An appendix attached to the professional services agreement further described Mr. Ference's role as a teacher. (ECF No. 68-4 pp. 6–7.) Teachers must "serve[] the school in this Catholic Ministry within instructional and extra-curricular capacities . . . .". Mr. Ference admits that he served Defendants by providing secular instructions to their students. (ECF 67 ¶ 26). Defendants do not explain how this one sentence in a document supports the argument that Mr. Ference was entrusted with, and spread, Defendants' faith while teaching sixth-grade students.
- They further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students in a Christ-like manner . . . .". First, Mr. Ference never attended catechetical training, nor was he told a timeline for its commencement/completion. (ECF 82 ¶ 68). According to Ms. Watkins, the Diocese was responsible for tracking attendance for catechetical training, but Ms. Marstellar said that Ms. Watkins held that responsibility. (ECF 82 ¶¶ 69-70). As a result, it is unclear when and if Mr. Ference would have attended/completed catechetical training. Even if Mr. Ference had attended catechetical training, it would not have enabled him to teach religion to his students. (ECF 82 ¶ 71). Defendants cannot demonstrate how the mere potential of catechetical training in the future supports the argument that Mr. Ference transmitted the Catholic faith to his students prior to his termination. Next, Defendants' citation of the language "supervise[] students

in a Christ-like manner…" is a calculated deception. Their ellipsis conceals the complete language of the provision, which is "supervise[] students in a Christ-like manner **or** with dignity." (ECF No. 68-4 p. 6) (emphasis added). When asked about the language of that provision, Mr. Watkins was forced to acknowledge that "in English when someone uses the 'or,' they can take -- either of those can stand in its place." (ECF 82 ¶ 72). That language clearly delineates a secular choice for Defendants' teachers and in no way supports the argument Mr. Ference transmitted the Catholic faith to his students prior to his termination.

- <u>The requirements of being a teacher for Diocese include having "an understanding and acceptance of Catholic School Philosophy, goals, and objectives," abiding "by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church</u>." Again, Defendants cannot demonstrate how that language, referenced in the abstract, translated to Mr. Ference being directed to, and performing, religious duties for Defendants prior to his termination. When asked how Mr. Ference could obtain an understanding of "Catholic School Philosophy, goals and objectives," Defendants' witnesses disagreed. According to Ms. Watkins, that information was contained in Aquinas's handbook, which Mr. Ference never received. (ECF 82 ¶¶ 73-74). Monsignor Riffle claimed that the information could largely be obtained from the "About Us" section of Aquinas's website, which Mr. Ference was never directed to read. (ECF 82 ¶¶ 75-76). For school policies and procedures, Mr. Ference never received the Aquinas handbook, and it is not the purpose of the Diocese's Code of Pastoral Conduct to educate individuals in Catholic belief systems. (ECF 82 ¶¶ 74, 89). Finally, Defendants' witnesses disagreed over where Mr. Ference would acquire knowledge of "the laws,

doctrines, and teachings of the Catholic Church." According to Monsignor Riffle, those would be taught in Catechetical training, which Mr. Ference never attended. (ECF 82 ¶¶ 68, 77). Ms. Watkins said that that information was found in the Aquinas handbook, which Mr. Ference never received. (ECF 82 ¶¶ 74, 78).

- Had Mr. Ference remained employed, he would have received additional catechetical training on the tenets of the Catholic faith, which he was required to apply in the classroom. (ECF No. 75 ¶ 31.) This is also like the plaintiff teachers in *Our Lady of Guadalupe* that the ministerial exception applied to. As described above, Defendants cannot demonstrate how the mere potential of catechetical training in the future supports the argument that Mr. Ference transmitted the Catholic faith to his students prior to his termination. Also, unlike the teachers in *Our Lady of Guadalupe*, there is no record evidence that Mr. Ference "performed vital religious duties." 591 U.S. at 756.

Defendants' ministerial exception argument relies on random document excerpts because the practical evidence fails them. Without a showing that the language of the relied upon documents translated to Mr. Ference educating and forming Defendants' students in the faith prior to his termination, those documents are irrelevant. In an almost identical case to the present matter, the Court in *Bell v. Judge Mem'l Catholic High Sch.* rejected the defendant's reliance on standard employment forms to establish the applicability of the ministerial exception. No. 2:20-cv-00829-RJS-JCB, 2023 U.S. Dist. LEXIS 90351, at *33 (D. Utah May 22, 2023). The *Bell* court collected cases in support of that position at *33 fn. 196. According to the court, "it would be a remarkable expansion of the ministerial exception for the court to hold, as Defendants urge, that all JMCHS teachers necessarily joined the Catholic ministry based on the policies cross-referenced in their one-year employment contracts—without any consideration of the work the

teachers individually performed at the school." *Id.* If the Court finds that the ministerial exception applies, simply because Mr. Ference signed agreements containing certain religious references, that would "circumvent the 'case-by-case fact-intensive' nature of the inquiry described by the Supreme Court in *Our Lady* and *Hosanna-Tabor*." *Id*. at *30.

Defendants' also attempt to rely on *Billard v. Charlotte Catholic High Sch.*, 101 F. 4th 316 (4th Cir. 2024), which is easily distinguished from this case. In *Billard*, the plaintiff "went out of his way" to integrate faith into his classes and was evaluated on the degree to which he integrated faith. *Id*. 332. The same cannot be said of Mr. Ference.

Because Mr. Ference was told not to teach religious content by Ms. Watkins, he did not teach or infuse any religious content in the subjects he taught. (ECF 82 ¶ 57). Nor did Mr. Ference receive curriculum that included religious instruction as a required topic in his classes. (ECF 82 ¶ 59). Mr. Ference taught his secular subjects in the same manner that he taught in public schools. (ECF 82 ¶ 80). When asked what Catholic beliefs, if any, Defendants required Mr. Ference to educate his students in, Monsignor Riffle responded, "I don't know that I have an answer specifically." (ECF 82 ¶ 81). When Ms. Watkins was similarly asked about the Mr. Ference's role in fostering Catholic values and beliefs in his classes, she explained that she expected him to act in the same manner as a public-school teacher. (ECF 82 ¶ 82).

Although Mr. Ference never received a performance evaluation, according to Ms. Davis, Aquanis's other six-grade teacher, Defendants' teacher evaluations did not have a faith-based component to them. (ECF 82 ¶ 83). Defendants used the Charlotte Danielson observation method, which could be used in either a public or private school. (ECF 82 ¶ 84). Also, Ms. Davis segmented teaching functions between religious and secular components. Outside of the religion class that Ms. Davis taught, she would not proactively discuss or infuse the Catholic

faith, its values, and its tenets into her non-religion classes, such as social studies, science, and the language arts. (ECF 82 ¶ 85).

Further distinguishing Mr. Ference from Mr. Billard, Mr. Ference did not begin each class with prayer and take communion in Mass with his students. (ECF 82 ¶¶ 86-87); 101 F. 4th at 331. Mr. Ference simply monitored student behavior during morning and afternoon prayers read over the loudspeaker and chaperoned his students at Mass. (ECF 82 ¶¶ 58, 61). Importantly, Mr. Ference was also prohibited from teaching religion classes, which is untrue of Mr. Billard, who sometimes filled in for teachers of religion classes. *Id*. at 332. Unlike Mr. Billard, Defendants did not entrust Mr. Ference with serving as a messenger of their faith.

When evaluating the applicability of the ministerial exception, both sides agree that the focus on what an employee does is key. However, courts also "take all relevant circumstances into account," because there is no "rigid formula" to be applied. *Our Lady of Guadalupe*, 591 U.S. at 758. In *Bell*, the following circumstances persuaded the court that the ministerial exception did not apply: (1) "Bell did not teach his students religion or facilitate religious services," because the defendant barred Bell from teaching religion because he was not Catholic; (2) Bell did not undergo any religious training; and (3) Bell only accompanied his students to Mass and never led them in prayer. 2023 U.S. Dist. LEXIS 90351, at *33. All three circumstances present in *Bell* apply to Mr. Ference. First, Mr. Ference was prohibited from teaching Catholic religion classes, and he did not facilitate religious services. (ECF 82 ¶¶ 55-64, 66, 86-87, 98, 102). Second, Mr. Ference never received any religious training. ECF 82 ¶¶ 68, 88-90, 95-97, 99). Third, Mr. Ference only chaperoned his students to Mass and did not lead them in prayer. (ECF 82 ¶¶ 58, 61). As a result, Mr. Ference was not a minister during his employment with Defendants.

In challenging Mr. Ference's PHRA claim, Defendants' single reference to the PHRA's BFOQ language fails to establish that sex was a valid BFOQ for Mr. Ference's sixth-grade teaching position. "The employer…has the burden of establishing that…sex…qualifies as a bona fide occupational qualification." 16 Pa. Code § 41.71(d). Under the PHRA, the following standard applies:

> The law is clear, however, that the exemption provided by a BFOQ is to be narrowly construed, and an employer asserting a BFOQ has the burden of proving that he has a *factual* basis for believing that all or substantially all of the discriminated against class would be unable to satisfactorily perform the duties of the job involved.

*Leechburg Area Sch. Dist. v. Commonwealth*, *Human Relations Com*., 339 A.2d 850, 854 (Pa. Commw. 1975) (emphasis in original). "[A]n employer seeking to establish a BFOQ needs to show an individualized consideration of the capabilities of the members of the group to which the discrimination is aimed. *Hickey v. Pa. State Police*, 2009 Pa. Commw. Unpub. LEXIS 165, at *16 (Commw. Ct. Jan. 14, 2009).

Here, Defendants have performed no individualized analysis and offered no factual basis for their BFOQ argument, despite having a complete record to work with. When the record is consulted, it is clear that Mr. Ference was satisfactorily performing the job duties of a sixth-grade teacher and thus Defendants cannot raise a valid BFOQ exemption. According to Ms. Watkins, Mr. Ference was an "excellent teacher," and thus it cannot be said that Mr. Ference was "unable to perform safely and efficiently the duties of the job involved." (ECF 82 ¶ 100); 16 Pa. Code § 41.71(c).

## IV. CONCLUSION

It is undisputed that Defendants terminated Mr. Ference because of his sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Pennsylvania Human Relations Act, 43 P.S § 955. To avoid liability, Defendants assert affirmative defenses and

constitutional arguments, all of which fail as a matter of law and fact. For the foregoing reasons, Plaintiff Kenneth Ference requests this Honorable Court deny Defendants' Motion for Summary Judgement in its entirety.

Date: August 9, 2024

Respectfully submitted,

/s/ *Nicholas W. Kennedy*

Nicholas W. Kennedy, Esq. (Pa. 317386)
Nicole Daller, Esq. (Pa. 312224)
Giulia R. Schaub, Esq. (Pa. 330375)

HORNE DALLER LLC
1380 Old Freeport Road, Suite 3A
Pittsburgh, PA 15238
Phone: (412) 967-9400
Fax: (412) 967-0465
nkennedy@hornedaller.com
ndaller@hornedaller.com
gschaub@hornedaller.com

*Attorneys for Plaintiff*