**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KENNETH FERENCE,             )
                                        )
        Plaintiff,         )       Civil Action No. 22-797
                                          )       District Judge J. Nicholas Ranjan
          v.           )       Magistrate Judge Maureen P. Kelly
                                        )
ROMAN CATHOLIC DIOCESE   )       Re: ECF No. 74
OF GREENSBURG and AQUINAS  )
ACADEMY,               )
                                        )
        Defendants.      )

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

Presently before the Court is a Motion for Summary Judgment filed on behalf of Defendants the Roman Catholic Diocese of Greensburg and Aquinas Academy. ECF No. 74. For the following reasons, it is recommended that the Court deny the motion.

## II.    REPORT

Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a)(1). The Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 955, similarly bars discrimination on the basis of sex.

Plaintiff Kenneth Ference brings this action under Title VII and the PHRA alleging that he was unlawfully terminated from his position as a secular sixth grade teacher at Aquinas Academy after school officials learned that he is married to his same-sex spouse. Aquinas Academy is operated under the supervision and operational control of the Roman Catholic Diocese of

1

Greensburg ("Diocese"). Defendants assert that the decision to terminate Mr. Ference is rooted in their religious beliefs and, as a result, Title VII does not bar the disputed adverse employment action.

### A.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### 1.    Factual Background

Mr. Ference applied for a sixth-grade teacher position at Aquinas Academy on Friday August 20, 2021. ECF No. 67 ¶ 8. He was asked to send documentation including a resume, clearances, and letters of recommendation. ECF No. 68-2 at 40. He interviewed that same day with school principal Kelly Watkins. ECF No. 67 ¶¶ 9-11. During his interview, Mr. Ference told Watkins that he had grown up Catholic, but is a practicing Lutheran. Id.; ECF No. 87 ¶ 51. This did not impede employment because schools within the Diocese, such as Aquinas Academy, hire non-Catholic teachers to fill the need for qualified professionals in the classroom due to the shortage of Catholic teachers. ECF No. 87 ¶¶ 54, 92. Mr. Ference learned that if hired, he would teach math, science, and social studies. He disclosed that he would not be comfortable teaching religion. Watkins explained that "as a hiring restriction," he was prohibited from teaching religion or "religious content." She added that this function would be handled by the other sixth-grade teacher. ECF No. 67 ¶ 28; ECF No. 68-2 at 17, 26-27, 30. He was not asked and did not disclose that he was in a same-sex marriage during the interview.

Mr. Ference was hired to teach for the August 23, 2021 – June 10, 2022 school year at an annual salary of $22,000. He began teaching at Aquinas Academy on Monday, August 23, 2021. ECF No. 67 ¶ 12; ECF No. 68-4 at 1, 4.

Over the course of his first week of employment, Mr. Ference executed various onboarding documents, including a Professional Services Agreement for Elementary Lay Teachers that set

forth the dates and benefits of employment, and his acknowledgment that a violation of the Aquinas Academy policies "could include … violation of the laws of the Church concerning marriage or espousal of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and homosexuality." ECF No. 68-4 at 3. He also signed an Acknowledgement of Receipt of the Code of Pastoral Conduct. Id. at 8. He disputes that he ever received the Faculty Handbook. ECF No. 82 ¶ 74.

On September 2, 2021, about two weeks after he began teaching, Mr. Ference received a waiver form for group medical insurance and disclosed that he was covered under his husband's health care plan. ECF No. 62 at 22-25; ECF No. 68-4 at 10. He was terminated from his position on September 28, 2021. It is not disputed that he was terminated because he was in a same-sex marriage that Defendants assert is a violation of the teachings of the Catholic Church and his employment contract. ECF No. 54 ¶ 27.

### 2.    Procedural History

Mr. Ference began this action on June 1, 2022, asserting a one-count claim against the Diocese for employment discrimination in violation of his rights under Title VII. The Diocese filed a Motion to Dismiss Complaint asserting that: (1) Title VII exempts the Diocese from liability for employment decisions based on religion; (2) the church autonomy doctrine bars Plaintiff's claim of sexual orientation discrimination; (3) the ministerial exception bars Plaintiff's Title VII claim; and (4) the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(a–b), shields the Diocese from Plaintiff's Title VII suit. ECF No. 10. A Report and Recommendation was issued on January 18, 2023, recommending that the Court deny the Motion to Dismiss on all grounds. ECF No. 20.

After consideration of the Diocese's objections, the Court adopted in part the Report and Recommendation and denied the Motion to Dismiss on May 8, 2023. ECF No. 24. The Court concluded that it was premature to decide the applicability of the religious exemptions set forth in Sections 702(a) and 703 of Title VII because the record lacked the necessary facts to determine whether Aquinas Academy is a "religious organization" within the meaning of the statutory exemption to Section 702, and whether the employment decision at issue was rooted in religious doctrines and beliefs. Id. For similar reasons, the Court concluded that the Diocese's "church autonomy doctrine" argument was premature given that it too "is predicated on a religious organization making personnel decisions 'rooted in a religious belief.'" Id. at 5. The Court adopted the Recommendation that RFRA does not apply to this case and that it would be premature to consider the application of the ministerial exception to Mr. Ference's Title VII claim.

Mr. Ference filed the operative First Amended Complaint on July 11, 2023, to add Aquinas Academy as a defendant and to add a claim for employment discrimination in violation of his rights under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955 (Count II). ECF No. 42. The Diocese, joined by Aquinas Academy, filed a renewed Motion to Dismiss based on the United States Supreme Court's decision in 303 Creative LLC v. Elenis, 600 U.S. 570 (2023) and asserted that a requirement to retain Mr. Ference as a teacher would violate Defendants' First Amendment expressive association rights. ECF No. 45. The motion was denied because "Defendants' arguments and reliance on 303 Creative is just their repackaging of similar arguments that they previously made, and which the Court found to be premature." ECF No. 53.

Defendants filed their Answer to the Amended Complaint. ECF No. 54. The parties completed fact discovery. ECF No. 65.

Defendants now present the pending Motion for Summary Judgment and request the entry of summary judgment as to Mr. Ference's Title VII and PHRA claims. ECF No. 74. In conjunction with their motion, the parties filed a Joint Concise Statement of Material Facts and Appendix, ECF Nos. 68, 69, 73. Defendants filed a Concise Statement of Material Facts, ECF No. 75, Appendix, ECF No. 76, and a Brief in Support of the Motion for Summary Judgment, ECF No. 77. Mr. Ference filed a Response to the Motion for Summary Judgment, ECF No. 80, and a Response to Defendants' Concise Statement of Material Facts with Counterstatement of Material Facts, ECF No. 81, a Brief in Opposition to the Motion for Summary, ECF No. 83, and an Appendix, ECF Nos. 84, 86. Defendants filed a Reply to Plaintiff's Counterstatement of Material Facts, ECF No. 87, and an Appendix to the Counterstatement, ECF No. 87, as well as a Reply Brief. ECF No. 89.

The Motion for Summary Judgment is ripe for consideration.

### B.    STANDARD OF REVIEW

Summary judgment is properly entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "[A] fact is 'material' where 'its existence or nonexistence might impact the outcome of the suit under the applicable substantive law.'" Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" Clews v. Cnty. of Schuylkill, 12 F.4th 353, 358 (3d Cir. 2021) (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating to the court that the undisputed evidence is not enough to support one or more essential elements of the non-moving party's claim. Celotex, 477 U.S. at 322; see also Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)) (internal quotations omitted). In making this assessment, the court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts for the nonmoving party. Matreale v. New Jersey Dep't of Mil. & Veterans Affs., 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 requires the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322–23; Jakimas v. Hoffman La-Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## C.    DISCUSSION

In the context of employment disputes, the Free Exercise and Establishment Clauses of the First Amendment as well as Sections 702 and 703 of Title VII, 42 U.S.C. § 2000e, *et seq.*, provide certain limits to judicial oversight of religious institutions. Defendants assert that Mr. Ference's termination falls within those limitations such that judgment is properly entered in their favor as a

matter of law. Defendants raise four arguments in support of their Motion for Summary Judgment: (1) Title VII's religious exemptions bar Mr. Ference's claim; (2) the ministerial exception to the First Amendment bars governmental interference into employment decisions; (3) the church autonomy doctrine precludes interference with employment decisions "rooted in religious belief"; and (4) requiring Aquinas Academy to employ Mr. Ference would unconstitutionally interfere with Defendants' First Amendment right to express their particular views on marriage.[1] ECF No. 77. The Court addresses each argument in turn.

### 1.    Religious Exemptions to Title VII

Section 702(a) of Title VII states that Title VII "shall not apply … to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-

---

[1] Mr. Ference's Title VII and PHRA claims are analyzed under the same legal standard. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000). Thus, his claims are subject to the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (applying the McDonnell Douglas standard to PHRA claims).

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination. Jones, 198 F.3d at 410 (citing McDonnell Douglas, 411 U.S. at 802). Second, if the plaintiff succeeds, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the challenged employment action. Id. (quoting McDonnell Douglas, 411 U.S. at 802). This burden is "relatively light." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant carries its burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination. Jones, 198 F.3d at 410. To show pretext, a plaintiff must either (i) submit evidence that "meaningfully throw[s] into question, i.e., [casts] substantial doubt upon, the [employer's] proffered reasons," or (ii) "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." Fuentes, 32 F.3d at 765.

Here, Defendants do not address the McDonnell Douglas burden shifting analysis because they contend that the First Amendment, religious exemptions to Title VII, and the church autonomy doctrine bar Mr. Ference's claims. The Court finds that Mr. Ference establishes a prima facie case of sex discrimination. Bostock v. Clayton Cnty., 590 U.S. 644, 659 (2020) ("if changing the employee's sex would have yielded a different choice by the employer – a statutory violation has occurred"). As to the second step, Defendants state that their right to employ only those individuals who adhere to and model their religious doctrine - and not illegal discrimination - is the reason for Mr. Ference's termination. As explained in this Report, Defendants' right is necessarily limited to individuals in a religious or ministerial role. Thus, turning to pretext at the third step of the McDonnell-Douglas framework and as explained in this Report, Mr. Ference presents evidence sufficient to raise material issues of fact related to whether his position is religious and therefore whether his termination was unlawful discrimination based on his sex.

1(a). Section 703 provides that for religious educational institutions, "it shall not be an unlawful employment practice … to hire and employ employees of a particular religion if such school … is, in whole or in substantial part, owned, supported, controlled or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school… is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e). Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate *an employee's or prospective employee's* religious observance or practice without under hardship on the conduct of the employer's business." 42 U.S.C. § 20003-1(j) (emphasis added). If the exemptions apply to Mr. Ference's claims, his claims cannot be sustained, and the Court need not delve into the constitutional questions raised by Defendants. See, e.g., Curay-Cramer v. Ursuline Acad. of Wilmington, Del., 450 F.3d 130, 138 (3d Cir. 2006).

With discovery now complete, the factual record in this case is sufficiently developed to determine first whether Aquinas Academy is a "religious organization" within the scope of Title VII's exemption and, second, whether Mr. Ference's termination was rooted in Defendants' religious beliefs. ECF No. 24 at 5. "[A]s the entit[ies] seeking the benefit of the religious exemptions, [Defendants] bear[] the burden of proving [they are] exempt." Id. (quoting Garcia v. Salvation Army, 918 F.3d 997, 1003 (9th Cir. 2019)).

As to the first inquiry, "the Court must decide 'whether an institution's purpose and character are primarily religious by weighing all significant religious and secular characteristics.'" Id. (quoting Garcia, 918 F.3d at 1003). "It does not suffice that an institution be merely affiliated with a religious organization." Id. The following non-exclusive factors may be used to determine whether Aquinas Academy is a religious organization:

(1)    whether the entity operates for a profit,

(2)    whether it produces a secular product,

(3)    whether the entity's articles of incorporation or other pertinent documents state a religious purpose,

(4)    whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue,

(5)    whether a formally religious entity participated in the management, for instance by having representatives on the board of trustees,

(6)    whether the entity holds itself out to the public as secular or sectarian,

(7)    whether the entity regularly includes prayer or other forms of worship in its activities,

(8)    whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and

(9)    whether its membership is made up by coreligionists.

ECF No. 24 at 4 (citing LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 226 (3d Cir. 2007)).

Mr. Ference concedes that Aquinas Academy is a religious institution. ECF No. 67 ¶ 3 ("Aquinas is a Catholic religious institution."). As to the LeBoon factors, the undisputed evidence points to the conclusion that Aquinas Academy is a religious institution. The parties agree that: (1) the Diocese is a Catholic diocese; (2) Aquinas Academy is a Catholic elementary school located in Diocese's geographic area; (3) the Diocese operates ten Catholic elementary schools, including Aquinas Academy; (4) the Diocese has operational control over the schools within the Diocese and also provides administrative support to those schools through a superintendent, assistant superintendent, and other administrative employees; (5) Mr. Ference interviewed for sixth-grade teacher position with Aquinas Academy's principal, Kelly Watkins, (6) Watkins reported to Dr.

Maureen Marsteller, the Superintendent of the Diocese's schools during the 2021-2022 school year. Id. ¶¶ 1-3, 6-7, 9-11.

Mr. Ference also agrees that (7) the Diocese and Aquinas Academy are Pennsylvania charitable trusts and nonprofit entities; (8) Aquinas Academy trustees and administrators oversee the operation of Aquinas Academy and include the Diocesan Bishop, Vicar General, and various parish priests and administrators; (9) the Diocese provides an annual subsidy to Aquinas Academy; and, (10) in keeping with its purpose, all students attend religious instruction class and Catholic and non-Catholic students are required to pray and attend mass together. ECF No. 81 ¶¶ 3-7, 9-11, 18.

The undisputed evidence therefore fails to raise an issue of fact to suggest that Aquinas Academy is not a religious organization.

The second issue to be resolved is whether the challenged termination decision was rooted in religious belief. The language of Section 702 provides that this is resolved "with respect to the employment of … [an individual] of a particular religion," 42 U.S.C. § 2000e-1(a); and under Section 703, whether Aquinas Academy terminated Mr. Ference because he was "of a particular religion," 42 U.S.C. § 2000e-2(e).

Religion is defined by Title VII to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The "intent and effect" of the definition of religion was explained by the United States Supreme Court in Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977), "to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, *for*

*the religious practices of his employees* and prospective employees." Id. 74 (emphasis added). Thus, the "intent and effect" is to make unlawful discrimination based on *the religion or religious practice of the employee*. See also Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 133 (3d Cir. 1986) (reiterating the intent and effect of the definition focuses on the extent of the employer's obligation to accommodate *the employee's* religious practices under Title VII) (emphasis added).

Defendants contend that  the Court is bound to apply the decision of the United States Court of Appeals for the Third Circuit in Little v. Wuerl, 929 F.2d 944 (3d Cir. 1991), and weigh an employer's religious beliefs to resolve this issue. ECF No. 77 at 12. There, a Protestant teacher claimed that a Catholic school violated Title VII's prohibition against religious discrimination when it failed to renew her contract because she remarried in violation of Catholic doctrine regarding the indissolubility of marriage. Id. at 945. The Little Court "recognize[d] that Congress intended Title VII to free individual workers from religious prejudice." Id. at 951. But as to the religious discrimination claim before it, the Third Circuit construed the Title VII exemptions to grant religious employers "permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." Id. Thus, the exemptions were extended beyond the individual's religion to the employer's "religious precepts." The Third Circuit stated that "[t]he broadening of the exception to cover all employees rather than only those engaged in 'religious activities' was done at the same time Congress eliminated a general exception from Title VII for all educational establishments. It is generally acknowledged that '[t]he sponsors of the 1972 exemption were chiefly concerned to preserve the statutory power of sectarian schools and colleges to discriminate on religious grounds in the hiring of all their employees.'" Id. at 950 (quoting King's Garden, Inc. v. Fed. Communications Comm'n, 498 F.2d 51, 54 (D.C. Cir.), *cert. denied*, 419 U.S. 996 (1974)).

Fifteen years later, in <u>Curay-Cramer v. Ursuline Acad. of Wilmington, Del.</u>, 450 F.3d 130 (3d Cir. 2006), Title VII gender discrimination claims were found unsustainable against a Catholic school when pursued by a schoolteacher who was terminated after she publicly endorsed a pro-choice advertisement in a local newspaper. She alleged that she was treated differently than similarly situated male employees who voiced public opinions or were of a different faith. <u>Id.</u> 138-39. The Third Circuit explained that the 1972 amendments to Title VII provide "that it would not be an unlawful employment practice for a religious school to hire employees based on their religious beliefs." <u>Id.</u> at 140 (citing <u>EEOC v. Pac. Press Publ'g Ass'n</u>, 676 F.2d 1272, 1276-77 (9th Cir. 1982). Following <u>Little</u>, the Third Circuit stated that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organizations['] religious activities." <u>Id.</u> 450 F.3d at 141 (citing <u>Little</u>, 929 F.2d at 951).

Giving consideration to Congressional intent, Section 702(a) was amended in 1972 to expand the exemption for religious institutions to include not just employment of individuals of a particular religion for "religious activities," but also "employment of individuals of a particular religion to perform work connected with the carrying on by such ... educational institution … its activities." 42 U.S.C. § 2000e-1(a) The legislative history to the amendment indicates that the goal was to "exempt religious corporations, associations, and societies from the application of this act insofar as the right *to employ people of any religion they see fit is concerned*. That is the only affect of this amendment." Legislative History of the Equal Employment Opportunity Act of 1972 (H.R. 1746, P.L. 92-261) Amending Title VII of the Civil Rights Act of 1964 (p. 1645) (Sen. Ervin)(emphasis added).

Senator Allen, the bill's co-sponsor, explained that the amendment sought to expand Title VII's exemption for religious schools beyond hiring individuals for purely "religious" activities to the employment of individuals for "educational" activities. The change would remove the possibility of Title VII enforcement against "a college which seeks to provide a Christian education at the hands of a Christian faculty in all subjects to employ in preference to an atheist, or a Mohammedan, or an agnostic, a professor to teach chemistry or [economics] or sociology who happened to be a member of the Christian church." Id. at 849. "Since the institution teaches chemistry and other nonreligious courses the EEOC has jurisdiction to deny it the right to prefer, and carry out such preference, to employ a man to teach chemistry who happens to be a member of the Christian church; and can compel the institution instead of doing that, to employ an applicant for the position who happens to be a Mohammedan, an agnostic, or an atheist. That is what the Senator from Alabama and I are seeking to prevent by the amendment." Id. at 850. Thus, the legislative history appears to confirm that the exemption for religious institutions was intended to permit the *hiring* of employees *of the same religion* to the exclusion of prospective employees of another faith. It does not address whether the exemptions to Title VII apply when an institution voluntary chooses to employ an individual of another faith and to disputes arising when that employee is required to conform to the institution's religion.

In Petruska v. Gannon Univ., 462 F.3d 294 (3d Cir. 2006), the Third Circuit recognized the limitations on the exemptions to Title VII. A chaplain sued a Catholic educational institution for constructive discharge from her position. She alleged that the employment decision was based on her gender and retaliation for her opposition to sexual harassment at the University. The Third Circuit observed that the "statute exempts religious entities and educational organizations from its nondiscrimination mandate to the extent that an employment decision is based on *an individual's*

*religious preferences*." Id., 462 F.3d at 303 (emphasis added). "By its terms, however, Title VII 'does not confer upon religious organizations the right to make those same decisions on the basis of race, sex, or national origin.'" Id. (quoting Rayburn v. Gen'l Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1166 (4th Cir. 1985)). Thus, after Little and Curay-Cramer, the Third Circuit acknowledged that the focus of Title VII's exemption is on the employee's religious preferences, which were not the basis of the chaplain's termination. In the case before it, the Third Circuit concluded that the exemption did not apply to Petruska's gender discrimination claims. Instead, her Title VII claims were unsustainable because adjudication would run afoul of the Free Exercise Clause of the First Amendment and impair "a religious institution's right to decide matters of faith, doctrine, and church governance." Id. at 306-07. It was "clear from the face of [Plaintiff's] complaint… that Gannon's choice to restructure constituted a decision about who would perform spiritual functions and about how those functions would be divided …. [thus] application of Title VII's discrimination and retaliation provisions to Gannon's decision to restructure would violate the Free Exercise Clause." Id. at 307-08.

In this case, the record indicates that Ference was fired because he was in a same sex marriage instead of an opposite sex marriage, and not because of *his* religion or *his* religious practices or *his* religious beliefs. Under Bostock v. Clayton Cnty., 590 U.S. 644, 651-52 (2020), this is a termination based on sex. ("An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids."). Thus, by its terms and as explained in Petruska and the legislative history, the exemptions in Section 702 and 703 do not apply. Instead, his termination must be examined – as

14

was the gender discrimination claim in <u>Petruska</u> – under the Free Exercise and Establishment Clauses of the First Amendment.

Based on the foregoing, it is recommended that the Court deny the Motion for Summary Judgment based on the statutory exemptions to Title VII.

### 2.    Ministerial Exception

In support of the Motion for Summary Judgment, Defendants argue that Mr. Ference's sex discrimination claims cannot be sustained because "they are not cognizable per the ministerial exception." ECF No. 77 at 19. They contend that despite Mr. Ference's assertions to the contrary, he served as a "minister" for Aquinas Academy and thus enforcement of Title VII would violate the Free Exercise and Establishment clauses of the First Amendment.

The United States Supreme Court first recognized the ministerial exception flowing from the Free Exercise and Establishment Clauses of the First Amendment in <u>Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.</u>, 565 U.S. 171, 188 (2012). "Since the passage of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <i>et seq.</i>, and other employment discrimination laws, the Courts of Appeals have uniformly recognized a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation to claims concerning the relationship between a religious institution and its ministers. We agree there is such a ministerial exception." <u>See also</u> <u>Patsakis v. Greek Orthodox Archdiocese of Am.</u>, 339 F. Supp. 2d 689, 693 (W.D. Pa. 2004) (then District Judge Hardiman acknowledged that even after <u>Little v. Wuerl</u>, Title VII's statutory exemption "does not relive religious employers of liability for employment discrimination pertaining to the other protected classes enumerated in Title VII, such as race, sex, or national origin. Thus, Congress left to the judiciary the task of deciding how Title VII applies to religious organizations. The judiciary's response, first articulated by the Court of

Appeals for the Fifth Circuit in <u>McClure v. The Salvation Army</u>, 460 F.2d 553 (5th Cir. 1972), was to create a 'ministerial exception,' which exempted the employment the employment relationship between churches and their ministers from Title VII.").

The ministerial exception recognizes that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision." <u>Hosanna-Tabor</u>, 565 U.S. at 188. Such an action "interferes with the internal governance of the church" by "depriving the church of control over the selection of those who will personify its beliefs." <u>Id.</u> Thus, courts are bound "to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." <u>Our Lady of Guadalupe</u>, 591 U.S. 732, 746 (2020).

The determination of "[w]hether an employee is subject to the ministerial exception 'rests not on [ ] ordination status or [ ] formal title, but rather on [ ] functional status as the type of employee that a church must be free to appoint or dismiss in order to exercise the religious liberty that the First Amendment guarantees.'" <u>Trotter v. United Lutheran Seminary</u>, No. 20-570, 2021 WL 3271233, at *3 (E.D. Pa. July 30, 2021) (quoting <u>Hosanna-Tabor</u>, 565 U.S. at 206 (Alito, J. concurring)). Courts consider the ministerial exception on a position-by-position basis. <u>Our Lady of Guadalupe</u>, 591 U.S. at 758.

In <u>Hosanna-Tabor</u>, the Supreme Court applied the ministerial exception to the facts of the case before it and held that a wrongful termination claim under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a), was foreclosed because the plaintiff, a kindergarten and fourth grade teacher at an Evangelical Lutheran school, was identified by her employer as a minister and was responsible for teaching religion, leading her students in prayer, and participating in the presentation of liturgy. <u>Hosanna-Tabor</u>, 565 U.S. at 192. "As a source of religious

instruction, [plaintiff] performed an important role in transmitting the Lutheran faith to the next generation." Id.

Eight years later, in Our Lady of Guadalupe, the Supreme Court held that the protection afforded an employer under this exception is not limited to discrimination claims asserted by individuals holding the title of "minister." "What matters, at bottom, is what an employee does. And implicit … in Hosanna-Tabor was a recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." Our Lady of Guadalupe, 591 U.S. at 753-54. Therefore, judicial review of "the selection and supervision of the teachers upon whom the schools rely to do this work" would "undermine the independence of religious institutions in a way that the First Amendment does not tolerate." Id.

Based on the record before it, the Supreme Court in Our Lady of Guadalupe extended the ministerial exception to bar employment discrimination claims of two Catholic elementary school teachers who were responsible for directly educating students in the Catholic faith, teaching and supervising prayers, preparing students for Mass and praying with them there, and preparing children for participation in other religious activities. Because each plaintiff was entrusted with the "core" responsibility of religious faith formation, the absence of the title "minister" did not preclude application of the exception. Id. at 757. In each case, based on the plaintiffs' religious duties, the ministerial exception foreclosed their claims against for wrongful termination under the ADA and the Age Discrimination in Employment Act ("ADEA"). Id. at 762.

As applied here, the focus must be on Mr. Ference's function and role in faith formation at Aquinas Academy. Despite Defendants' arguments to the contrary and construing the record in

the light most favorable to Mr. Ference at the summary judgment stage of this litigation, there are material issues of fact that preclude the entry of summary judgment.

Defendants assert that Mr. Ference "participated in and supervised his students during church services." ECF No. 77 at 23. Mr. Ference contends that as agreed in his initial interview, he attended services with his students "solely to chaperone to monitor his students' behavior." ECF No. 83 at 18 (citing ECF No. 82 ¶ 58). It was also his understanding based on his discussion with Watkins that the religious-related provisions of the employment agreement, except as related to behavior supervision, would not apply to him. ECF No. 81 ¶ 39. The other sixth-grade teacher agreed that Mr. Ference watched his students during services, and that she never saw Mr. Ference take communion, pray with his students, or lead the students in hymns during mass. Id. (citing ECF No. 82 ¶ 60). Defendants respond that his co-teacher's testimony is immaterial because Watkins' limitation on teaching religion did not extend to a waiver of his contractual obligations to support and participate in all school religious functions, including school liturgy. ECF No. 87 ¶ 60. But Defendants present no evidence that Mr. Ference's open violation of these obligations, if they applied, was addressed by Aquinas Academy or the Diocese during the five weeks he was employed as a math, science, and social studies teacher.

Defendants also point to Mr. Ference's role during student prayer at the beginning and end of each school day. ECF No. 77 at 23. The parties agree that the prayers were recited each morning and afternoon over the school intercom. ECF No. 67 ¶ 33. According to Defendants, Mr. Ference "supervised and facilitated those prayers." Id. (citing ECF No. 75 ¶¶ 40-42). Mr. Ference responds that he did not participate in daily prayer and that his role was limited to monitoring student behavior. ECF No. 81 ¶¶ 39, 42. He points to Watkins' testimony that in the weeks she observed Mr. Ference's classroom, she could not recall witnessing him talk to his students about prayer or

18

religion. ECF No. 83 at 19 (citing ECF No. 82 ¶ 62). Defendants assert that Watkins' testimony on her observations is immaterial because Mr. Ference's employment agreement and the Aquinas Academy Faculty Handbook required him to facilitate prayers. ECF No. 87 ¶ 63. But Mr. Ference contends that he never received the Faculty Handbook and that he was never instructed to pray or facilitate prayer in his classroom. ECF No. 83 at 22 (citing ECF No. 82 ¶ 74). As with Mr. Ference's role during church services, there is no evidence that Defendants objected to his failure to lead or facilitate daily prayers during his employment.

Defendants raise the provisions of Mr. Ference's employment agreement and on-boarding documents related to his acknowledgment and acceptance of Catholic theology and the requirement that he support and participate in school religious functions and liturgy. ECF No. 77 at 23-4. The documents include a provision that teachers may be dismissed for rejection of Church doctrine or laws, including those related to Catholic teaching related to abortion and homosexuality. Id. In response, Mr. Ference reiterates that Aquinas Academy considered him unqualified to instruct students on the Catholic faith and expressly instructed him that he was not authorized to lead prayer or provide spiritual direction. ECF No. 83 at 18-27. Mr. Ference asserts he was not provided religious-related curriculum and he did not infuse religious content in math, science, and social studies lessons. ECF No. 82 ¶ 57, 59, 80. He also believed, based on his discussion with Watkins during his interview, that the religious provisions in Aquinas Academy's on-boarding documents did not apply to him as a Lutheran and such provisions, absent other evidence of Mr. Ference's responsibility for educating students in the Catholic faith, do not alone compel application of the ministerial exception. See Bell v. Judge Memorial Catholic High Sch., No. 2:20-829, 2023 WL 3585247, at *14 (D. Utah May 22, 2023) ("Indeed, it would be a remarkable expansion of the ministerial exception for the court to hold, as Defendants urge, that

all JMCHS teachers necessarily joined the Catholic ministry based on the policies cross-referenced in their one-year employment contracts—without any consideration of the work the teachers individually performed at the school.").

As summarized, the disputed evidence related to the application of the ministerial exception raises significant material issues of fact for a jury to resolve. Thus, it is recommended that the Court deny the Motion for Summary Judgment based on the ministerial exception.

### 3.    Church Autonomy Doctrine

Defendants also contend that if termination of Mr. Ference is not within Title VII's religious exemption, the "church autonomy doctrine" derived from the First Amendment bars his claims. ECF No. 77 at 16-19,

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The Establishment and the Free Exercise Clauses have long been recognized to preclude governmental interference with certain ecclesiastical matters, including the disposition of church property and the hiring or firing of ministers. Hosanna-Tabor, 565 U.S. at 184-87 (citing, among others, Watson v. Jones, 13 Wall. 679 (1872) (court should decline to review church decisions related to control over property that implicate discipline, faith, or ecclesiastical rule); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94 (1952) (state law mandating recognition of one branch of church leadership over another violated the First Amendment by interfering with "strictly a matter of ecclesiastical government")).

In Hosanna-Tabor, the Supreme Court concluded that this autonomy or "special solicitude" extends to the selection of church ministry and bars application of discrimination laws to "claims concerning the employment relationship between a religious institution and its ministers."

Hosanna-Tabor, 565 U.S. at 188. To hold otherwise would "violate[] the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions," including who will shape a church's faith and mission. Id. at 188-89. Defendants argue that the church autonomy doctrine extends to all matters of employment, regardless of the employee's role, so long as the decision is "rooted in religious belief." ECF No. 77 at 17 (citing Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 657-58 (10th Cir. 2002)).

Mr. Ference responds that the church autonomy doctrine does not provide blanket immunity to religious entities from secular laws and is limited to decisions related to spiritual/religious functions. ECF No. 83 at 10-13. (citing Hosanna-Tabor, 565 U.S. at 200 (Alito, J. and Kagan, J. concurring)("[r]eligious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance…. These include those who serve in positions of leadership, those who perform important functions in worship services and in the performance of religious ceremonies and rituals, and those who are entrusted with teaching and conveying the tenets of the faith to the next generation."). Mr. Ference argues that his employment was limited to secular classes, with no responsibility to teach or participate in Aquinas Academy's religious mission. As such, he was not employed in a ministerial role and was not hired for a position of "substantial religious importance." Id. at 13. Therefore, Mr. Ference contends that the church autonomy doctrine does not bar his claim.

The Court agrees that the Diocese's interpretation represents a significant expansion of immunity for religious institutions beyond the recognized categories of church governance, ministerial leadership, and religious education. See, e.g., Our Lady of Guadalupe, 591 U.S. at 746 ("The independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence in what we have termed 'matters of church government.' This does not mean that

religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission.") (citation omitted). Thus, the Court declines Defendants' invitation to immunize them against all employment discrimination claims by employees not entrusted with "teaching and conveying the tenets of the faith" based on the assertion that church doctrine permits the violation of civil rights.

Aside from substantive limitations, application of the church autonomy doctrine requires a factual determination to determine whether Mr. Ference's role implicates matters of church governance or is essential to Aquinas Academy's religious mission. Id. at 756-57 (Religion Clauses applied to bar claims by teachers who "performed vital religious duties" and were "entrusted most directly with the responsibility of educating their students in the faith."). Like the ministerial exception, the evidence presented in this regard raises substantial material issues of fact for a jury to resolve. Thus, it is recommended that the Court deny the Motion for Summary Judgment based on the church autonomy doctrine.

### 4.    303 Creative LLC v. Elenis

Defendants contend that, in accordance with the United States Supreme Court decision in 303 Creative LLC v. Elenis, 600 U.S. 570 (2023), the forced employment of Mr. Ference or the imposition of penalties for his termination would violate their First Amendment rights to free speech by compelling them to express a view contrary to Catholic doctrine on marriage.[2] ECF No. 77 at 13-15. Simply, the holding in 303 Creative is not as broad as Defendants assert and, based on the evidence presented, does not apply to this employment discrimination case.

---

[2]  Mr. Ference does not seek reinstatement to his teaching position at Aquinas Academy. See First Amended Complaint, ECF No. 38 at 6.

303 Creative was initiated by a graphic designer who offered website design services through her business. She planned to create wedding websites but refused to offer her services for same sex-couples based on religious and free speech objections. The plaintiff asserted that the "Accommodation Clause" of the Colorado Anti-Discrimination Act could be enforced to compel her to create websites celebrating marriages she does not endorse. 303 Creative, 600 U.S. at 580-81. The parties stipulated that "[a]ll of the graphic and website design serves [plaintiff] provides are 'expressive'; [t]he websites and graphics Ms. Smith designs are 'original customized' creations that 'contribute to the overall messages' her business conveys 'through the websites' it creates; and, '[j]ust like the other services she provides, the wedding websites [plaintiff] plans to create 'will be expressive in nature.'" Id. at 582 (cleaned up). Based on these stipulations, the Supreme Court held that the plaintiff's websites qualify as "pure speech." Id. at 587. In addition, the websites involve "her speech." Id. at 588 (emphasis in original). Therefore, compelling the plaintiff to create a wedding website for a same-sex couple would abridge her "First Amendment right to speak freely." Id. at 589.

The Supreme Court explained that the First Amendment forbids other forms of compelled speech, such as requiring the inclusion of a gay rights group in a veteran's sponsored St. Patrick's Day parade or acceptance of a previously described avowed homosexual and gay rights activist as a Boy Scout adult leader. Id. at 585-86 (citing Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557 (1995), and Boy Scouts of America v. Dale, 530 U.S. 640 (2000)). In Hurley, the Supreme Court held that a parade is constitutionally protected speech and that "requiring the veterans to include voices they wished to exclude would impermissibly require them to 'alter the expressive content of their parade.'" Id. at 585. And, in Dale, the Supreme Court

held that the "forcing the Scouts to include Mr. Dale would 'interfere with its choice not to propound a point of view contrary to its beliefs.'" Id. at 586.

Unlike Mr. Dale's public advocacy or the excluded gay pride organization in Hurley that sought to march behind an LGBT banner, there is no evidence Mr. Ference publicly championed same-sex marriage. Thus, his speech is not at issue. As to Defendants' speech, Mr. Ference's existence as a Lutheran in a same-sex marriage does not present *expressive content* contrary to Catholic doctrine. And, considering the evidence in the light most favorable to Mr. Ference, Defendants do not present a basis for a jury to conclude that after they employed him in a secular role with no responsibility for religious faith formation, continued employment would "amount to expressive conduct that communicates [Defendants'] views" within the meaning of the First Amendment. McMahon v. World Vision, Inc., 704 F. Supp. 3d 1121, 1146 (W.D. Wash. 2023). Thus, entry of summary judgment in Defendants' favor based on 303 Creative should be denied.

### D. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion for Summary Judgment be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties may file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file

objections will waive the right to appeal.  Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may respond to the objections within 14 days in accordance with Local Civil Rule 72.D.2.


Respectfully submitted,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: February 24, 2025


cc:     The Honorable J. Nicholas Ranjan
        United States District Judge

        All counsel of record by Notice of Electronic Filing