## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH FERENCE, | **ELECTRONICALLY FILED** |
| Plaintiff, | |
| | No. 2:22-cv-00797-NR-MPK |
| vs. | |
| | District Judge J. Nicholas Ranjan |
| ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY, | Magistrate Judge Maureen P. Kelly |
| Defendants. | **JURY TRIAL DEMANDED** |

## DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO DENY SUMMARY JUDGMENT MOTION

### I.    Introduction

Roman Catholic Diocese of Greensburg ("Diocese") and Aquinas Academy ("Aquinas," and when collectively referred to with Diocese, "Defendants") request the Court to sustain their objections to the Magistrate Judge's Report and Recommendation ("R&R").

### II.    Objections

#### A.    The Court Should Grant Summary Judgment Under Title VII's Religious Exemptions and Precedential Case Law Interpreting Them

Title VII's religious exemptions bar Mr. Ference's sex discrimination claims. Under those exemptions, Title VII "shall not apply" to a religious organization "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Likewise, it is not unlawful for a "school … owned, supported, controlled, or managed by a particular religion" to "hire and employ employees" of a particular religion. 42 U.S.C. § 2000e-2(e). Title VII defines "religion" to include not just religious "belief" but "all aspects of religious observance and practice." 42 U.S.C. §§ 2000e(j), 2000e-2(e).

Here, the R&R agreed that Defendants are religious organizations. (Id. pp. 8–10.) The reason for Mr. Ference's termination is undisputed: his same-sex marriage did not adhere to the "religious observance and practice" taught by the Catholic Church. (ECF No. 91 pp. 2–3.) Under Title VII's plain language, its religious exemption applies. Mr. Ference's claims fail.

Binding precedent also requires this result. In Little v. Wuerl, for example, a Catholic parish declined to renew an elementary teacher's contract after she entered a canonically invalid marriage. 929 F.2d 944, 945–46 (3d Cir. 1991). The plaintiff sued under Title VII, but the Third Circuit held her claims were barred under Title VII's religious exemption. The court explained that "Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" Id. at 951. Thus, the exemption's "permission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." Id.

Wuerl is dispositive here: "it does not violate Title VII" for Defendants "to discharge a . . . teacher"—like Mr. Ference—"who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." Id. ("[W]e interpret the exemption broadly[.]"). Rather, Defendants are permitted "to employ only persons whose beliefs and conduct are consistent" with Church teaching on same-sex marriage. Id.

Resisting this straightforward result, the Magistrate Judge insisted that "Ference was fired because he was in a same sex marriage rather instead of an opposite sex marriage, and not because of his religion." (ECF No. 91 p. 14) And because "this is a termination based on sex," "the exemptions in Section 702 and 703 do not apply." (Id.)

2

But this is a false dichotomy and is irreconcilable with the statutory text. The exemption on its face says that "[t]his subchapter"—i.e., all of Title VII—"shall not apply" when the religious exemption's requirements are met. 42 U.S.C. § 2000e-1(a). Moreover, under Title VII's statutory definition, "religion" includes not only "belief" but "all aspects of religious observance and practice." 42 U.S.C. § 2000e(j). By entering into a same sex marriage, Mr. Ference publicly rejected the "religious observance and practice" of marriage taught by the Catholic Church. So in terminating him for this reason, Defendants were engaging in precisely the conduct that Title VII's religious exemption expressly protects: "employ[ing]" only individuals of a "particular" "religious observance and practice." 42 U.S.C. §§ 2000e-1(a); 2000e(j). That Defendants' "adherence to Roman Catholic doctrine" could *also* be construed as "produc[ing] a form of sex discrimination does not make the action less religiously based." Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc., 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J., concurring).

Third Circuit precedent already confirms the point. In Curay-Cramer v. Ursuline Academy of Wilmington, Del., 450 F.3d 130 (3d Cir. 2006), the Third Circuit applied Wuerl's understanding of the religious exemption to bar a *sex* discrimination claim, recognizing that such claims (like claims of religious discrimination) can "jeopardize[]" a religious organization's ability to maintain a community of faithful adherents. 450 F.3d at 137–41. Like this case (and Wuerl), Curay-Cramer involved a teacher at a Catholic school. Id. at 133; see also Billard v. Charlotte Catholic High Sch., 101 F.4th 316, 333 (4th Cir. 2024) (King, J., concurring) (concluding that Title VII's religious exemptions bar claims by employee at Catholic school fired for entering same-sex marriage); Fitzgerald v. Roncalli High Sch., Inc., 73 F.4th 529, 534–37 (7th Cir. 2023) (Brennan, J., concurring) (same); Starkey, 41 F.4th at 945–47 (Easterbrook, J., concurring) (same); EEOC v.

Mississippi College, 626 F.2d 477 (5th Cir. 1980); Maguire v. Marquette Univ., 627 F. Supp. 1499 (E.D. Wis. 1986), aff'd in part on other grounds, vacated in part, 814 F.2d 1213 (7th Cir. 1987).

Addressing the definition of "religion," the Magistrate Judge cited two cases involving an employee's unsuccessful attempt to persuade his non-religious employer to accommodate his request to not work on his sabbath, Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 66–69 (1977), and Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 133 (3d Cir. 1986). (ECF No. 91 pp. 10–11.) But Mr. Ference never claimed that Defendants failed to accommodate his religious beliefs. (ECF No. 42.) And neither of those cases considered the statutory and constitutional rights of religious employers. Title VII's "religion" definition protects their rights too.

As instructed by the Supreme Court's decision in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490 (1979), Wuerl also recognized the constitutional pitfalls federal courts would face if they pried into whether a religious employer's purported religious-based employment decision was pretext for a different category of discrimination Title VII prohibits. 929 F.2d at 948–51. Wuerl warned federal courts not to engage in the very analysis adopted by the R&R. (ECF No. 91 p. 14 (stating that "Ference was fired because he was in a same sex marriage instead of an opposite sex marriage, and not because of his religion or his religious practices or his religious beliefs.") (emphasis removed).)

The R&R's analysis implies that the standard McDonnell Douglas framework should apply to resolve Mr. Ference's sex discrimination claim at trial. (ECF No. 91 pp. 7 n.1, 14–15.) But the purpose of McDonnell Douglas is to provide a framework for adjudicating whether the "legitimate reasons offered by the defendant" were its "true reasons," or whether they instead "were a pretext for discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515–16 (1993) (internal quotation marks omitted). That framework has no application where the reason for the decision is

undisputed and the only question is whether that decision violates Title VII. Here, all agree on the reason Mr. Ference was terminated—it was because he was in a same-sex marriage, which constitutes an undisputed public rejection of Catholic doctrine. (ECF No. 91 pp. 2–3.) Even if that decision would otherwise constitute sex discrimination, it is permitted under the terms of Title VII's express religious exemption—requiring summary judgment in Defendants' favor.

To hold otherwise is to rule that Title VII was "clearly" and "affirmatively" intended by Congress to outlaw the practice by the Defendants of witnessing to the Catholic faith's beliefs on marriage. (See, NLRB v. Catholic Bishop, 440 U.S. at 506). Adopting Mr. Ference's (and the R&R's) view of the law requires the Court to decide that Congress clearly and affirmatively intended Title VII to coerce religious institutions into employing individuals in religiously sensitive positions of trust when those individuals intentionally defy and deny the doctrinal integrity of the Church's teaching ministry.

Petruska v. Gannon Univ., emphasized by the R&R, does not shepherd Mr. Ference's case into trial. 462 F.3d 294, 299 (3d Cir. 2006) (adopting the ministerial exception). Petruska recognized that Title VII, by its terms, "'does not confer upon religious organizations the right to make those same decisions on the basis of race, sex, or national origin.'" Id. at 303 (quoting Rayburn v. Gen. Conf. of Seventh Day Adventists, 772 F.2d 1164, 1166 (4th Cir. 1985)). But this language does not overrule Curay-Cramer or impose a new, atextual limitation on the religious exemption's scope; it stands for the uncontroversial proposition that religious organizations are not exempt from Title VII when the exemption's terms are not met. Petruska nevertheless dismissed the plaintiff's Title VII sex discrimination claim because a fact finder would have had to decide whether Gannon University's decision to restructure was based on religious reasons or

as cover for sex discrimination.  462 F.3d at 307–08.  <u>Petruska</u> actually undercuts, rather than undergirds, Mr. Ference's sex discrimination claims.

The R&R cites <u>Bostock v. Clayton County</u>, 590 U.S. 644, 651–52 (2020), in support of its conclusion that Mr. Ference's termination is "based on sex."  (ECF No. 91 p. 14.)  But the R&R ignores <u>Bostock's</u> warning: the Supreme Court "is deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society."  590 U.S. at 681.  The majority further acknowledged Title VII's "express statutory exception for religious organizations" and stated that the interaction between Title VII and "doctrines protecting religious liberty . . . are questions for future cases . . . ."  <u>Id.</u> at 682.

This is one of the future cases the Supreme Court contemplated in <u>Bostock</u>.  When a statutory prohibition on sex discrimination collides with a religious employer's First Amendment rights and statutory permission to discriminate for religious reasons, the employer's religious interests should prevail—and Title VII expressly indicates that they must.  <u>See</u> 42 U.S.C. § 2000e-1(a) ("This subchapter shall not apply . . . .").  It is the very essence of "undue hardship" to force a Church to choose between violating its religious beliefs by employing people who openly contradict those beliefs versus being penalized for upholding its religious beliefs.  Coercing such a choice flies in the face of American constitutional jurisprudence.  The Court should enter summary judgment in Defendants' favor.  Furthermore, as "constitutional issues should be avoided whenever possible," the Court should grant summary judgment to Defendants via Title VII's exemptions to avoid considering Defendants' remaining First Amendment-based arguments. <u>Wuerl</u>, 929 F.2d at 946–47.

**B.     Mr. Ference's Sex Discrimination Claims Contravene the Supreme Court's Decisions in <u>303 Creative LLC v. Elenis</u> and <u>Boy Scouts v. Dale</u>**

The R&R wrongly held that the Supreme Court's decision in <u>303 Creative LLC v. Elenis</u>, 600 U.S. 570 (2023) "does not apply to this employment discrimination case." (ECF No. 91 p. 22.) This is because, according to the Magistrate Judge, Mr. Ference did not "publicly champion[]" his same-sex marriage in contrast to the gay rights advocates in <u>Hurley v. Irish Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.</u>, 515 U.S. 557, 585 (1995), and <u>Boy Scouts of America v. Dale</u>, 530 U.S. 640, 653 (2000). (ECF No. 91 p. 24.) But whether someone's actions, beliefs, or views were publicly championed did not matter in <u>303 Creative</u>. This is because 303 Creative's owner did not "carry out her plans" to expand her business to create wedding websites for fear that "Colorado will force her to express views with which she disagrees" on marriage. 600 U.S. at 579–80. Even assuming there is a "public championing" requirement for <u>303 Creative</u> to apply, Mr. Ference publicly disclosed his same-sex marriage to Defendants. (ECF No. 91 p. 3.)

Granting summary judgment to Defendants is consistent with prior Supreme Court expressive association precedent. The Supreme Court, in 1995, allowed veterans organizing a parade to exclude a group of gay, lesbian, and bisexual people from the event. <u>Hurley</u>, 515 U.S. at 560–61, 581. In so ruling, the Supreme Court acknowledged that the parade constituted expressive content and that the First Amendment protected the veterans' right to deliver the message that they wanted without their views being diluted "by views they did not share." <u>303 Creative</u>, 143 S. Ct. at 2311 (citing <u>Hurley</u>, 515 U.S. at 572–73). It was the very presence of a gay, lesbian, and bisexual parade unit within the veterans' parade that the Supreme Court determined would interfere with the veterans' message. <u>Hurley</u>, 515 U.S. at 572–75.

The First Amendment's Free Speech Clause protects the "freedom to think as you will and to speak as you think." <u>Dale</u>, 530 U.S. at 660–61 (internal quotation marks omitted). In <u>Dale</u>, the

7

Supreme Court upheld the Boy Scouts's right to exclude an assistant scoutmaster after they learned he was gay.  Id. at 661.  This is because the Boy Scouts were "an expressive association" shielded by the First Amendment.  Id. at 656.  Requiring the Boy Scouts to include the assistant scoutmaster would "interfere with [its] choice not to propound a point of view contrary to its beliefs." Id. at 656.  It was the very presence of a gay assistant scoutmaster that would have caused the Boy Scouts to "propound a point of view contrary to its beliefs."  Id. at 654.

The "First Amendment protects acts of expressive association."  303 Creative, 143 S. Ct. at 2312.  The government cannot "compel a person to speak its own preferred messages," make a silent person speak a message he does not want to speak, or require "an individual to include other ideas with his own speech that he would prefer not to include."  Id.  If a business owner that generally offers her services to the public may refuse to communicate a message she does not agree with, then Defendants should not be forced to employ (or penalized for not employing) Mr. Ference as a teacher whose example and conduct undermine the doctrinal integrity of the teaching mission of the Church in the presence of impressionable children.  (ECF No. 75 ¶¶ 19–28, 48–49; ECF No. 67 ¶¶ 13–15, 34.)

Mr. Ference's decision to enter into a same-sex marriage is inconsistent with Defendants' beliefs on marriage.  (ECF No. 75 ¶¶ 48–49; ECF No. 67 ¶ 34.)  Put differently, Mr. Ference does not model marriage in the manner that Defendants wish to communicate by word and deed to their students.  (ECF No. 75 ¶¶ 1–29); 303 Creative, 143 S. Ct. at 2308, 2311–2318, 2321–22.  Similar to the expression at issue in 303 Creative, Hurley, and Dale, Mr. Ference teaching at Aquinas, a Catholic school operated by Diocese, interferes with Defendants' First Amendment right to express their particular views.  303 Creative, 143 S. Ct. at 2308, 2311–2318, 2321–22; Hurley, 515 U.S. at 570, 572–75; Dale, 530 U.S. at 644, 648–51, 653–56, 659, 661; see also Slattery v.

Hochul, 61 F.4th 278, 288 (2d Cir. 2023) (forcing an expressive association to employ individuals who act against its mission violates the First Amendment). Defendants have the First Amendment right to terminate Mr. Ference's role as an exemplar to children for living his life in violation of Catholic doctrine on the sacramental state of marriage. Summary judgment should be entered in Defendants' favor on all aspects of Mr. Ference's suit.

      **C.**      **The Church Autonomy Doctrine Requires the Court to Grant Summary Judgment to Defendants**

The Court should sustain Defendants' objections to the R&R and hold that Mr. Ference's sex discrimination claims fail under the church autonomy doctrine. The church autonomy doctrine springs from the First Amendment.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. The Supreme Court has long warned against entanglements between government and religion that produce "confrontations and conflicts" between government and churches. Walz v. Tax Comm'n, 397 U.S. 664, 674 (1970). Over 150 years ago, the Supreme Court explained the basis of the church autonomy doctrine:

> "it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character, a matter over which the civil courts exercise no jurisdiction, in a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them, becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would

> become, in almost every case, the criteria by which the validity of
> the ecclesiastical decree would be determined in the civil court. This
> principle would deprive these bodies of the right of construing their
> own church laws, would open the way to all the evils which we have
> depicted as attendant upon the doctrine of Lord Eldon, and would,
> in effect, transfer to the civil courts where property rights were
> concerned the decision of all ecclesiastical questions."

Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713–14 (1976) (quoting Watson

v. Jones, 80 U.S. 679, 733–34 (1872)).

The church autonomy doctrine precludes claims challenging religious organizations'

personnel decisions if "the alleged misconduct is 'rooted in religious belief.'" Bryce v. Episcopal

Church in Diocese of Colorado, 289 F.3d 648, 657–58 (10th Cir. 2002) (quoting Wisconsin v.

Yoder, 406 U.S. 205, 215 (1972)).  The Religion Clauses of the First Amendment "protect[] a

religious group's right to shape its own faith and mission through its appointments" and "prohibit[]

government involvement in such ecclesiastical decisions." Hosanna-Tabor Evangelical Lutheran

Church & Sch. v. EEOC, 565 U.S. 171, 188–89 (2012); Kedroff v. Saint Nicholas Cathedral of

Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952); Serbian Eastern Orthodox Diocese,

426 U.S. at 709; Watson, 80 U.S. at 733.

The church autonomy doctrine applies when resolution of a case would require a court to

decide a religious dispute, answer a religious question, or decide the meaning or application of

church rules or processes.  Catholic Bishop of Chicago, 440 U.S. at 502 ("It is not only the

conclusions that may be reached by the Board which may impinge on rights guaranteed by the

Religion Clauses, but also the very process of inquiry leading to findings and conclusions.");

Wuerl, 929 F.2d at 949; Demkovich v. St. Andrew the Apostle Parish, 3 F.4th 968, 975–77 (7th

Cir. 2021) (en banc); Garrick v. Moody Bible Inst., 412 F. Supp. 3d 859, 868–69, 871–72 (N.D.

Ill. 2019); Curay-Cramer, 450 F.3d 130; Bryce, 289 F.3d at 655–59.  If Title VII or the PHRA

were construed to apply to Defendants for terminating a teacher at a Catholic school because that

teacher violated Catholic principles, then the Court would be contradicting the church autonomy doctrine by effectively controlling or manipulating the religious-based employment decisions of Catholic schools. Kedroff, 344 U.S. at 116; Wuerl, 929 F.2d at 948–49; Catholic Bishop of Chicago, 440 U.S. at 502; Curay-Cramer, 450 F.3d at 138–39; Bryce, 289 F.3d at 657–58; Butler v. St. Stanislaus Kostka Catholic Academy, 609 F. Supp. 3d 184, 191 (E.D. N.Y. 2022) ("This [church autonomy] principle is process-oriented: it cabins a court's authority to interfere in a religious organization's 'independence in matters of faith and doctrine and in closely linked matters of internal government,' Our Lady of Guadalupe, 140 S. Ct. at 2061, even outside the discrimination context.").

The Third Circuit recognizes that the First Amendment's Establishment Clause prevents "excessive government entanglement with religion" while the First Amendment's Free Exercise Clause "protects not only the individual's right to believe and profess whatever religious doctrine one desires, but also a religious institution's right to decide matters of faith, doctrine, and church governance." Petruska, 462 F.3d at 306, 311 (cleaned up). Federal courts may only adjudicate disputes turning "on a question devoid of doctrinal implication" and that "employ neutral principles of law to adjudicate." Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc., 684 F.3d 413, 418–19 (3d Cir. 2012). Nor should federal courts "pars[e] the precise reasons" for a church employee's termination if doing so "would intrude on internal church governance [and] require consideration of church doctrine . . . ." Lee v. Sixth Mount Zion Baptist Church of Pittsburgh, 903 F.3d 113, 121–22 (3d Cir. 2018). But the R&R disagrees with these precedential principles.

The R&R states that Defendants' interpretation of the church autonomy doctrine "represents a significant expansion of immunity for religious institutions beyond the recognized

categories of church governance, ministerial leadership, and religious education." (ECF No. 91 p. 21.) Then, the R&R "declines Defendants' invitation to immunize them against all employment discrimination claims by employees not entrusted with 'teaching and conveying the tenets of the faith' based on the assertion that church doctrine permits the violation of civil rights." (Id. p. 22.) The R&R so concluded because "application of the church autonomy doctrine requires a factual determination to determine whether Mr. Ference's role implicates matters of church governance or is essential to Aquinas Academy's religious mission." (Id.) The Court should sustain Defendants' objections to the R&R's flawed understanding of the church autonomy doctrine.

The R&R effectively reduces the church autonomy doctrine to the ministerial exception, which separately bars employment claims by employees who are entrusted with "teaching and conveying" the faith, regardless of the reason why the employee was terminated. See infra Part II.D. But the Supreme Court has explained that the ministerial exception is merely one "component" of the "the general principle of church autonomy." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 746 (2020). Another component is religious organizations' freedom to make *religious decisions* about who is qualified for church membership or employment, whether the employee is a "minister" or not. See Amos, 483 U.S. at 342 (Brennan, J., concurring) ("Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself.") That is why courts hold that a religious organization's "personnel decision based on religious doctrine" is protected under the "broader church autonomy doctrine," without any need of determining whether the employee "was a 'minister' for purposes of" the ministerial exception. Bryce, 289 F.3d at 658 n.2, 660.

The R&R neither responds to this precedent nor points to any mandatory precedent allowing a factfinder to decide whether the employee of a religious teaching entity's role is "religious enough" for the church autonomy doctrine to apply.  While Mr. Ference considers himself a secular employee—within a parochial elementary school—entitled to Title VII's and the PHRA's protections, Defendants—with the help of undisputed material facts—demonstrated that Mr. Ference's employment was an appointment through which their mission is shaped.  Hosanna-Tabor, 565 U.S. at 188–89; (ECF Nos. 75–76.)  This case boils down to a single issue: whether a religious teaching entity or an employee of that religious teaching entity (who agreed to follow the religious ministry's doctrine) decides whether the employee's role is religious.  Federal courts, in adherence to the First Amendment, should "defer to religious organizations' good-faith claims" on this score.  Our Lady, 591 U.S. at 762–63 (Thomas, J., concurring).  Indeed, it is difficult to see how a religious organization could feasibly maintain religious employment standards otherwise, since, as the Supreme Court has recognized, "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious."  Amos, 483 U.S. at 336.

Mr. Ference seeks to hold Defendants liable for terminating him because he is married to a man, an act violating Defendants' sincerely held religious belief that marriage can only be between a man and a woman.  (ECF No. 75 ¶¶ 48–49; ECF No. 67 ¶ 34.)  Yet, Mr. Ference contradictorily recognized Defendants' religious beliefs on the sacrament of marriage when he signed his professional services agreement and acknowledgment of receipt of the code of pastoral conduct.  (ECF No. 75 ¶¶ 14–17, 19–27; ECF No. 67 ¶¶ 13–15.)  Mr. Ference's claims, if they advanced to trial, would require a factfinder to decide if he was terminated due to sex or conformance to religious doctrine—a constitutionally impermissible inquiry, given the way the

two are entangled here.  <u>Catholic Bishop of Chicago</u>, 440 U.S. at 502; <u>Butler</u>, 609 F. Supp. 3d at 200–04.  The church autonomy doctrine also weighs against the Court or a factfinder determining the bounds of "religion" within Aquinas and assessing whether Mr. Ference established or was within an alleged "secular" enclave within a parochial school that the Church supports.

If a factfinder rules in Mr. Ference's favor, it will force Defendants to employ teachers in Catholic schools whose conduct violates Catholic religious precepts or will penalize Defendants for not employing such teachers.  Such a result would eviscerate the First Amendment of the United States Constitution.  The Court should enter summary judgment for Defendants.

### D.    The Ministerial Exception Bars Mr. Ference's Sex Discrimination Claims

The Court should sustain Defendants' objections and hold, as a matter of law, that Mr. Ference was in a ministerial role and thus cannot assert sex discrimination claims against Defendants.  The Supreme Court recently discussed the ministerial exception in two cases.

First, in <u>Hosanna-Tabor</u>, the Supreme Court recognized that "it is impermissible for the government to contradict a church's determination of who can act as its ministers."  <u>Hosanna-Tabor</u>, 565 U.S. at 185.  "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so," violates the Free Exercise and Establishment Clauses.  <u>Id.</u> at 188–89, 194–95.  The ministerial exception "is not limited to the head of a religious congregation . . . ."  <u>Id.</u> at 190.  Nor does the ministerial exception only apply to individuals that exclusively perform religious functions.  <u>Id.</u> at 193.

The Supreme Court has not created "a rigid formula for deciding when an employee qualified as a minister."  <u>Id.</u> at 190.  It held in <u>Hosanna-Tabor</u> that the ministerial exception applied to a teacher at a Lutheran school for kindergarteners through eighth graders.  <u>Id.</u> at 177–78, 190. The teacher accepted the church's "formal call to religious service, *according to its terms*."  <u>Id.</u> at

191 (emphasis added).  And her job duties reflected her role in "conveying the [c]hurch's message and carrying out its mission."  Id. at 192.

The Hosanna-Tabor court concluded its opinion with the following summary:

> The interest of society in the enforcement of employment discrimination statutes is undoubtedly important.  But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission.  When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us.  The church must be free to choose those who will guide it on its way.

Id. at 196.

Eight years after the Supreme Court decided Hosanna-Tabor, it revisited the ministerial exception in Our Lady.  591 U.S. 732.  There, the Supreme Court held that the ministerial exception applied to two elementary school teachers in Catholic schools, even though those teachers lacked the title of "minister" and had less religious training than the plaintiff in Hosanna-Tabor.  Our Lady, 591 U.S. at 737–38.  The Our Lady court reasoned that

> [t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission.  Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

Id. at 738.  "[A] church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." Id. at 747.  Otherwise, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith."  Id.

It is not necessary for someone to be designated a "minister" for the ministerial exception to apply to them.  Id. at 752–53.  If titles were dispositive, federal courts "would have to decide

which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail." Id. at 753. This is also why a religious employee does not, in every case, have to meet "rigid academic requirements" to be subject to the ministerial exception. Id. The Our Lady court stated that "[w]hat matters," in determining whether the ministerial exception applies, "is what an employee does." Id. "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." Id. at 753–54.

The Supreme Court recognized "abundant record evidence" that two Catholic school elementary teachers in Our Lady "performed vital religious duties" and held that the ministerial exception applied to them. Id. at 756. The Supreme Court also highlighted that those teachers' employment agreements "specified in no uncertain terms that they were expected to help the schools carry out" the mission of "[e]ducating and forming students in the Catholic faith." Id. at 756–57. The teachers "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities." Id. at 757. The Our Lady court stated that the teachers' schools

> expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important.

Id.

Courts, when determining if the ministerial exception applies, should "take all relevant circumstances into account" and "determine whether each particular position implicated the

16

fundamental purpose of the exception." Id.  An employee is not required to be a "'practicing' member of the religion with which the employer is associated" for the ministerial exception to apply. Id. at 761–62.  The Our Lady court concluded that "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." Id. at 762.

A recent Fourth Circuit decision confirms that Mr. Ference should be subject to the ministerial exception. Billard, 101 F.4th 316.  There, the court held that a male teacher of drama and English in a Catholic high school, who was fired after announcing his intent to marry a man, was a minister. Id. at 320–22, 324, 329–31.  This was because the teacher was entrusted with "'vital religious duties,' making him a 'messenger' of its faith . . . ." Id. at 330 (quoting Our Lady, 591 U.S. at 754, 756).  The Catholic high school's educational mission was driven by the Catholic faith, teachers were expected to model the Catholic faith in all subject areas, and teachers were evaluated based on how they integrated the faith in their classes. Billard, 101 F.4th at 331. The teacher in Billard "was expected to—and did—begin each class with prayer and attend Mass with his students . . . ." Id.  While "Billard was not regularly tasked with providing specifically religious instruction," his "duties included conforming his instruction to Christian thought and providing a classroom environment consistent with Catholicism." Id. at 331–32. The Fourth Circuit held that "[t]he ministerial exception protects religious institutions in their dealings with individuals who perform tasks so central to their religious nature," including a drama and English teacher at a Catholic high school. Id. at 332–33.

Mr. Ference was not allowed to teach religion class at Aquinas, but that does not mean he was not a minister. (ECF No. 67 ¶ 28.)  Mr. Ference participated in and supervised his students

during church services.  (Id. ¶¶ 30–33; ECF No. 75 ¶¶ 19–29, 35, 39–42); Our Lady, 591 U.S. at

757 (ministerial exception applied to teachers at Catholic school that attended Mass with students).

He admitted that "a standard school day" at Aquinas "started and ended with prayers" and he was

positioned in the front of the classroom to supervise and facilitate those prayers.  (ECF No. 67

¶ 33; ECF No. 75 ¶¶ 40–42); Our Lady, 591 U.S. at 778 (daily prayer occurred in the Catholic

schools that the ministerial exception applied to in that case).  In Mr. Ference's professional

services agreement, he was required to "support and participate in all religious functions of the

school, including school liturgy."  (ECF No. 68-4 p. 7.)  He accepted and "recognize[d] the

religious nature of the Catholic school and agree[d]" that the Diocese had the right to dismiss him

"for immorality, scandal, or rejection of the official teaching, doctrine[,] or laws of the

Roman Catholic Church[.]"  (ECF No. 75 ¶¶ 19–22.)  He additionally acknowledged that he could

be immediately terminated for violating "the laws of the Church concerning marriage or espousal

of beliefs contrary to the Catholic Church teaching and laws in the practice of abortion and

homosexuality."  (Id. ¶¶ 21–23.)  This is similar to the employment agreements between the

plaintiff teachers and Catholic schools that favored application of the ministerial exception in

Our Lady, in which the teachers were to be an example of living their lives in accordance with the

Catholic faith – conduct which is, in itself, a form of ministerial witness.  591 U.S. at 756–57.

    An appendix attached to the professional services agreement further described

Mr. Ference's role as a teacher.  (ECF No. 68-4 pp. 6–7.)  Teachers must "serve[] the school in

this Catholic Ministry within instructional and extra-curricular capacities . . . ."  (Id. p. 6.)  They

further must be "willing to obtain Diocesan Catechetical Certification" and "supervise[] students

in a Christ-like manner . . . ."  (Id.)  The requirements of being a teacher for Diocese include having

"an understanding and acceptance of Catholic School Philosophy, goals, and objectives," abiding

"by Diocesan and school policies and procedures," and following "the laws, doctrines, and teachings of the Catholic Church." (Id. p. 7.) Had Mr. Ference remained employed, he would have received additional catechetical training on the tenets of the Catholic faith, which he was required to apply in the classroom. (ECF No. 75 ¶ 31.) This is also like the plaintiff teachers in Our Lady that the ministerial exception applied to. 591 U.S. at 756–57.

The R&R's explanation for why summary judgment should not be entered against Mr. Ference under the ministerial exception is mistaken. While the R&R relies on Mr. Ference's assertion that he attended Mass with his students as a chaperone (ECF No. 91 p. 18), Mr. Ference actually admitted to participating in the Mass's uniquely Catholic liturgical rituals: he stood when the children stood; he sat when the children sat; and he kneeled when the children kneeled. (ECF No. 67 ¶¶ 30–32.) The R&R also erroneously elevated Mr. Ference's "understanding" of how "the religious-related provisions of the employment agreement" applied to him over the agreement's own plain language. (ECF No. 91 pp. 18–19.) Yet the Supreme Court in Our Lady found such language important in determining whether the employee's role was ministerial. 591 U.S. at 732, 739–40, 743, 756–57.

Furthermore, the R&R tries to diminish the importance of Mr. Ference complying with contractual obligations by criticizing Defendants for not addressing those violations during his barely month-long stint as an Aquinas teacher. (ECF No. 91 pp. 18–19.) But the R&R cites no case law stating that an employee's ministerial status is determined by his capacity to comply with employment terms and religious doctrine. (Id.) If the R&R is correct, an employee's actions, rather than whether the religious employer imbued a position with ministerial significance, would control. That would thwart the functional, positional analysis that the Supreme Court requires in determining if the ministerial exception applies. Our Lady, 591 U.S. at 756–58.

Mr. Ference worked in a ministerial position.  Whether someone is a minister is a pure issue of law instead of a factual question to be decided by a jury.  <u>Lee</u>, 903 F.3d at 119–23; <u>Demkovich</u>, 3 F.4th at 982–85; <u>Grussgott v. Milwaukee Jewish Day Sch., Inc.</u>, 882 F.3d 655, 657 (7th Cir. 2018); <u>Conlon v. IVCF</u>, 777 F.3d 829, 833 (6th Cir. 2015).  Defendants' objections should be sustained and summary judgment entered against Mr. Ference.

## III.  <u>Conclusion</u>

The Court should grant Defendants' summary judgment motion on Mr. Ference's sex discrimination claims (including his claim under the Pennsylvania Human Relations Act, which is interpreted coextensively with Title VII).  <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 317 n.3 (3d Cir. 2000).  Those claims are barred by Title VII's religious exemptions.  Should the Court hold that Title VII's religious exemptions do not apply to Defendants, Defendants' objections to the R&R should still be sustained based on the First Amendment principles of expressive association, the church autonomy doctrine, and the ministerial exception.

**MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, P.L.L.C.**

/s/ Bernard P. Matthews, Jr., Esq.
**BERNARD P. MATTHEWS, JR., ESQ.**
PA. I.D. #54880
bmatthews@mdbbe.com
**ALEXANDER W. BROWN, ESQ.**
PA. I.D. #322661
abrown@mdbbe.com
40 North Pennsylvania Ave., Suite 410
Greensburg, PA 15601
Telephone No.: (724) 836-4840
Fax No.: (724) 836-0532
*(Attorneys for Defendants)*

**BALL, MURREN & CONNELL, LLC**

/s/ Philip J. Murren, Esq.
**PHILIP J. MURREN, ESQ.**
PA. I.D. #21426
bmc-law2@msn.com
**KATHERINE M. FITZ-PATRICK, ESQ.**
PA. I.D. #208863
fitz-patrick@bmc-law.net
**DAVID R. DYE, ESQ.**
PA. I.D. #88665
dye@bmc-law.net
2303 Market Street
Camp Hill, PA 17011
Telephone No.: (717) 232-8731
Fax No.: (717) 232-2142
*(Attorneys for Defendants)*