IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KENNETH FERENCE,**<br><br>Plaintiff,<br><br>v.<br><br>**ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY,**<br><br>Defendants. | CIVIL ACTION NO. 2:22-cv-797<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTIONS TO JUDGE MAUREEN KELLY'S REPORT AND RECOMMENDATION TO DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. Introduction

This Court should adopt Judge Kelly's Report and Recommendation because Judge Kelly correctly found that religious organizations, when employing individuals in secular roles, are not statutorily or constitutionally permitted to engage in sex discrimination. Further, as Judge Kelly noted, there are issues of fact that must be resolved by the fact finder.

Contrasted with Judge Kelly's Report and Recommendation are Defendants' Objections. Their Objections are the latest in a protracted series of attempts to seek immunity from the application of Title VII and the PHRA to their secular employment decisions. It is important to recall that it was Defendants' voluntary decisions that led them to run afoul of Title VII. The decision to hire a non-Catholic teacher was not foisted upon Defendants, nor was the decision to fire that teacher because of his sex. Instead of taking accountability for their actions, Defendants have expended countless time and treasure repeating their arguments to persuade this Court to disregard the statutory text of Title VII and controlling legal precedent. Practically speaking,

Defendants ask this Court to engage in policymaking from the bench. By adopting the Report and Recommendation, this Court will further the rule of law and avoid judicial activism.[1]

## II. Response to Objections

A. Title VII prohibits Defendants' sex discrimination.

When a religious organization asserts a religious justification for sex discrimination, its recourse is to look to the ministerial exception as a defense, not Title VII's narrow religious exemptions. "Title VII 'does not confer upon religious organizations the right to make…[employment] decisions on the basis of race, sex, or national origin.'" *Petruska v. Gannon Univ.*, 462 F.3d 294, 303 (3d Cir. 2006) (quoting *Rayburn v. Gen'l Conf. of Seventh Day Adventists*, 772 F.2d 1164, 1166 (4th Cir.1985)). Multiple circuits that considered this issue agree with the following holding: Title VII "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination." *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *accord Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993); *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) *abrogation recognized by Alcazar v. Corp. of Cath. Archbishop of Seattle*, 598 F.3d 668 (9th Cir. 2010).

Defendants fired Mr. Ference because of his sexual orientation, which is sex discrimination under Title VII. (ECF 91, p. 14). The unambiguous holding of *Bostock* mandates that conclusion. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 662 (2020). "Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on

[1] As in Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Plaintiff, in the interest of brevity, is summarizing and incorporating the arguments already made in ECF 13, ECF 23, ECF 48, ECF 82.

why the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Simply put, Defendants' motives are not relevant. It is Defendants' explicit sex discrimination that controls. Monsignor Riffle plainly admitted that Mr. Ference was terminated "because of his status as being in a same-sex marriage and not because he's Lutheran." (ECF 82 ¶ 103). As a result, *Petruska* mandates that Defendants are subject to Title VII's prohibition on sex discrimination.

Judge Kelly, in addition to relying on *Petruska*, provides an in-depth analysis in the R&R of Title VII's statutory text and legislative history to support the conclusion that Defendants' actions do not fall within the exemptions in §§ 702 and 703 of Title VII. Specifically, Judge Kelly found that because Mr. Ference's termination was not based on *his religious preferences*, Title VII's religious exemptions do not apply. (ECF 91, pp. 14-15). Defendants hired Mr. Ference with the knowledge that he was not Catholic and restricted his duties as a result, but they fired Mr. Ference because of his same-sex marriage and thus engaged in sex discrimination.

As in prior pleadings, Defendants cite a litany of cases, but "rely on cases that do not address an employer's hiring decision where the religious reason behind the decision also implicates another protected trait." *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195, 1204 (S.D. Ind. 2020). Again falling back on *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991), Defendants argue that its holding extends beyond religious discrimination claims, due to the following language in 42 U.S.C. § 2000e-1(a): "[t]his subchapter shall not apply." That argument omits the rest of the sentence, which says that this subchapter shall not apply only "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Thus, the entire subchapter of Title VII does not apply to religious organizations with respect to

discrimination because of an *individual's* religion but *does* apply with respect to discrimination "because of such individual's race, color, . . . sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Additionally, in *Wuerl*, the court recognized that "Title VII has been interpreted to bar race and sex discrimination by religious organizations towards their nonminister employees.". 929 F.2d at 947-48. Also, *Wuerl* involved a claim for religious discrimination, not sex discrimination. *See Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 328 (3d Cir. 1993). Finally, *Wuerl* predates *Petruska.*

Unlike in *Wuerl,* Mr. Ference does not allege that Defendants discriminated against him because of his religion. If Mr. Ference's sex was hypothetically changed to female, as described in *Bostock*, Defendants' decision to limit him to secular instruction would not change due to his status as a non-Catholic remaining the same. 590 U.S. at 659-660. The same cannot be said of Defendants' decision to terminate Mr. Ference's employment. Changing his sex to female would mean that there was no same-sex marriage at issue, and thus no grounds for termination by Defendants.

Defendants' reliance on *Curay-Cramer v. Ursuline Academy of Wilmington, Del.* in support of their Title VII argument fails to acknowledge that the Third Circuit decided the case on First Amendment grounds and not on the statutory text of Title VII. 450 F.3d 130, 137 (3d Cir. 2006). In *Curay-Cramer*, the plaintiff's allegations required the court to evaluate whether a church's doctrinal beliefs about abortion were equivalent to its doctrinal beliefs about the Iraq War. *Id*. at 139. That analysis is wholly inapplicable where an employment decision facially discriminates on the basis of race, color, sex, or national origin. *See Johnson Controls, Inc*., 499 U.S. at 199. The *Curay-Cramer* court also recognized "under most circumstances, Title VII's substantive provisions, with the exception of the prohibition against religious discrimination,

apply to religious employers." 450 F.3d at 140. The Court cautioned "religious employers against over-reading the impact of [its] holding." *Id*. at 142.

Defendants also cite Judge Easterbrook's solo concurrence in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, along with a series of other concurrences stemming from it, which rely on the erroneous assumption that "[o]ne function of § 702(a) is to permit sex discrimination by religions that do not accept women as priests." 41 F.4th 931, 946 (7th Cir. 2022). To the contrary, that function is already accomplished by the ministerial exception and by the exemption for positions in which sex is a BFOQ. *See* 42 U.S.C. § 2000e-2(e)(1). The only "function" of applying § 702 to sex discrimination claims would be to authorize sex discrimination against non-ministerial employees, which is contrary to controlling Third Circuit and Supreme Court precedent.

Additionally, it is important to draw the Court's attention to the exhaustive analysis that the court conducted in *Zinski v. Liberty Univ. Inc*. on these exact issues merely a month ago. No. 6:24-cv-00041, 2025 U.S. Dist. LEXIS 31362 (W.D. Va. Feb. 21, 2025). In *Zinski*, the Court, after analyzing Title VII's text, applicable precedent, legislative history, and *Bostock*, reached the following conclusion:

> Where a religious employer discriminates on the basis of any other protected class in a but-for fashion, a statutory violation occurs, even if the decision was religiously motivated. Several sources of law, described above, support this conclusion. First, the statutory text is ambiguous as to the meaning of "a particular religion," rendering a strict textualist approach unsound. Second, the legislative history of Title VII evinces a clear Congressional intent to subject religious institutions to Title VII scrutiny with only narrow exceptions. Congress drew a line between religious discrimination (permissible), and discrimination based on other protected classes (impermissible)—though the line itself can be challenging to discern. Third, *Bostock* announces a but-for causation standard that logically maps on to Sections 702 and 703 just as it does to the general provisions of Title VII. Under this standard, a statutory violation occurs if discrimination operates on the basis of any protected class except religion;

> and discrimination triggering other protected classes—sex, race, national origin—cannot be converted into religious discrimination by claiming a religious motivation.

*Id*. at *52-*53. Importantly, Judge Kelly performed a similar analysis and reached the exact same conclusion.

Next, Defendants' Objections warn that the R&R endorses engaging in a pretext analysis of Defendants' justification for firing Mr. Ference. Defendants' argument has nothing to do with the interpretation of Title VII's text and is simply a distraction. Also, Judge Kelly's reference to the *McDonnell Douglas* framework was just an exercise in analyzing the application of *Bostock* to the facts of this case. As Defendants recognize, there is no doubt that they fired Mr. Ference because he is in a same-sex marriage, which eliminates any need to engage in a pretext analysis to question of Defendants' beliefs.

Finally, Defendants reference language in *Bostock* regarding the intersection between Title VII and religious liberties and again describe the parade of horribles they see occurring if the Court adopts the R&R. What Defendants do not include in their Objections is the Supreme Court's acknowledgement of the many protections in place to ensure that religious liberties are not infringed. *See Bostock*, 590 U.S. at 682. Regarding Defendants' parade of horribles, they fail to acknowledge that there are two sides to every coin. "To decide that sex discrimination is acceptable so long as it is religiously motivated would allow employers to achieve all manner of discrimination under the banner of religion." *Zinski*, No. 6:24-cv-00041, 2025 U.S. Dist. LEXIS 31362, at *55. Such a holding "would supply religious institutions with a power not afforded to secular institutions, thereby generating favorites under the law and raising Establishment Clause questions." *Id.*

B. Mr. Ference's Title VII and PHRA claims are unaffected by the *303 Creative* Ruling

*303 Creative* did not upend over sixty years of civil rights protections and jurisprudence as Defendants continue to suggest. "[A]n organization engaged in commercial activity enjoys only minimal constitutional protection" under the freedom of expressive association when it comes to "recruitment of . . . employees." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 635 (1984) (O'Connor, J., concurring in part). In all their briefs regarding this issue, Defendants have failed to address the distinction between unconstitutional direct burdens on pure speech, which "force an individual to 'utter what is not in [her] mind' about a question of political and religious significance," and incidental burdens on speech, which are constitutionally permissible. *303 Creative LLC. Co. v. Elenis*, 600 U.S. 570, 596 (2023). This case falls into the latter category.

In line with the failure to address that distinction, Defendants also fail to address the holdings of *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) and *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376 (1973). According to the Supreme Court in *Hishon*, "[invidious] private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." 467 U.S. at 78 (citation omitted). *See also McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1144 (W.D. Wash. 2023) (In citing *Hishon* the court held that "this employment discrimination action does not implicate World Vision's expressive associational rights. Indeed, the Supreme Court has previously rejected such a defense in the context of employment discrimination."). In *Pittsburgh Press Co.*, the Supreme Court held that "Discrimination in employment is not only commercial activity, it is illegal commercial activity…." 413 U.S. at 388. Further, Defendants' citation of *Slattery v. Hochul*, 61 F. 4th 278 (2d. Cir. 2023), for the first time, provides no weight to their argument. *Slattery* simply reversed

a motion to dismiss and did not address *Hishon*, nor the distinction between laws directly regulating "pure speech" and laws regulating commercial activity that incidentally burden speech.

In the R&R, Judge Kelly, in addition to reviewing controlling precedent, analyzed how the facts specific to Mr. Ference's case may translate into expressive content for Defendants. (ECF 91, p. 24). By considering the evidence in a light most favorable to Mr. Ference, as required on summary judgment, Judge Kelly held that Defendants employing Mr. Ference would not amount to expressive content contrary to their beliefs. (*Id*.). Judge Kelly reached that holding because there was no evidence that Mr. Ference publicly championed same-sex marriage, nor played a role in religious faith formation. (*Id*.). Again, this holding is consistent with *Zinski*. In that case, the court held that "Liberty's continued employment of Zinski does not significantly burden Liberty's ability to maintain its views and associate for its expressed purposes" because Zinski was not a public activist and was not involved with promoting Liberty's religious message. No. 6:24-cv-00041, 2025 U.S. Dist. LEXIS 31362, at *92.

C. The church autonomy doctrine does not bar Mr. Ference's sex discrimination claim.

Defendants' request for the Court to sanction the termination of a secular employee in the guise of the church autonomy doctrine is simply a request for blanket immunity from all employment laws. Defendants can point to no case law to support their argument that they are entitled to carte blanche in their employment decisions. Simply put, "Ecclesiastical abstention is 'not without limits,' however, and it generally 'does not apply to purely secular decisions, even when made by churches.'" *Zinski*, 2025 U.S. Dist. LEXIS 31362, at *95 (quoting *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 657 (10th Cir. 2002)). The Church Autonomy doctrine "does *not* contemplate avoidance of civil controversies merely because the

controversies involve religious parties or spring incidentally from religious law." *Id*. at *95 (emphasis in original).

According to Defendants, "[t]his case boils down to a single issue: whether a religious teaching entity or an employee of that religious teaching entity (who agreed to follow the religious ministry's doctrine) decides whether the employee's role is religious." If that is truly what this case is all about, then the resolution of that issue is simple—*see* the ministerial exception. If religious institutions get to call the shots on who is a religious employee and who is not, then there is no need for the ministerial exception to exist—but it does exist. Instead of the self-reporting system advocated by Defendants, "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753 (2020).

In support of their argument, Defendants largely rely on *Bryce.* That case concerned a religious organization's speech about its employment decisions, not the legality of the employment decisions themselves. 289 F.3d at 653. The plaintiff in *Bryce* was a youth minister, who did not challenge the church's decision to terminate her employment but instead attempted to challenge the church's speech about the termination decision as a form of sexual harassment. *Id*. at 651-53. The court made clear that "rooted in religious belief" does not exempt religious organizations from Title VII scrutiny, where the challenged "decision does not involve the church's spiritual functions." *Id*. at 657 (quoting *Rayburn,* 772 F.2d at 1171). As a youth minister, the plaintiff in *Bryce* was unquestionably involved in the church's spiritual functions, unlike Mr. Ference.

Correctly, Judge Kelly did not grant Defendants the blanket immunity they desire. Consistent with Judge Kelly, in *Zinski*, the court held the following:

> We wholeheartedly agree that the Court is not authorized to interpret scripture, but we disagree that Zinski's complaint requires us to do so. Zinski's complaint asks the

> Court to determine whether Title VII prohibits a religious institution from firing a transgender person, not whether a religious institution, like Liberty, has properly interpreted its religious doctrine when determining that a transgender person violates religious law and must be fired.

No. 6:24-cv-00041, 2025 U.S. Dist. LEXIS 31362, at *96-97. If the Court adopts the approach advocated by Defendants, then "'well-settled' doctrine like the ministerial exception, which applies much more narrowly, would be effectively swallowed whole and made redundant." *Id*. at 97.

D. Mr. Ference did not serve as Defendants' Minister.

The most telling flaw in Defendants' argument, among many, is their continued reliance on an ellipsis to hide the truth. Brief after brief, Defendants perpetuate the deception that Mr. Ference's professional services agreement contains language requiring him to "supervise[] students in a Christ-like manner…" and there is nothing to see after those three dots. Plaintiff will not stop pointing out that Defendants' use of an ellipsis to hide the words "or with dignity" is nothing but smoke and mirrors, like their ministerial exception argument as whole.

To make their argument, Defendants' point to documents, which, in a vacuum, appear to mandate religious functions for their teachers. However, when the testimony in this case is examined, as done in Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and the R&R, it is clear that those documents are divorced from reality.

Defendants hired Mr. Ference at the eleventh hour because the school year was starting, and there is a shortage of Catholic teachers. (ECF 67 ¶¶ 8-9, 12), (ECF 81 ¶¶ 53, 54). They then chose to discriminate against Mr. Ference because of his religion, which is legal, and now will not accept the consequences of their actions and sleep in the bed that they made. Because Mr. Ference is Lutheran, Defendants did not task him with providing spiritual direction or passing on their faith to their students. (ECF 81 ¶¶ 66-67). Defendants' employment documents, in the

abstract, do not change that reality and convert Mr. Ference into a minister. *See Zinski,* No. 6:24-cv-00041, 2025 U.S. Dist. LEXIS 31362, at *69 (rejecting relevance of doctrinal statement plaintiff endorsed for purposes of evaluating ministerial exception); *Bell v. Judge Mem'l Catholic High Sch*., No. 2:20-cv-00829-RJS-JCB, 2023 U.S. Dist. LEXIS 90351, at *33 (D. Utah May 22, 2023) ("[I]t would be a remarkable expansion of the ministerial exception for the court to hold, as Defendants urge, that all JMCHS teachers necessarily joined the Catholic ministry based on the policies cross-referenced in their one-year employment contracts—without any consideration of the work the teachers individually performed at the school.")

Defendants' repeat attempt to draw parallels between Mr. Ference's case and *Billard v. Charlotte Catholic High Sch*., 101 F. 4th 316 (4th Cir. 2024) again fails to account for the significant factual differences between the cases. Billard integrated faith into his classrooms. *Id*. at 332. Conversely, as detailed in Plaintiff's Brief in Opposition, because Mr. Ference was told not to teach religious content by Ms. Watkins, he did not teach or infuse any religious content in the subjects he taught. (ECF 82 ¶ 57).

Further, Defendants' argument that because Mr. Ference stood, sat, and kneeled in Mass he became a minister does not hold water. Defendants do not describe how going through those physical motions made him a messenger of their faith. Importantly, Mr. Ference did attend church services, but solely as a chaperone to monitor his students' behavior. (ECF 82 ¶ 58). Jennifer Davis, the other sixth-grade teacher, attended Mass with Mr. Ference and never saw Mr. Ference take Communion, pray with his students, or lead the students in hymns during Mass. (ECF 82 ¶¶ 59-60).

On the question of the decisionmaker for the ministerial exception, it is undisputed that the ministerial exception is an affirmative defense. *Hosanna-Tabor Evangelical Lutheran*

*Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012). When facts are in dispute, which prevent a ruling on an affirmative defense, or question of law, the issue must be resolved by a jury. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.")

Finally, it is worth noting that Defendants did not file objections challenging Judge Kelly's denial of their BFOQ argument under the PHRA. As a result of that failure to file objections, Defendants are not entitled to a *de novo* review of that argument. Instead, the proper standard to be applied is plain error. *See Tice v. Wilson*, 425 F. Supp. 2d 676, 680 (W.D. Pa. 2006) ("By virtue of Respondent's failure to file Objections to that portion of the Magistrate Judge's Report and Recommendation…the Respondent has waived its right to have this Court conduct a *de novo* review…Instead, the scope of our review is far more limited and is conducted under the far more deferential standard of "'plain error.'")

**III. Conclusion**

Judge Kelly's Report and Recommendation should be adopted in its entirety.

Respectfully submitted,

/s/ *Nicholas W. Kennedy*
Nicholas W. Kennedy, Esq. (Pa. 317386)
Nicole Daller, Esq. (Pa. 312224)
Giulia R. Schaub, Esq. (Pa. 330375)

HORNE DALLER LLC
1380 Old Freeport Road, Suite 3A
Pittsburgh, PA 15238
Phone: (412) 967-9400
Fax: (412) 967-0465
nkennedy@hornedaller.com
ndaller@hornedaller.com
gschaub@hornedaller.com
*Attorneys for Plaintiff*