IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH FERENCE,<br><br>Plaintiff,<br><br>v.<br><br>ROMAN CATHOLIC DIOCESE OF GREENSBURG and AQUINAS ACADEMY,<br><br>Defendants. | ) | 2:22-cv-797-NR-MPK |

**OPINION**

**J. Nicholas Ranjan, United States District Judge**

The 2021–22 school year was fast approaching and Aquinas Academy, a Catholic school in Greensburg, found itself in desperate need of a middle school teacher. When Plaintiff Kenneth Ference applied to teach sixth grade in late August 2021, Aquinas reached out less than half an hour later. That very same day, Aquinas interviewed and hired Mr. Ference to teach math, science, and social studies classes to sixth graders. However, it turned out that Mr. Ference was a Lutheran. So during the interview, the school's principal explicitly forbade Mr. Ference from teaching religion class or engaging in any type of spiritual instruction. By Mr. Ference's account, he was hired to be a "secular" teacher. ECF 93, at 8.

All went well for the first few weeks of Mr. Ference's employment. But then Mr. Ference disclosed on an insurance waiver form that the health plan he was covered under belonged to his husband—and thus incidentally revealed that he was in a same-sex marriage. When Aquinas found out, it fired Mr. Ference, citing the school's religious views as to same-sex relationships. Everybody agrees, one way or another, that Mr. Ference's same-sex marriage was the reason he was fired.

In this action, Mr. Ference asserts that his termination violated his rights under Title VII and the Pennsylvania Human Relations Act. Aquinas Academy, citing its religious beliefs, moved for summary judgment, raising four defenses: (1) Title VII's religious exemptions preclude liability; (2) the decision to fire Mr. Ference is unreviewable under the First Amendment's ministerial exception; (3) the First Amendment's church autonomy doctrine prevents the Court from deciding this case; and (4) punishing Aquinas for firing Mr. Ference would unconstitutionally burden its freedom of expressive association.

Before the Court is the Magistrate Judge's Report and Recommendation (ECF 91) recommending that the Court deny Aquinas Academy's motion for summary judgment. ECF 74. The Court finds that there are genuine disputes as to material facts which preclude the entry of summary judgment. The Court therefore adopts the ultimate conclusions of the Magistrate Judge's R&R. Because the Court departs from the R&R's analysis on some issues, the discussion below is included to explain those departures.

## BACKGROUND

The Court adopts the R&R's discussion of this case's relevant factual background and procedural history. ECF 91, at 2–5. The Court also adopts the R&R's discussion of the relevant legal standard at the summary judgment stage. *Id.* at 5–6.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1), this Court must review *de novo* the entire R&R. The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. *See United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("In providing for a de novo determination . . . Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." (citation modified)).

The Magistrate Judge recommended denying the motion for summary judgment, finding that none of the defenses raised by Aquinas Academy preclude liability at this stage. ECF 91. at 24. Aquinas filed objections to the R&R, which it later supplemented. ECF 92; ECF 100.

After careful consideration of the record and upon a *de novo* review of the R&R, the Court agrees with the Magistrate Judge's ultimate conclusions. Accordingly, the Court will overrule Aquinas Academy's objections and deny its motion for summary judgment. The Court provides the analysis below to explain its approach to the relevant law (which differs in part from the Magistrate Judge's approach) and to provide clarity for the parties as to key legal and factual issues as the case proceeds to trial.

## DISCUSSION AND ANALYSIS

Aquinas Academy raises four defenses in its motion for summary judgment. It first argues that Mr. Ference's firing was permissible under Title VII's religious exemptions[1] because its objection to his same-sex marriage was religiously based. It then raises a series of constitutional defenses, arguing that (1) the ministerial exception prevents judicial inquiry into Mr. Ference's firing; (2) application of Title VII would otherwise violate the church autonomy doctrine; and (3) requiring the school to employ Mr. Ference would impose an unconstitutional burden on its expressive-association interest. The Court addresses each defense in turn.

### I. Title VII's religious exemptions do not bar Mr. Ference's claim.

The Magistrate Judge concluded that Mr. Ference's claim does not fall under Title VII's religious exemptions. The Court agrees for the reasons stated below.

[1] In addition to his Title VII claims, Mr. Ference brings analogous PHRA claims. The Title VII analysis is the same as to those state-law claims. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000).

**A. Overview of the religious exemptions.**

Title VII of the Civil Rights Act of 1964 protects employees from discrimination on the basis of belonging to any of several protected classes, including religion and sex. 42 U.S.C. § 2000e-2(a). The prohibition on religious discrimination is subject to several exemptions, two of which are relevant here: one in Section 702 that applies to all religious organizations, and one in Section 703(e)(2) specifically for religious educational institutions. 42 U.S.C. § 2000e-1(a) (exempting religious employers, including educational institutions, from Title VII liability "with respect to the employment of individuals of a particular religion"); 42 U.S.C. § 2000e-2(e)(2) (permitting religious educational institutions "to hire and employ employees of a particular religion"). "Both sections do the same thing for the purposes of this suit; the difference between them is that they each identify a different type of institution covered under the religion exemption." *Zinski v. Liberty Univ.*, 777 F. Supp. 3d 601, 613 (W.D. Va. 2025). Accordingly, the rest of the Court's analysis treats both exemptions together.

Whether the exemptions apply in this case depends on two questions: (1) whether Aquinas Academy is the type of religious organization covered by Sections 702 and 703(e)(2); and (2) whether firing Mr. Ference because of his same-sex marriage qualifies as "the type of employment decision made on the basis 'of a particular religion' that is exempted from Title VII scrutiny." *Zinski*, 777 F. Supp. 3d at 622.

For the first question, the Court adopts the R&R's discussion concluding that Aquinas Academy is a religious educational institution covered by the Section 702 exemption. ECF 91, at 8–10. Based on that analysis, the Court also finds that Aquinas Academy is a covered employer for purposes of the Section 703(e)(2) exemption.

The second question is the harder one. Was Mr. Ference's firing permissible religious discrimination, or prohibited sex discrimination? To answer this, some overview of the scope of the religious exemptions and sex discrimination under Title VII is needed.

First, what does it mean for an employer to discriminate on the basis of an employee's "particular religion"? The Third Circuit has interpreted "of a particular religion" to encompass an employee's "beliefs and conduct." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991). In effect, that means that a covered employer will be protected by the exemptions whenever it fires an employee for religious reasons, regardless of the employee's formal religious affiliation.

But crucially, the exemptions only apply with respect to *religious* discrimination; religious employers remain subject to Title VII's other substantive prohibitions, including its ban on sex discrimination. *Petruska v. Gannon Univ.*, 462 F.3d 294, 303 n.4 (3d Cir. 2006) ("Title VII does not confer upon religious organizations a license to make [hiring] decisions on the basis of race, sex or national origin. The statutory exemption applies to one particular reason for employment decision—that based upon religious preference. It was open to Congress to exempt from Title VII the religious employer, not simply one basis of employment, and Congress plainly did not." (quoting *Rayburn v. Gen. Conf. of Seventh Day Adventists*, 772 F.2d 1164, 1166–67 (4th Cir. 1985)); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 140 (3d Cir. 2006) ("[T]he courts that have addressed this issue have held that, under most circumstances, Title VII's substantive provisions, with the exception of the prohibition against religious discrimination, apply to religious employers.").

Second, what is sex discrimination under Title VII? The Supreme Court answered this question in *Bostock v. Clayton County*, 590 U.S. 644 (2020). Under *Bostock*, an employment decision constitutes sex discrimination under Title VII if the

employee's sex is a but-for cause of the decision. *Id.* at 656–57. "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. That's because when an employer fires a man because he is attracted to the same sex, the employer "discriminates against him for traits or actions it tolerates in his female colleague." *Id.*

Applying these principles here, it's clear that Aquinas Academy fired Mr. Ference for a religious reason, because it claims his same-sex marriage conflicts with its Catholic beliefs. That's religious discrimination. It is similarly clear that Mr. Ference was fired because of his same-sex marriage. Under *Bostock*'s but-for standard, that's sex discrimination.

So what's the result when a religious employer's firing of an employee is both permissible religious discrimination *and* prohibited sex discrimination? Do the religious exemptions place beyond scrutiny *all* terminations with *any* religious basis, or just those terminations with *only* a religious basis? These questions haven't been directly answered by the Third Circuit. But the Court's analysis of the statutory text and analogous case law from the Third Circuit, along with persuasive cases from other courts, demonstrate that the exemptions do not apply here.

**B. The religious exemptions are best interpreted to permit only pure religious discrimination.**

As the Fourth Circuit recently observed, "[n]o federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024). All other federal courts to consider this issue also agree. *See, e.g.*, *Zinski*, 777 F. Supp. 3d at 631 (holding, after a thorough discussion and analysis of the statutory text, that Title VII does not permit religiously motivated

transgender discrimination); *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1205 (S.D. Ind. 2020) (finding that the religious exemptions did not bar a religious school guidance counselor's Title VII claim for sexual orientation discrimination by reading Section 702 to allow discrimination on the basis of religion only, and no other class); *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1134 (W.D. Wash. 2023) ("It is well-established in the Ninth Circuit that Title VII's religious employer exemption offers qualifying employers immunity only from religious discrimination claims."), *rev'd on other grounds*, 147 F.4th 959 (9th Cir. 2025) (ministerial exception applied); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986) (holding Title VII's religious employer exemption did not immunize religious school from sex discrimination claim where the school denied health insurance benefits to women based on its religious belief that only men can be the head of the household).

Those decisions serve as useful guideposts for this Court's analysis. The central question is how expansive Congress intended the religious exemptions to be. To answer that question, the Court first looks to Third Circuit case law.

In past decisions, the Third Circuit has cited constitutional avoidance to justify expansive interpretations of the exemptions, applying the framework laid out in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). *See Little*, 929 F.2d at 946–52; *Curay-Cramer*, 450 F.3d at 138–41. *But see Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 328–31 (3d Cir. 1993) (finding avoidance unnecessary). Under *Catholic Bishop*, where application of a law would raise "serious constitutional questions," a court should reach the constitutional issue only if Congress "clearly expressed" an intent that the law apply in such circumstances. 440 U.S. at 501.

The Court's analysis proceeds in two steps. First, the Court must determine "whether applying Title VII [to Mr. Ference's firing] . . . would raise substantial

constitutional questions." *Little*, 929 F.2d at 947. Then, if it would, the Court looks to "whether Congress clearly expressed an intent that Title VII be applied to this kind of decision." *Id.*

**1. Application of Title VII to this case raises a "serious constitutional question."**

To better understand the interrelated statutory and constitutional issues here, it helps to consider the precise ways in which resolving Mr. Ference's claim might risk violating the Free Exercise and Establishment Clauses. To that end, the Court starts with three Third Circuit cases in which the Court analyzed the constitutional questions raised in the context of discrimination claims against religious employers. Those cases are *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006); and *Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324 (3d Cir. 1993).

In *Little*, the Court determined the plaintiffs' Title VII claims raised serious constitutional questions. 929 F.2d at 947–49. There, an elementary school teacher at a Catholic school brought a Title VII religious discrimination claim against the parish that operated the school after she was fired for remarrying without getting her first marriage annulled, which the school said was a violation of Catholic doctrine. *Id.* at 945–46. The Court found that reviewing Little's firing would imperil the Parish's free exercise rights by "forc[ing] [the Court] to determine what constitutes 'the official teachings, doctrine or laws of the Roman Catholic Church' and whether plaintiff has 'rejected' them." *Id.* at 948. It also found that the claim risked "excessive government entanglement with religion" because "inquiry into the employer's religious mission" was "inevitable." *Id.* at 948–49.

Fifteen years later, the Third Circuit in *Curay-Cramer* found that adjudicating the case would raise serious constitutional questions for a different reason. 450 F.3d

at 138–40. There, a teacher at a Catholic school filed a Title VII gender discrimination claim after she was fired for lending her name to a pro-choice advertisement in a local newspaper. *Id.* at 131–133. To prove gender discrimination, the schoolteacher argued that similarly situated male employees—pointing to men at the school who were Jewish or opposed the Iraq War—had been treated differently. Id. at 139. But because she could only point to men who had committed different "'offenses' against Catholic doctrine," her claim would have impermissibly forced the Court to "assess the relative severity of offenses." *Id.* The Court observed: "[I]f we were to consider whether being Jewish or opposing the war in Iraq is as serious a challenge to Church doctrine as is promoting a woman's right to abortion, we would infringe upon the First Amendment Religion clauses." *Id.* at 140.

Finally, consider *Geary*, where the Third Circuit two years after *Little* found nothing constitutionally questionable about applying the ADEA's prohibition on age discrimination against a religious school. 7 F.3d at 331. There, a 50-year-old "lay teacher"[2] at a Catholic elementary school brought an age discrimination claim under the ADEA after she was fired and replaced with a younger, lower-paid teacher. *Id.* at 326. Although the school claimed a religious reason for her dismissal, the Third Circuit found no serious constitutional questions because the case merely required a "limited inquiry" examining "only whether [the school] discriminated against Geary on the basis of age" as opposed to "ongoing supervision" by the government. *Id.* at 328 (contrasting "pervasive supervision" with the ADEA's "simple prohibition"). But

---

[2] The Court did not mention the ministerial exception in *Geary*, which it decided 13 years before the Third Circuit recognized the exception in *Petruska v. Gannon University*. 462 F.3d 294 (2006). Instead, drawing a rough-and-ready distinction between "clergy," on one hand, and employees with no "duties of a religious nature," on the other, the Court concluded that "notwithstanding Geary's apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate Geary's claims without the entanglement that would follow were employment of clergy or religious leaders involved." *Geary*, 7 F.3d at 331.

importantly, the Court also observed that Geary's claim involved no "direct conflict between the ADEA's secular prohibition and the proffered religious doctrine." *Id.* So, because the school did not argue that Catholic doctrine "mandates age discrimination," and because Geary did not argue that the ADEA "prohibits [the school's] right to implement Catholic teachings on marriage," there was no need to "invoke the interpretive rule of *Catholic Bishop*." *Id.*

With these cases in mind, the Court now turns to whether application of Title VII in this case raises serious constitutional questions. The Court concludes that it does. More precisely, it raises a single serious question: whether religious employers are subject to employment discrimination laws that "directly conflict" with their religious doctrine.[3] *Id.* at 326. It's the exact scenario the Court described in *Geary*—Mr. Ference's claim implies that Title VII prohibits Aquinas Academy's "right to implement Catholic teachings on marriage." *Id.* at 328.

Based primarily on *Geary*, the Court finds that application of Title VII here raises a serious constitutional question. So the Court proceeds to the second step of the *Catholic Bishop* analysis: clearly expressed congressional intent.

**2. Congress clearly expressed an intent for Title VII to apply in this case.**

To determine Congress's intent, "start with the text." *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 96 F.4th 599, 609 (3d Cir. 2024) (citation modified).

[3] This case differs meaningfully from *Little* and *Curay-Cramer*, however. Unlike in *Curay-Cramer*, this is not a pretext claim, meaning there's no foreseeable possibility of the Court needing to compare the severity of different violations of Catholic doctrine. And unlike in *Little*, this is a claim for sex discrimination, not religious discrimination—meaning the Court need not pass judgment on what constitutes official Catholic doctrine or whether Mr. Ference had rejected it. On those questions, the Court can simply take Aquinas Academy's word for it. Finally, note that this case does not require any inquiry into Aquinas Academy's religious mission and Mr. Ference's fitness for that mission. *Cf. Little*, 929 F.2d at 949. Mr. Ference's fitness (lack thereof) for the school's religious mission is not in dispute.

"Because we presume that Congress' intent is most clearly expressed in the text of the statute, we begin our analysis with an examination of the plain language of the relevant provision." *United States v. Adams*, 132 F.4th 259, 263 (3d Cir. 2025). The words of a statute "must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 588 U.S. 128, 141 (2019). If the text is "reasonably susceptible to different interpretations," a court may "go beyond interpreting the text of a provision." *Monzon v. De La Roca*, 910 F.3d 92, 101 (3d Cir. 2018).

By their terms, the religious exemptions allow covered employers to discriminate on the basis of religion. The broader religious organization exemption in Section 702 provides: "This subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 42 U.S.C. §§ 2000e-1(a); *cf. id.* § 2000e-2(e)(2). This language plainly grants religious employers license to base employment decisions on religious preferences; but it just as plainly does not permit those decisions to be based on any of the other classes protected by Title VII. The Third Circuit, in the same year it decided *Curay-Cramer*, recognized the limited scope of the religious exemptions:

> The statute exempts religious entities and educational organizations from its nondiscrimination mandate *to the extent that an employment decision is based on an individual's religious preferences*. By its terms . . . Title VII "does not confer upon religious organizations the right to make those same decisions on the basis of race, sex, or national origin."

*Petruska*, 462 F.3d at 303 (emphasis added) (citation modified) (quoting *Rayburn*, 772 F.2d at 1166).

If the exemptions permitted religiously motivated discrimination on the basis of a different protected class, then a religious employer could "convert any claim of

discrimination on the basis of one of the protected classes under Title VII to a case of religious discrimination, so long as there was a religious reason behind the employment decision." *Starkey*, 496 F. Supp. 3d at 1203. The result would be a near-total exemption of religious employers from not just Title VII's mandate against sex discrimination, but also its bans on race-based and national origin-based discrimination. *See id.* ("Consider a religious employer that genuinely believes the Bible forbids interracial marriage. Under Defendants' interpretation of Section 702, that employer would be free to terminate an employee who married someone of a different race.").

The text of these narrow exemptions for religious preferences cannot support an interpretation with such "wide-ranging and unpredictable consequences." *Billard*, 101 F.4th at 327. "It was open to Congress to exempt from Title VII the religious employer, not simply one basis of employment, and Congress plainly did not." *Rayburn*, 772 F.2d at 1166–67.[4]

In conclusion, the Court finds that Congress clearly intended for Title VII's religious exemptions not to apply to religiously motivated sex discrimination. The Court therefore concludes that the exemptions don't apply to Mr. Ference's firing. But that doesn't mean religious employers will always face liability in such cases; the First Amendment provides them with its own robust protections. Those are discussed next.

## II. There are genuine disputes over issues of fact material to whether the ministerial exception applies.

The Magistrate Judge concluded that "the disputed evidence related to the application of the ministerial exception raises significant material issues of fact for a

[4] Because the Court finds the text unambiguous on this point, there is no need to look beyond it. But as other courts have pointed out, the legislative history reinforces the Court's narrow interpretation of the religious exemptions. *See, e.g.*, *Rayburn*, 772 F.2d at 1167.

jury to resolve." ECF 91, at 20. The Court agrees and adopts the R&R's discussion of the ministerial exception's applicability on this record. To aid the parties as the case proceeds to trial and to explain the Court's perspective on the applicability of the broader church autonomy doctrine discussed below, the Court writes separately on the application of the exception in this case.

**A. Overview of the ministerial exception.**

The Supreme Court first confirmed the existence of the ministerial exception in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, recognizing that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision." 565 U.S. 171, 188 (2012). Deriving from both Religion Clauses, the exception's purpose is to "protect[] a religious group's right to shape its own faith and mission through its appointments" and to prevent the government from "determin[ing] which individuals will minister to the faithful." *Id.* at 188–89. Thus, under the exception, religious organizations cannot be held liable for *any* employment discrimination claims by a narrow category of employees. In the context of private religious schools, these employees are ones who are responsible for "educating young people in their faith, inculcating its teachings, and training them to live their faith"—responsibilities that lie "at the very core of the mission of a private religious school." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753–54 (2020).

There is no "rigid formula" to determine whether the exception applies. *Hosanna-Tabor*, 565 U.S. at 190. Instead, in every case, courts should "take all relevant circumstances into account" and "determine whether each particular position implicated the fundamental purpose" of the ministerial exception. *Our Lady of Guadalupe*, 591 U.S. at 758. "What matters, at bottom, is what an employee does." *Id.* at 753.

The Supreme Court cited four factors in *Hosanna-Tabor*: 1) the employee's formal title; 2) the substance reflected in that title; 3) the employee's own use of that title; and 4) the important religious functions the employee performed for the Church. 565 U.S. at 192. Eight years later in *Our Lady of Guadalupe*, the Supreme Court chided the Ninth Circuit for applying those factors too mechanically, finding "abundant record evidence" that the teachers in that case "performed vital religious duties." 591 U.S. at 756; *see id.* at 757–62 (explaining the Ninth Circuit's errors). That evidence included:

- The fact that "educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught";
- That "their employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that responsibility";
- The fact that they taught "all subjects, including religion," indicating they were "entrusted most directly with the responsibility of educating their students in the faith";
- That they were "expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith"; and
- That they "prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities."

*Id.* at 756–57.

The Court also provided a helpful example of a non-ministerial teacher: "A teacher, such as an instructor in a class on world religions, who merely provides a description of the beliefs and practices of a religion without making any effort to inculcate those beliefs could not qualify for the exception." *Id.* at 758 n.26.

### B. Applying the ministerial exception test to this case.

Despite the broad deference courts owe churches as to the religious significance of their employees, the Court cannot conclude at this point that Mr. Ference fits into the category of employees "at the very core" of Aquinas Academy's religious mission. *Id.* at 754. The "relevant circumstances" in this case, viewed in the light most favorable to Mr. Ference, indicate that Aquinas did not expect Mr. Ference to perform the "vital religious duties" that the school expects other teachers to carry out. *Id.* at 756. To illustrate, consider the following non-exhaustive list of the relevant factors in the record.[5]

Aquinas Academy was still looking to hire a sixth-grade teacher in late August 2021 for the 2021–22 school year. ECF 67, ¶¶ 8–9, 12. Mr. Ference applied to teach at Aquinas Academy on Friday, August 20, 2021; that same day, the school interviewed and hired Mr. Ference to start working Monday, August 23, 2021. *Id.* It's undisputed that Mr. Ference is not Catholic; he is Lutheran. *Id.* ¶ 28. And the parties agree Mr. Ference was hired amid a shortage of qualified Catholic teachers. ECF 87, ¶¶ 54, 92. Because he is not Catholic, the school forbade him from teaching religion class. ECF 75, ¶ 30. Like all non-Catholic teachers at Aquinas Academy, he was not expected to provide spiritual direction to the students. ECF 87, ¶ 66. Mr. Ference was hired to teach math, science, and social studies classes. ECF 67, ¶ 26. He did not infuse religious content into his lessons for those classes. ECF 87, ¶ 57. Mr. Ference's participation in Catholic liturgy was limited to sitting, standing, and kneeling with the rest of the assembly during Mass. *Id.* ¶ 58. He doesn't recall taking

[5] The Court emphasizes that the relevant circumstances discussed in the following paragraphs are not exhaustively listed. When it comes time to ultimately rule on whether the ministerial exception applies here, the Court will not limit itself to consideration of the facts discussed in this opinion, but will take into account "all relevant circumstances" as determined by the factfinder. *Our Lady of Guadalupe*, 591 U.S. at 758.

communion, praying with his students, or singing hymns. *Id.* During his job interview, the principal told him he would attend Mass only as a chaperone to monitor student behavior. *Id.* In the classroom, he did not participate in daily prayer beyond supervising his students' behavior. *Id.* ¶ 61.

On the other hand, Aquinas Academy maintains that "at all times, the Catholic school is engaged in the process of catechesis and the formation of the Christian personality, a process which is integrated within the curriculum of all subjects taught in Catholic schools." ECF 77, at 3. The Faculty Handbook (which Mr. Ference disputes ever receiving) required teachers to facilitate prayers. ECF 87, ¶ 58. It also contained a clause requiring Mr. Ference to agree that he could be dismissed for "immorality, scandal, or rejection of the official teaching, doctrine or laws of the Roman Catholic Church." *Id.* ¶ 74. The Teacher's Contract, which he executed over his first week of employment, contained similar provisions. *Id.* A few units in the science curriculum contain learning goals relating to recognizing God's role in nature. ECF 75, ¶ 34.

But even if teachers at Aquinas are generally required to meet the religious expectations set forth in those materials, Mr. Ference has adduced enough evidence to create a genuine dispute over whether those expectations applied to his position specifically. Mr. Ference maintains that, based on his conversation with the principal during his job interview, he understood none of the religious expectations of the job applied to him. ECF 83, at 2. For its part, Aquinas insists that it only meant to forbid Mr. Ference from teaching religion class, and that he was still expected to comply with the other religious obligations Aquinas gives its teachers. If anyone from the school took issue with Mr. Ference's apparent dereliction of duty, however, the record contains no sign of it.

Taken together, the relevant circumstances call into question whether Aquinas saw Mr. Ference's role as ministerial. Applying the exception at this stage would

amount to assigning dispositive weight to the mere presence of religious duties in the onboarding documents. One factor cannot carry that much weight without turning the test into the kind of "rigid formula" that the Supreme Court's warned against applying in *Hosanna-Tabor* and *Our Lady of Guadalupe.* 565 U.S. at 190; 591 U.S. at 758.

The Court concludes that whether Mr. Ference's position was ministerial depends on disputed facts that must be determined at trial.

### III. Resolving this case does not otherwise violate the church autonomy doctrine.

The Magistrate Judge concluded that material issues of fact preclude application of the church autonomy doctrine. ECF 91, at 22. The Court agrees, though finds this doctrine to be inapplicable as a standalone defense in this case. More specifically, the Court finds that the ministerial exception is the only relevant application of the church autonomy doctrine here, and as discussed above, there are material disputes of fact as to that exception.

The church autonomy doctrine protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cath. of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Its purpose is to ensure that religious organizations enjoy "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 591 U.S. at 747. In any given case, the doctrine will apply not just when the relief sought would intrude too far, but also when the "very process of inquiry" would "impinge on rights guaranteed by the First Amendment." *Curay-Cramer*, 450 F.3d at 138 (quoting *Cath. Bishop*, 440 U.S. at 502). In this sense, the doctrine is both outcome-sensitive and process-sensitive.

The ministerial exception is just one application of that principle, arguably falling in the former category. *Our Lady of Guadalupe*, 591 U.S. at 737; *see Petruska*, 462 F.3d at 307 ("The ministerial exception . . . operates to bar any claim, *the resolution of which* would limit a religious institution's right to select who will perform particular spiritual functions." (emphasis added)). The exception applies when an employee's position is tied so closely to an employer's religious mission that *any* government interference with his hiring or firing would unconstitutionally intrude into a religious organization's internal affairs. Conversely, if a court determines that an employee is not covered by the exception, then it may apply secular employment laws with regard to his position without infringing on his employer's First Amendment rights.

Put another way, the church autonomy doctrine does not protect employees who are not "ministerial" under the exception. An employee cannot be non-ministerial for purposes of the exception but still occupy a role "important" enough to trigger the church autonomy doctrine. *Our Lady of Guadalupe*, 591 U.S. at 752; s*ee Billard v. Charlotte Cath. High Sch.*, 2021 WL 4037431, at *12 (W.D.N.C. Sep. 3, 2021) ("[T]he ministerial exception was created to demarcate the line where a religious organization's First Amendment rights outweigh the government's compelling interest in eradicating employment discrimination. In the context of employment, the church autonomy doctrine is limited only to employees who perform spiritual functions that qualify for the ministerial exception." (citation omitted)), *rev'd on other grounds*, 101 F.4th 316 (4th Cir. 2024) (applying the ministerial exception).

But the church autonomy doctrine does have applications outside the ministerial exception in employment cases. The doctrine is sensitive to a variety of considerations that might make it inappropriate to continue litigating a case, even when the employee is non-ministerial. These considerations include the kinds of

"serious constitutional questions," discussed at the first step of the *Catholic Bishop* analysis, that animated the Third Circuit's applications of constitutional avoidance in *Little* and *Curay-Cramer*. But those concerns do not apply here because, as noted above, this case involves no "pervasive supervision" of Aquinas, *Geary*, 7 F.3d at 328, and there's no need for the Court or any fact-finder to delve into the nuances of Catholic doctrine or the particulars of church governance.

Outside the possible applicability of the ministerial exception, the only burden on Aquinas's religious autonomy in this case stems from Title VII's direct conflict with the school's ability to implement Catholic views on marriage. And that burden is not heavy enough to trigger the church autonomy doctrine. Holding otherwise would effectively give religious employers constitutional carte blanche to discriminate on any basis—not just sex—in the name of religious autonomy, so long as their beliefs require such discrimination. The Court declines to take such a radical step.[6]

Furthermore, such an expansive interpretation of the church autonomy doctrine "would render the ministerial exception superfluous." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1206 (S.D. Ind. 2020). "If Defendants could claim that religious autonomy protects employment decisions regardless of whether the position was religious or secular, it is not clear why the

---

[6] The Court concludes only that the church autonomy doctrine does not apply to the religiously motivated sex discrimination here. Aquinas urges a contrary conclusion, citing a recent Ninth Circuit decision in a non-Title VII case applying the church autonomy doctrine to protect a Christian ministry's hiring preference for co-religionists in non-ministerial roles. ECF 100; *see United Gospel Mission of Yakima Wash. v. Brown*, 162 F.4th 1190 (9th Cir.), *reh'g granted*, 181 F.4th 1331 (9th Cir. 2026) (mem.). That opinion's persuasive force was put in limbo when it was vacated for *en banc* rehearing. But its holding was also explicitly limited to pure religious discrimination; the panel explicitly disclaimed the church autonomy doctrine's applicability to discrimination on any other basis. *Id.* at 1205 ("Unlike with the broader protection of the ministerial exception, a religious organization cannot discriminate on other grounds . . . .").

Supreme Court reaffirmed the ministerial exception's narrow application to only those employees who have responsibilities 'that lie at the very core of the mission of a private religious school.'" *Id.* (quoting *Our Lady of Guadalupe*, 591 U.S. at 754).

In sum, the church autonomy doctrine's applicability in this particular Title VII case is limited to the ministerial exception. Whether the First Amendment's Religion Clauses shield Aquinas Academy from liability for Mr. Ference's firing depends only on the questions of fact underlying the ministerial exception.

## IV. Aquinas Academy's free-speech arguments fail.

The Magistrate Judge found Aquinas Academy's free-speech arguments unpersuasive. ECF 91, at 22–24. The Court agrees, but writes separately to explain its analysis.

"Generally, . . . the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Nor may the government "force an individual to include other ideas with his own speech that he would prefer not to include." *Id.* When the government requires a speaker to "speak as the State demands or face sanctions for expressing her own beliefs," that is "more than enough to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.* at 589. In this context, speech "is not construed literally, or even limited to the use of words"—it also includes certain "nonverbal acts of communication," or "expressive conduct." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002).

The First Amendment also protects "acts of expressive association." *303 Creative*, 600 U.S. at 586. The right to expressive association is the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "The forced inclusion of

an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. But, in contrast to compelled "pure speech," the freedom of expressive association may be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (quoting *Roberts*, 468 U.S. at 623).

For a school with a religious mission, who it chooses to employ as teachers involves both speech and expressive association. When a school charges a teacher with carrying out that mission by inculcating its preferred values, it is the school's ideas and beliefs that the teacher passes to his students. And because such a school engages in expressive activity, its choice of employees no doubt affects its "ability to advocate public or private viewpoints." *Id.* at 650.

The Court addresses both issues as they relate to Mr. Ference's employment. Neither issue merits summary judgment for Aquinas Academy.

**A. Applying Title VII here would not compel speech.**

The Court can quickly dispense with compelled speech because Mr. Ference's marriage status alone does not constitute speech under the First Amendment.

"Conduct is protected by the First Amendment when 'the nature of the activity, combined with the factual context and environment in which it was undertaken,' shows that the 'activity was sufficiently imbued with elements of communication to fall within the First Amendment's scope.'" *Tenafly*, 309 F.3d at 158 (citation modified) (first quoting *Spence v. Washington*, 418 U.S. 405, 409–10 (1974); and then quoting *Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1090 (3d Cir. 1995)). To tell whether conduct is "sufficiently imbued with elements of communication," a court must examine whether the actor subjectively intended to communicate a message

and whether the audience was likely to understand that the conduct was intended to convey a message. *Id.*

Mr. Ference's marriage status is not expressive conduct here. Assuming for the sake of argument that the being in a marriage constitutes "conduct" in the first place, the record contains no evidence that his marriage was "imbued with elements of communication." *Id.* Nothing in the record suggests that Mr. Ference intended to communicate a message via the passive state of being married to his husband.

Aquinas's objection is not to the ideas or beliefs Mr. Ference expressed or intended to express to his students through his teaching activities, or any other kind of speech. The school took issue only with his marriage status. Determining whether that status impermissibly burdens Aquinas's freedom of speech requires an expressive association analysis.

**B. Aquinas Academy's freedom-of-expressive-association defense fails.**

The expressive-association analysis in this case involves balancing the "burden imposed on the school's associational expression" against the government's compelling interest in combatting sex discrimination in the workplace. *Pi Lambda Phi Fraternity v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (citing *Dale*, 530 U.S. at 657–58). But the Court concludes that applying Title VII in Mr. Ference's case would not "significantly affect" Aquinas Academy's ability to advocate its viewpoints. *Dale*, 530 U.S. at 650. For that reason, the burden on the school's expressive freedom does not outweigh the compelling government interest in this case.

The first step in the expressive-association analysis is to establish "whether the group making the claim engaged in expressive association." *Pi Lambda Phi*, 229 F.3d at 442. If it does, the next step is to determine whether the state action would "significantly affect[]" the group's ability to advocate its viewpoints. *Id.* If it would,

then the last step is to "weigh[] the state's interest implicated in its action against the burden imposed on the associational expression to determine if the state interest justified the burden." *Id.*

At the first step, the Court finds that Aquinas Academy's employment of Mr. Ference constitutes expressive association. The school clearly "maintains a system of values and seeks to instill these values in its members—students and employees alike." *Zinski*, 777 F. Supp. 3d at 645 (citing *Dale*, 530 U.S. at 649–50). A religious school that aims to maintain a community in conformity with its religious precepts, like Aquinas Academy, engages in expressive association through its choice of faculty, regardless of whether any given teacher has religious responsibilities.

The second step asks whether the state action "significantly affects" the school's expressive interest. *Dale* is instructive here. In *Dale*, the Supreme Court found that requiring the Scouts to let Dale serve as an Assistant Scoutmaster in his troop was a significant burden on the Scouts' expressive interest because including Dale, as a leader who was "by his own admission . . . open and honest about [his] sexual orientation," would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." 530 U.S. at 653. Likewise, here there is no question that Aquinas Academy's employment of an "open and honest" gay teacher would "send a message" to its students and the world about what kind of conduct it deems legitimate. *Id.*

But in finding a significant burden, the Court relied heavily on the fact that Dale was not just gay, but an avowed "gay rights activist." *Id.* at 653 (also noting that he was "copresident of a gay and lesbian organization" in college). Dale's own actions and publicly expressed ideas inextricably bound his identity to his advocacy relating to his sexuality. The record here, by contrast, indicates that Mr. Ference kept his sexuality private at work. Aquinas only discovered Mr. Ference's marriage

status when he disclosed that he was covered by his husband's insurance on a group insurance waiver form. The record contains no evidence that he ever told anyone at the school about his marriage status aside from that private HR disclosure. Nor does it contain any indication that Mr. Ference intended, or would eventually need, to be "open and honest" about his marriage at work.

In essence, then, all the burden on Aquinas Academy's freedom of expressive association flows from Mr. Ference's marriage status alone. The Court in *Dale* expressly warned against finding a significant burden on such a basis without more. *See id.* ("That is not to say an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."). Until the incidental disclosure on the waiver form, his marriage status was apparently a complete secret at Aquinas; and nothing about the circumstances of that disclosure imply that Mr. Ference would not, or could not, remain discreet about his marriage at work. The Court therefore concludes that applying Title VII to this case would not significantly affect Aquinas Academy's expressive interest, and ends the expressive-association analysis without proceeding to the third step.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Aquinas Academy's motion for summary judgment (ECF 74), overrules Aquinas Academy's objections (ECF 92), and adopts the Report and Recommendation (ECF 91), as qualified by the analysis in this opinion.

DATED this 30th day of September, 2026.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge